Ann E. Prezyna (WA Bar No. 17572)
**ANIMAL & EARTH ADVOCATES, PLLC**
2031 Fairview Ave. E Apt. A
Seattle, WA 98102-3571
(206) 910-0753
ann@animalearthlaw.com
*Attorney for Washington Wildlife First*

Toby Thaler (WA Bar No. 8318)
**LAW OFFICE OF TOBY THALER**
P.O. Box 1188
Seattle, WA 98111-1188
(206) 697-4043
toby@thaler.org
*Local Counsel for Plaintiff Lorna Smith*

**Additional Lead Counsel and Pro Se Party Listed on Signature Page**

**IN THE UNITED STATES DISTRICT COURT**
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WASHINGTON WILDLIFE FIRST, LORNA SMITH, and CLAIRE LOEBS DAVIS,

Plaintiffs,

v.

KELLY SUSEWIND, individually and in his official capacity as director of the Washington Department of Fish and Wildlife, and AMY WINDROPE, individually and in her official capacity as deputy director of the Washington Department of Fish and Wildlife,

Defendants.

Case No. 3:26-cv-05333-TMC

**FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF**

Violations of 42 U.S.C. § 1983
(First Amendment Viewpoint Discrimination and Retaliation)

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS


**I. INTRODUCTION** ..... **1**

II. **PARTIES** ..... **3**

**III. JURISDICTION AND VENUE** ..... **4**

**IV. LEGAL BACKGROUND** ..... **5**

**V. FACTUAL BACKGROUND** ..... **6**

**A. Background on WDFW, Defendants, and Commission** ..... **6**

1. WDFW is Governed by a Nine-Member Volunteer Commission ..... 6

2. Director Leads Large and Complex Department ..... 9

3. Commission Has Broad Authority but Is Structured to Function as Little More Than a Rubber Stamp ..... 10

**B. WDFW Gives Disproportionate Influence to Hunting, Fishing, and Other Consumptive Interests** ..... **12**

**C. New Voices Emerge to Advocate for Wildlife Protection** ..... **14**

1. Davis Seeks to Curb WDFW's Illegal Conduct through Court Action ..... 14

2. Inslee Appointments Prioritize Expertise and Commissioners Representing a Broader Range of Washington Values ..... 16

3. WW1 Forms in 2021 to Reform State Wildlife Governance ..... 17

**D. Spring Bear Hunting Becomes Divisive Issue** ..... **20**

1. Commission Votes in 2021 to Suspend Washington's Spring Bear Hunt Over Susewind's Objections ..... 20

2. Amid Backlash, Commission Reaffirms Spring Bear Vote in 2022 ..... 23

3. Governor Inslee Appoints Experts in Science and Wildlife Law to Fill Empty Commission Seats ..... 24

**E. Smith, Davis, and WW1 Oppose Susewind and Windrope on Numerous Issues** ..... **25**

1. Changes to Bear and Cougar Hunting Seasons ..... 26

2. Susewind's Push to Downlist Endangered Wolves ..... 27




ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

3. Rulemaking to Set Standards for Killing State Endangered Wolves ............... 28

4. Management of Chronic Wasting Disease ..................................................... 29

5. Expansion of Hatchery Production in Violation of SEPA .............................. 29

6. Development of the 2026 Game Management Plan ....................................... 30

7. Violations of SEPA ........................................................................................ 30

8. WDFW's Toxic Workplace Culture ............................................................... 31

9. WDFW's Disregard of Safety Rules that Led to Two Employees' Deaths ..... 32

**F. Susewind and Windrope Join Hunting Rights Activists in Targeting Smith, Davis, and WW1 ........................................................................................ 34**

1. Sportsmen's Alliance, NRA, and Allies Retaliate Against Commissioners Who Voted to Ban Spring Bear Hunting ........................................................ 34

2. Susewind and Windrope Seize Upon Opportunity to Oust Commissioners Who Oppose Their Agendas ........................................................................ 36

3. Defendants Enlist Assistant Attorney General Joe Panesko to Help Oust Commissioners ............................................................................................. 37

4. Susewind Directs Thomas Knoll to Prepare Memo Summarizing Allegations ................................................................................................... 38

**G. Susewind and Windrope Persuade Governor Ferguson to Launch Investigation ............................................................................................... 39**

1. Ferguson Hires Investigator to Pursue Allegations Against Smith and Rowland ........................................................................................................ 39

2. Plaintiffs Learn of Susewind's and Windrope's Retaliatory Campaign and File Suit ...................................................................................................... 41

3. Final Investigative Report Released After Many Delays ................................ 42

4. Governor's Office Scolds Smith and Orders Her to Cease Protected Conduct ........................................................................................................ 45

5. Governor's Office Releases Report Appendix with Previously Privileged Memos .......................................................................................................... 46



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

**VI. DEFENDANTS' RETALIATORY CAMPAIGN .......... 46**

**A. Defendants Displayed Longstanding Animus Toward Plaintiffs on the Basis of Protected Conduct .......... 47**

1. Defendants Resented Davis's Public-Interest Litigation and Advocacy .......... 47

2. Defendants Treated WW1 as a Disfavored Advocacy Organization .......... 48

3. Susewind and Windrope Disliked Smith From the Start Because She Held Dissenting Views, and Sought to Bring New Perspectives to the Commission .......... 50

**B. Inquiry Was Pretext for Retaliatory Action Designed to Chill Opposition .......... 55**

1. Defendants Identified Commissioners to Target Before Inquiry Began .......... 55

2. Defendants Advanced New, Subjective Theories of Wrongful Conduct .......... 56

3. Defendants Curated and Screened Documents to Target Plaintiffs .......... 57

a. *Defendants Began with Documents Requested by a Special Interest Group for the Express Purpose of Ousting the Spring Bear Commissioners .......... 57*

b. *Defendants Zeroed in on Documents Related to Smith and Rowland .......... 58*

c. *Defendants Only Looked Beyond SAF Production to Find Additional Documents to Target Smith, Rowland, Davis, WW1, and "Animal Rights" Groups .......... 59*

d. *Final Investigation Was Based on Conclusory Memos Dictating a Predetermined Outcome .......... 60*

e. *Defendants and Their Agents Deceived Smith, Withheld Information, and Gave Her Conflicted Legal Advice .......... 62*

**C. Defendants Leveled Accusations Directly Attacking Protected Speech, Association and Political Expression** .......... 65

1. Defendants Targeted Plaintiffs Based on the Viewpoints They Expressed .......... 65

2. Defendants Focused on Plaintiffs' Protected Right to Association .......... 67

3. Defendants Sought to Punish and Chill Exercise of the Right to Petition the Government for a Redress of Grievances .......... 69



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

**D. Disparate Treatment Shows Allegations Were Only a Pretext for Targeting Plaintiffs for Protected Conflict** ........ 72

1. Defendants Falsely Alleged Smith's Relationship with Davis and WW1 was Unusual ........ 72

a. *WW1 Talked with Every Commissioner Willing to Listen* ........ *73*

b. *Active Commissioners Met Frequently with Advocates and Stakeholders* ........ *74*

c. *Defendants Have Ignored Clear Favoritism and Close Alignment with Other Special Interest Groups Verging on Genuine Conflicts of Interest* ........ *75*

d. *Consumptive Interests Enjoy Superior Access to WDFW Leadership and Staff* ........ 77

2. Other Commissioners and WDFW Leadership Have Maintained Close Relationships With Parties With Litigation Pending Against WDFW ........ 80

a. *Davis, WW1, and WFC Met With Other Commissioners While They Had Pending Litigation and Rulemaking Petitions* ........ *80*

b. *Susewind and Other Commissioners Maintained Close Relationships with Other Parties With Pending Litigation Against WDFW* ........ *82*

3. Defendants Fail to Articulate Rational Theory of Alleged "Litigation Collusion," While Aiding Litigants Against WDFW in Pursuit of Smith, Davis, and WW1 ........ 83

a. *Defendants Have Targeted Davis's Right to Speak, Associate, and Petition by Threatening Her Profession and Livelihood* ........ *83*

b. *Defendants' Concerns About "Litigation Collusion" and Potential Liability Were Pretextual, as Shown by Their Conduct Creating Significant Liability* ........ *87*

4. Defendants Make Novel Use of Commission Rules to Justify Broad Allegations ........ 90

5. Defendants Equate Questions from Smith and Rowland as "Disrespect," While Looking the Other Way When Other Commissioners Insult and Demean Staff ........ 93

6. Defendants Accuse Smith and Rowland of Evading the PRA, While They Engage in the Same Conduct, Withhold Documents, and Ignore Intentional Deletion of Records ........ 95



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

a. *Defendants Fault Smith for Use of Private Email and Text Accounts Even as They Use the Same Means to Communicate with Other Commissioners* ........ *95*

b. *Defendants Declare Smith "Incompetent" for Speed of PRA Responses, Even as Many Commissioners Struggle and WDFW Drags Requests Out for Years* ........ *97*

7. Defendants Bury Evidence of Potential PRA Violations by Windrope and Other Commissioners, while Putting Smith's Compliance under a "Microscope" ........ 99

8. Defendants Nonsensically Push Claims of OPMA Violations Against Just Two Commissioners ........ 101

9. Defendants Make Unsubstantiated Claims of Fraud Because Smith Worked Too Hard ........ 103

**E. Defendants Intentionally, Knowingly, and Recklessly Incited Dangerous, Anti-Woman Extremists ........ 105**

1. Defendants Intended, Knew or Should have Known That Their Inflammatory Allegations Would Add Fuel to a Potentially Dangerous Situation ........ 105

2. Defendants Leaked, or Caused to be Leaked, Confidential Information Designed to Generate Anger and Heighten Tension ........ 105

3. Defendants Have Inflamed Rage-Filled, Woman-Hating, Heavily Armed Extremists ........ 109

**F. Defendants Intentionally, Knowingly, and Recklessly Inflicted Foreseeable Harm ........ 111**

1. Damages to Plaintiff Lorna Smith ........ 112

2. Damages to Plaintiff Claire Loebs Davis ........ 113

3. Damages to Plaintiff Washington Wildlife First ........ 115

4. Damages and Relief Common to Plaintiffs ........ 116

**FIRST CLAIM FOR RELIEF ........ 117**

**SECOND CLAIM FOR RELIEF ........ 127**

**THIRD CLAIM FOR RELIEF ........ 133**

**PRAYER FOR RELIEF ........ 139**



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

## I. INTRODUCTION

1. This action concerns who may participate in shaping the future of Washington's wildlife policy and whether leadership at the Washington Department of Fish and Wildlife ("WDFW") may use governmental authority to silence the voices advocating for a new approach in the face of the mounting existential threats of climate change, human population growth, habitat loss, and overexploitation.

2. It arises from Defendants' use of state authority and resources to discriminate against Plaintiffs and other advocates who hold the view that WDFW's primary duty is to "protect, preserve [and] perpetuate" the state's fish and wildlife, and from Defendants' retaliatory actions against Plaintiffs for advancing that position through protected speech, expressive association, and petitioning activity.

3. Plaintiff Lorna Smith is a member of the Washington Fish and Wildlife Commission ("Commission"). Plaintiff Washington Wildlife First ("WW1") is a nonprofit organization dedicated to advocating on behalf of wildlife. WW1 has served as a public watchdog over WDFW, advocated for policy changes before the Commission, and pursued public-interest litigation against WDFW. Plaintiff Claire Loebs Davis is WW1's president and executive director and the managing partner of Animal & Earth Advocates, a public-interest law firm that brings litigation on behalf of wildlife and the environment.

4. Plaintiffs have engaged in protected speech, expressive association, and petitioning on matters of public concern, including the protection and management of Washington's fish and wildlife, the scientific basis for agency decisions, environmental compliance, employee safety, public transparency, and the accountability of government officials. Smith has associated with Davis, WW1, other advocacy organizations, scientists, agency employees, and members of the public to exchange information and viewpoints concerning issues before the Commission and matters of public importance. Davis and WW1 have engaged in public advocacy, administrative petitioning, public-interest litigation, and communications with public officials to advance their views on state fish and wildlife policy.

5. Defendants Kelly Susewind and Amy Windrope are, respectively, WDFW's director and deputy director. They exercise authority over WDFW's daily operations, staff, records, agency counsel, and official processes. Defendants opposed Smith's viewpoints and regarded her association with Davis, WW1, and other fish and wildlife advocacy organizations as a threat to their authority and policy agenda. Defendants also resented Davis and WW1 because they publicly criticized Defendants' leadership and policy recommendations, advocated opposing viewpoints, and repeatedly challenged WDFW in court.

6. Beginning in or around early 2025, Defendants directed WDFW staff to search records relating to Smith and two other commissioners; identify communications and evidence of meetings involving Smith, the other two commissioners, Davis, and WW1; and curate a set of documents that suggested Smith and the other two commissioners had engaged in misconduct. Defendants then caused or directed the preparation of memoranda that portrayed Plaintiffs' protected speech, association, advocacy, and petitioning as wrongful "collusion" that created the "appearance" of a conflict of interest.

7. Defendants used those materials to persuade Governor Bob Ferguson to investigate and take action against Smith and one other commissioner who had been the most outspoken in opposing Defendants' policy recommendations and criticizing Defendants' leadership. Defendants shaped the resulting investigation by defining the allegations the investigator would explore, selecting and curating the materials she would review, and presenting her with false and misleading allegations that omitted context and portrayed Plaintiffs' protected speech, association, and petitioning as wrongful conduct.

8. Defendants' conduct was not a neutral enforcement of the laws, rules, and requirements governing Commission conduct. From the beginning, Defendants selectively targeted Smith and her colleague Commissioner Melanie Rowland because of their past speech and association with Davis, WW1, and other wildlife advocates critical of WDFW policies and leadership, while encouraging or overlooking comparable conduct by commissioners, interest groups, and members of the public whose positions aligned with Defendants' policy agenda.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

9. Defendants' actions would chill a person of ordinary firmness from continuing to engage in protected speech, association, and petitioning and, in fact, have chilled Plaintiffs' protected activity. Because of Defendants' actions and the threat of further governmental retaliation, Smith has curtailed her communications, advocacy, participation in Commission activities, and association with individuals and organizations. She has suffered reputational harm, emotional distress, and impairment of her ability to perform her duties as a commissioner. WW1 has suffered concrete organizational injury, including diversion of resources, impairment of advocacy activities, reputational harm, impairment of fundraising, and damage to its relationships with policymakers, donors, and supporters. Davis has suffered threats of bar discipline, damage to her professional reputation, impairment of her ability to practice effectively, damage to her professional standing, and interference with the relationships necessary for her to function as an effective advocate.

10. Defendants acted under color of state law and intentionally, recklessly, or with callous indifference to Plaintiffs' federally protected rights. Plaintiffs seek damages against Defendants in their individual capacities and declaratory and narrowly tailored prospective injunctive relief against Defendants in their official capacities to prevent continuing violations of the First Amendment.

11. This case is about more than the direction of Washington's fish and wildlife management or the perennial tension between wildlife protection and exploitation. Smith, Davis, and WW1 bring this action to challenge the creep of authoritarianism into Washington's agencies, prevent the spread of governmental retaliation that chills free speech, and protect their fundamental First Amendment freedoms to speak on matters of public concern, associate with others to exchange information and advance shared policy goals, and petition their government for changes in policy.

## II. PARTIES

12. Plaintiff Washington Wildlife First is a 501(c)(3) nonprofit organization incorporated in the State of Washington with its principal place of business in King County,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Washington. WW1 is dedicated to using the power of the law, informed advocacy, and strategic partnerships to transform Washington's relationship with its fish and wildlife from an approach centered around consumptive use to a more democratic paradigm that values science, recognizes the intrinsic value of individual animals, and prioritizes protecting, preserving, and perpetuating wild lives and healthy ecosystems.

13. Plaintiff Claire Loebs Davis is a resident of King County, Washington. Davis is a founder of WW1, has served as the president of its board of directors since its inception, and has served as its executive director at various times, including the present. She is also an attorney and the managing partner of Animal & Earth Advocates, PLLC.

14. Plaintiff Lorna Smith is a resident of Jefferson County, Washington. Smith is a commissioner on the Commission. WW1, Davis, and Smith are referred to collectively as "Plaintiffs."

15. Defendant Kelly Susewind is the director of WDFW. Susewind is sued both individually and in his official capacity.

16. Defendant Amy Windrope is the deputy director of WDFW. Windrope is sued both individually and in her official capacity.

## III. JURISDICTION AND VENUE

17. This is an action for injunctive and declaratory relief and damages pursuant to 42 U.S.C. § 1983, based on Defendants' ongoing violations of rights secured to Plaintiffs by the First Amendment to the U.S. Constitution.

18. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983. The Court also has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

19. This Court has venue pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claims herein occurred in this district.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

## IV. LEGAL BACKGROUND

20. Under 42 U.S.C. § 1983, a plaintiff may seek relief against a person who, acting under color of state law, deprives the plaintiff of rights secured by the Constitution or laws of the United States.

21. The First Amendment protects freedom of speech, assembly, and petition. It also protects the freedom to associate with others for the common advancement of political beliefs and ideas. U.S. CONST. AMEND. I; *Kusper v. Pontikes,* 414 U.S. 51, 56–57 (1973).

22. Speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values." *Dodge v. Evergreen Sch. Dist. #114,* 56 F.4th 767, 782 (9th Cir. 2022) (citation modified). The First Amendment protects "uninhibited, robust, and wide-open" debate on public issues. *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964). That protection applies with particular force to persons serving in legislative or quasi-legislative capacities, who "have an obligation to take positions on controversial political questions." *Bond v. Floyd,* 385 U.S. 116, 136 (1966).

23. The right to petition includes the right to bring administrative petitions and public-interest lawsuits against the government. *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972). Joining with others to pursue public-interest litigation is also protected political expression and association. *NAACP v. Button,* 371 U.S. 415, 430, 452–53 (1963) (Douglas, J., concurring).

24. The First Amendment prohibits the government from retaliating against or discriminating against individuals because of their protected speech, association, or political expression. *Hartman v. Moore,* 547 U.S. 250, 256 (2006). The government also may not condition the exercise of one constitutional right on the surrender of another. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972). Government action that chills the exercise of fundamental rights is subject to constitutional scrutiny. *Perry v. Schwarzenegger,* 591 F.3d 1126, 1139 (9th Cir. 2010) (citation modified).



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

25. A First Amendment retaliation claim requires allegations that: (1) the plaintiff engaged in constitutionally protected speech, association, political expression, or petitioning; (2) the defendant took an adverse action that would chill a person of ordinary firmness from continuing to engage in that protected activity; (3) the protected activity was a substantial or motivating factor in the defendant's adverse action; and (4) the plaintiff suffered injury as a result.

26. A First Amendment viewpoint-discrimination claim requires allegations that the government burdened, restricted, or treated the plaintiff's speech, association, petitioning, or other protected activity differently because of the viewpoint expressed or advanced. Viewpoint discrimination occurs when the government targets speech because it disagrees with the speaker's ideas, position, or perspective, or favors comparable speech because it reflects a preferred viewpoint. Such discrimination is presumptively unconstitutional.

27. The same governmental conduct may constitute both retaliation and viewpoint discrimination. Conduct constitutes retaliation when the government takes adverse action because a plaintiff engaged in protected activity. Conduct constitutes viewpoint discrimination when the government targets or burdens that activity because of the viewpoint it expresses or advances. Plaintiffs allege both theories here: Defendants retaliated against Plaintiffs for engaging in protected speech, association, and petitioning, and discriminated against them because their advocacy and associations advanced viewpoints that Defendants opposed.

## V. FACTUAL BACKGROUND

### A. Background on WDFW, Defendants, and Commission

1. <u>WDFW is Governed by a Nine-Member Volunteer Commission</u>

28. The Commission consists of nine volunteer commissioners appointed by the Governor, subject to Senate confirmation, to serve staggered six-year terms. There are few statutory qualifications for commissioners:

- The Commission must consist of three commissioners from the east side of the Cascades, three commissioners from the west side of the Cascades, and three at-large commissioners. RCW 77.04.030.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

- No two commissioners may be from the same county. RCW 77.04.030.
- Commissioners must be registered voters. RCW 77.04.030.
- Commissioners shall have “general knowledge of the habits and distribution of fish and wildlife.” RCW 77.04.040.
- Commissioners may not hold any other state, county, or municipal elective or appointive office. RCW 77.04.040.
- The Governor shall “seek to maintain a balance reflecting all aspects of fish and wildlife,” including appointing commissioners who are recommended by organized groups representing commercial and recreational fishers, hunters, landowners, and environmentalists. RCW 77.04.040.

29. Commissioners sometimes serve for years without Senate confirmation. The Governor may remove appointed state officers for “incompetency, misconduct, or malfeasance.” RCW 43.06.070.

30. Although commissioners are appointed from different regions and may be recommended by various interest groups, they serve the public at large—not the residents of a particular geographic area or members of a particular interest group.

31. The Commission establishes state fish and wildlife policies to “preserve, protect, and perpetuate wildlife, fish, and wildlife and fish habitat.” RCW 77.04.055. It also must “maximize fishing, hunting, and outdoor recreational opportunities compatible with healthy and diverse fish and wildlife populations.” Id.

32. The Commission has one staff member—an executive assistant who serves all nine commissioners.

33. Commissioners receive no salary but may receive a $100 stipend for each day worked on Commission business, including days spent attending official meetings and other days logged in service to the Commission. The stipend is payable for a full day regardless of whether the commissioner works one hour or twelve hours.

34. During the period relevant to this action, the Commission included the following commissioners:


ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

- **Barbara Baker,** of Thurston County, is the former chief clerk of the Washington State House of Representatives. She served as chair until August 15, 2025, when she was replaced as chair by Jim Anderson. Her term expires at the end of 2028.

- **Dr. Tim Ragen,** of Skagit County, is the former executive director of the U.S. Marine Mammal Commission. He served as vice-chair until Governor Ferguson removed him from the Commission in February 2025. Governor Ferguson appointed Victor Garcia to replace Ragen in March 2025. Garcia died in August 2026, leaving the seat vacant.

- **Jim Anderson,** of Pierce County, is the former executive director of the Northwest Indian Fisheries Commission, and an avid hunter and angler. He was reappointed by Governor Ferguson in March 2025 and elected chair on August 15, 2025. His current term expires at the end of 2030.

- **Molly Linville,** of Douglas County, is a cattle rancher. She was removed from the Commission by former Governor Jay Inslee in January 2025 but reappointed by Governor Ferguson in March 2025. Her current term expires at the end of 2030.

- **Plaintiff Lorna Smith, o**f Jefferson County, is a former environmental supervisor for Snohomish County and former director of Western Wildlife Outreach. Her term expires at the end of 2026.

- **Dr. John Lehmkuhl, o**f Chelan County, is a retired U.S. Forest Service research biologist and an avid hunter. He was elected vice-chair on August 15, 2025. His term expires at the end of 2026.

- **Melanie Rowland,** of Okanogan County, is a retired environmental attorney who worked for the National Oceanic and Atmospheric Administration and the National Marine Fisheries Service. Her term expires at the end of 2026. Since Ragen's removal, Defendants have targeted Rowland and Smith in an effort to persuade Governor Ferguson to remove them.

- **Woody Myers,** of Spokane County, is a former WDFW wildlife biologist and an avid hunter. His term expires at the end of 2028.

- **Steve Parker,** of Yakima County, is a retired fisheries biologist with the Yakama Nation. His term expires at the end of 2028.

35. Smith and Rowland are the only current commissioners whose protected speech and association are directly at issue in the retaliatory investigation described below. Defendants sometimes include Ragen in their allegations against Smith and Rowland, but he had departed before Defendants' retaliatory actions began in early 2025.The WDFW computer that Ragen returned upon his departure from the Commission became the source of many of the materials Defendants used to target Smith, Rowland, Davis, and WW1.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

2. <u>Director Leads Large and Complex Department</u>

36. The Commission hires the WDFW director, subject to few statutory requirements. RCW 77.04.055, .080. Like commissioners, the director must have "practical knowledge of the habits and distribution of fish and wildlife" and "general knowledge of the fisheries and wildlife resources and of the commercial and recreational fishing industry in this state," and may not have a financial interest in the fishing industry or a directly related industry.

37. The director "shall supervise the administration and operation of the department and perform the duties prescribed by law and delegated by the commission," including assisting the Commission in fulfilling its mandate. Although the Commission appoints and may remove the director, the director exercises substantial operational authority over WDFW's staff, information, and daily activities.

38. The Commission hired Defendant Susewind on June 16, 2018, and he began serving as director on August 1, 2018.

39. As director, Susewind oversees an agency with more than 2,000 employees and an operating budget of more than $1 billion per biennium. Those employees include managers, law-enforcement officers, biologists, research scientists, land managers, field staff, technicians, and administrative and support personnel located throughout Washington and at WDFW's Olympia headquarters.

40. Susewind operates WDFW with the assistance of Defendant Windrope, his second in command, who is responsible for operational oversight and daily management. Susewind and Windrope also work with WDFW's executive management team ("EMT"), which includes senior policy, finance, legislative, communications, enforcement, program, and regional personnel.

41. As director and deputy director, Susewind and Windrope exercise supervisory authority over WDFW employees and control or influence the policies, practices, personnel, records, agency counsel, and official processes challenged in this action.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

3. Commission Has Broad Authority but Is Structured to Function as Little More Than a Rubber Stamp

42. Under RCW 77.04.055, the Commission has broad authority to establish fish and wildlife policy, adopt related regulations, set policy goals and objectives, review WDFW's performance, establish fishing, hunting, and trapping seasons, and set restrictions on the taking of fish and wildlife. The Commission also has final approval authority over WDFW's legislative budget proposals and certain tribal, interstate, and international agreements.

43. In practice, however, the Commission's limited resources and dependence on WDFW staff make it difficult for the Commission to exercise that authority independently. Nine volunteer commissioners share one staff member, while the director controls a large agency with thousands of employees, extensive technical resources, and responsibility for preparing the information and recommendations presented to the Commission.

44. The Commission's authority extends across WDFW's wildlife, fish, habitat, enforcement, land-management, hatchery, and other programs. WDFW manages more than a million acres of public land, operates more than 80 salmon and steelhead hatcheries, and oversees a large statewide workforce. The scope and complexity of these responsibilities make the Commission highly dependent on the director and WDFW staff for information, briefings, analysis, and administrative support.

45. The Commission's ability to deliberate is further limited by the Open Public Meetings Act ("OPMA"), which requires all Commission "actions" to be taken at publicly noticed meetings where a quorum is present. The Commission generally holds 10 to 12 full Commission meetings each year. Its committees may study issues and make recommendations but may not take final action. Commissioners therefore have limited opportunities to obtain information, develop proposals, and place matters on the Commission's agenda.

46. Although the Commission has an Executive Committee responsible for setting agendas and planning meetings, Susewind, Windrope, and senior staff largely control what information and proposals reach the Commission by managing the rulemaking process, selecting



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

policies for presentation, and planning staff briefings and presentations. Commissioners may request briefings and occasionally propose policies of their own, but those efforts depend heavily on staff access and leadership cooperation.

47. One of the few mechanisms for putting new issues and decisions before the Commission used to be the citizen rulemaking petition process, which allowed citizens to ask the Commission to consider rules on particular issues. However, in August 2024, the Commission voted to delegate citizen rulemaking petitions to the director, effectively consolidating it under the director's management of rulemaking.

48. The director also controls the Commission's access to information. Unless commissioners conduct independent research or consult outside experts, they depend on staff who work for the director. By limiting commissioners' access to staff or controlling the information staff provide, the director can limit the Commission's consideration of alternative policies, contrary evidence, and competing scientific views.

49. During Susewind's tenure, commissioners generally received the most extensive briefings when individual commissioners had enough expertise to know which questions to ask and had independently conducted their own research and/or consulted outside experts. Such efforts were often met with objections from leadership that commissioners did not trust staff or staff science, allegations that they were controlled or misled by outside advocates, or criticism that they were "stepping outside their lane."

50. As a result, the Commission ordinarily defers to the director's recommendations and the information selected by WDFW staff. Commissioners who challenge that pattern disrupt the director's control of the information the Commission receives, the recommendations it considers, and the policies it adopts. Smith's dissent therefore posed a direct challenge to the director's practical control over the agency and the Commission's decision-making process.

51. Although the Commission is the only body empowered to remove the director, it has limited independent access to information about the director's performance. Commissioners depend largely on information the director and his staff choose to provide and lack independent



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

human resources, operational, and investigative support to evaluate employee complaints, workplace dysfunction, safety concerns, or allegations of unlawful or unethical conduct within WDFW.

52. The result is that the Commission's authority to set fish and wildlife policy and supervise the director largely exists only on paper. The director retains substantial practical control over WDFW's staff, information, and daily operations, and the Commission's ability to exercise its authority often depends on the director's cooperation.

53. To the extent the Commission exercises its authority, it may do so only as a body. Individual commissioners possess no authority or power on their own.

54. This dynamic was well understood within WDFW. In May 2022, for example, Commissioners Smith and Baker asked Wildlife Director Eric Gardner to provide an internal WDFW poll showing decreased public support for hunting and increased support for predator populations—information that WDFW leadership had attempted to suppress. Gardner's resulting email to Windrope described the administration's response to commissioners who challenge their traditional passive role: "I'm not sure we can allow this behavior and outwardly facing lack of trust [to] go unchecked."

### B. WDFW Gives Disproportionate Influence to Hunting, Fishing, and Other Consumptive Interests

55. WDFW's statutory mandate requires it to preserve, protect, and perpetuate Washington's fish, wildlife, and habitat for the benefit of the public. RCW 77.04.012. The Commission and WDFW must conserve fish and wildlife in a manner that does not impair the resource and may authorize the taking of fish and wildlife only at times, places, and in manners or quantities that do not impair the supply of those resources. The Commission must also seek to maximize fishing, hunting, and outdoor recreational opportunities consistent with healthy and diverse fish and wildlife populations.

56. Although WDFW's mandate encompasses the interests and values of all Washingtonians, the Department's institutional structure developed during a period when state fish and wildlife agencies were organized primarily around regulating and promoting hunting



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

and fishing. WDFW continues to operate through structures, relationships, and advisory processes that give hunting, fishing, commercial, and other consumptive-use interests disproportionate influence over agency policy.

57. That institutional preference is reflected in WDFW's advisory groups. The Budget Policy Advisory Group ("BPAG") advises WDFW on budget planning, policy proposals, and strategic planning. Of its 26 seats, at least 16 are held by hunters, anglers, or business representatives, most of whom represent hunting, fishing, or other consumptive-use interests, including the Hunters Heritage Council, First Hunt Foundation, Congressional Sportsmen Foundation, Boone & Crockett Club, American Sportfishing Association, and Washington Farm Bureau.

58. The Game Management Advisory Council ("GMAC") advises WDFW and the Commission on the management of wildlife classified as game species. GMAC is composed entirely or almost entirely of hunters and representatives of hunting and trapping organizations, including the Boone and Crockett Club, Backcountry Hunters and Anglers, Washington Trappers Association, Rocky Mountain Elk Foundation, National Wild Turkey Federation, HOWL for Wildlife, Conservation Coalition of Washington, and Washington State Archery Association.

59. WDFW has treated these groups as preferred stakeholders with recurring access to agency leadership, staff, and policy-development processes. GMAC members, for example, were given opportunities to review and comment on portions of WDFW's draft Game Management Plan ("GMP") beginning in spring 2024—more than a year before the draft was released to the public or provided to all members of the Commission. WDFW did not provide environmental or wildlife-advocacy organizations with a comparable opportunity to review the plan during its development.

60. WDFW has also invested substantial resources in programs designed to recruit, retain, and reactivate hunters and anglers, commonly known as "R3" programs. WDFW has not devoted comparable institutional resources to engaging wildlife watchers, conservation



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

advocates, or other members of the public whose primary interest is protecting wildlife and ecosystems rather than killing or harvesting wildlife.

61. This disparity is significant because hunting and fishing represent only a small portion of Washington's population. By 2025, approximately 2% of Washington residents held hunting licenses and an overlapping 8% had fishing license. By contrast, a 2022 survey conducted by WDFW revealed that approximately 71% of Washington residents engaged in wildlife watching.

62. Plaintiffs do not contend that WDFW may not support hunting, fishing, or other consumptive recreational activities. But Plaintiffs allege that WDFW has given those interests influence and access disproportionate to their share of the public, while treating advocates who prioritize the protection and preservation of wildlife as disfavored, suspect, or illegitimate.

63. Defendant Susewind has reinforced this institutional preference. He has described himself as a hunter and stated that hunting "shapes everything" he does as WDFW director. He has supported increased predator hunting, the expansion of hunting opportunities, and other policies favored by hunting-rights organizations. Hunting-rights advocates have publicly praised Susewind for making decisions in favor of the hunting community and have described him as an ally whose leadership was essential to their interests.

64. Susewind and members of WDFW leadership have maintained close relationships with hunting-rights organizations and their representatives. Those relationships have included recurring communications, meetings, participation in WDFW advisory groups, and coordination concerning proposals before the Commission. WDFW leadership has encouraged hunting-rights organizations to mobilize in support of agency recommendations and has treated their advocacy as a legitimate and necessary part of the policy process.

**C. New Voices Emerge to Advocate for Wildlife Protection**

1. <u>Davis Seeks to Curb WDFW's Illegal Conduct through Court Action</u>

65. Since 2017, Davis has filed multiple actions challenging WDFW's conduct, including orders to kill state-endangered wolves, inadequate protection of fish and marine



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

ecosystems from commercial aquaculture operations, violations of the Public Records Act ("PRA"), and failures to comply with the State Environmental Policy Act ("SEPA") and Administrative Procedure Act ("APA"). These actions have exposed WDFW's lack of transparency and failure to follow its own legal requirements and protocols.

66. Davis began engaging with WDFW in 2017, when she was a partner at Lane Powell PC, chair of its pro bono committee, and head of its Animal & Earth practice group. On May 31, 2018, she filed suit challenging WDFW's secretive program allowing hunters to pursue bears with hounds each spring, in violation of the 1996 citizen initiative banning the use of hounds or bait to hunt bears or cougars. Susewind continued to operate this program after he became director on August 1, 2018, despite public exposure and staff protests that the program was illegal. He did not discontinue the program until October 2020, when the Washington Court of Appeals ruled that it was illegal and forced WDFW to shut it down.

67. In 2019, Davis and senior attorney Ann Prezyna left Lane Powell to form Animal & Earth Advocates, PLLC ("AEA"), a firm that brings public-interest actions in state and federal court on behalf of wildlife and the environment. Through AEA, Davis has continued litigating against WDFW, including challenges concerning hatchery policies, carnivore-hunting rules, actions to kill endangered wolves, and WDFW's adoption of the GMP.

68. Davis has filed multiple actions challenging Susewind's and Windrope's orders to kill state-endangered wolves, including Windrope's order to kill one of the two remaining adult wolves in the Sherman wolf pack—an action that would likely have led to the death of the pack's remaining pups and destroyed the pack.

69. In 2021, 2023, and 2025, Davis filed three actions challenging WDFW's failure to comply with SEPA in adopting new hatchery policies, approving a major expansion of hatchery production, and approving construction of a new hatchery facility. One of those cases remains before the trial court, and two are before the Washington Court of Appeals.

70. Most recently, Davis filed an action on behalf of WW1 challenging WDFW's February 13, 2026, adoption of the GMP. The action alleges that WDFW failed to complete the



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

environmental impact statement required by SEPA and violated its public-trust obligations in developing and drafting the plan.

2. Inslee Appointments Prioritize Expertise and Commissioners Representing a Broader Range of Washington Values

71. At the beginning of 2020, seven of the nine commissioners—78%—were hunters, anglers, and/or representatives of commercial interests. The exceptions were Barbara Baker, an Olympia attorney and former chief clerk of the Washington State House of Representatives, and former physician Kim Thorburn, who did not hunt but was an outspoken advocate for hunting rights. At that time, Larry Carpenter, the owner of a fishing-boat dealership, served as Commission chair, and Baker served as vice-chair.

72. On December 30, 2020, Governor Inslee appointed longtime conservationists and wildlife advocates Lorna Smith and Fred Koontz to the Commission. Their appointments reflected Inslee's deliberate effort to broaden the Commission's expertise, perspectives, and representation of Washington values beyond its longstanding concentration on hunting, fishing, and commercial interests. Governor Inslee selected Smith and Koontz *because* of their specialized expertise, longstanding environmental work, and experience advocating for wildlife and habitat protection—not *despite* their viewpoints and associations.

73. Koontz, a resident of King County, holds a Ph.D. in zoology and served as Vice President of Field Conservation at the Woodland Park Zoo until his retirement in 2017. Previously, he worked for the Wildlife Conservation Society and the Wildlife Trust, now known as EcoHealth Alliance. He was appointed to the at-large position previously held by Bob Kehoe, president of the Seattle-based Purse Seine Vessel Owners Association and one of only two commissioners, along with Thorburn, who voted against ending coyote-hunting contests in 2020.

74. Smith filled the western Washington position previously held by longtime commissioner Brad Smith of Bellingham, a dean emeritus at Western Washington University who referred to himself as "Hunter Smith."

75. Smith is a fifth-generation Washingtonian descended from a long line of lighthouse keepers, hunters, fishers, and boaters. Since 1980, five governors have appointed her



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

to environmental commissions and boards. From 1986 to 2007, she served as Snohomish County's supervisor for environmental compliance and public outreach, overseeing 25 biologists, geologists, planners, and outreach staff. She was the county's point person for compliance with the federal Endangered Species Act, the National Environmental Policy Act ("NEPA"), SEPA, and other environmental laws, and led efforts to protect the Snohomish River estuary.

76. After retiring from Snohomish County, Smith spent four years in Costa Rica working on habitat projects and establishing a national park. After returning to Washington in 2012, she served three terms on the Jefferson County Planning Commission and the Jefferson County Conservation Futures Oversight Committee. From 2012 to 2021, she served as Executive Director of Western Wildlife Outreach, working under contract with WDFW, the U.S. Fish and Wildlife Service, and the Woodland Park Zoo to develop educational materials and conduct outreach concerning coexistence with bears, cougars, and wolves.

77. Governor Inslee temporarily left open the eastern Washington seat vacated by Leavenworth resident Dave Graybill, who operated a website, produced YouTube videos, and appeared on radio as the "Fishing Magician."

78. The appointments of Smith and Koontz immediately provoked backlash from hunting groups, including the Hunters Heritage Council, which criticized the new commissioners' lack of ties to hunting, commercial and recreational fishing, agriculture, and ranching. The group claimed that their appointments had thrown the Commission "out of balance." Commissioner Thorburn likewise declared that "[h]unting is under attack in Washington" and published an op-ed characterizing disagreements over hunting methods and seasons as "culture wars."

3. WW1 Forms in 2021 to Reform State Wildlife Governance

79. In 2021, Davis, her law partner Ann Prezyna, and other citizen wildlife advocates formed WW1 to advocate for reform of Washington's wildlife governance. WW1 launched in September 2021 in response to what its founders viewed as WDFW's dysfunction, disregard for science, and prioritization of consumptive interests over the protection of fish, wildlife, and



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

habitat and the values of the broader Washington public. Davis has served as president of WW1's board since its inception. She also served as its executive director from June 2023 until present. Before Davis became executive director, WW1 employed Samantha Bruegger in that role beginning in December 2021.

80. WW1's mission is to transform Washington's approach to fish and wildlife policy into a more democratic paradigm that elevates science, recognizes the intrinsic value of individual animals, and prioritizes protecting, preserving, and perpetuating wild lives and healthy ecosystems. WW1's credibility, relationships, and reputation are central to its ability to carry out that mission.

81. During its first year, WW1 built a coalition of local, state, and national fish and wildlife advocacy groups and individual advocates who supported reform of Washington's wildlife governance (the "WA Wildlife Coalition").

82. From its inception, WW1 committed to sending a representative to every in-person Commission meeting and fulfilled that commitment. WW1 representatives regularly attended committee meetings, full Commission meetings, briefings, public hearings, and public-comment sessions, often remaining after public testimony ended and, at times, serving as the only members of the public present.

83. WW1's sustained attendance and participation gave its representatives organic opportunities to speak with commissioners before, during, and after meetings about pending issues and matters of public concern. WW1 representatives also communicated with commissioners by telephone, email, and other ordinary advocacy channels. These relationships developed through repeated public engagement and advocacy, not through secret arrangements or improper access.

84. WW1 sought to provide commissioners with information and perspectives that would assist them in exercising their statutory responsibilities independently. It therefore researched the issues on which it engaged, consulted scientists and other subject-matter experts, and presented factual and scientific support for its positions.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

85. WW1's Science and Advocacy Director, Dr. Francisco Santiago-Ávila, is a leading national expert in large-carnivore science and policy, human-wildlife coexistence, and conservation ethics. Under his guidance, WW1 monitors scientific developments and WDFW's activities and consults with independent scientists and subject-matter experts in fields including wildlife ecology, population modeling, conservation biology, genetics, animal behavior, animal welfare, ethics, disease ecology, and environmental law.

86. WW1 has engaged with the Commission on matters including carnivore science and management; hatchery, fish, and marine-mammal policy; ungulate disease management; wildlife classifications; protection of sensitive, threatened, and endangered species; hunting and trapping frameworks; agency governance; environmental review; and the Conservation Policy, Best Available Science Policy, State Wildlife Action Plan, and the GMP. WW1 has also submitted comments concerning WDFW's SEPA determinations and researched, drafted, and filed substantive rulemaking petitions concerning cougars, bears, and wolves.

87. WW1 also sought to educate and mobilize members of the public to participate more actively in state fish and wildlife policy. Through public communications concerning WDFW actions and Commission decisions, WW1 encouraged Washingtonians to attend meetings, submit comments, and address the Commission on matters affecting wildlife and habitat.

88. WW1's advocacy and relationships with commissioners therefore arose from its mission and sustained participation in public governmental proceedings. WW1 communicated with commissioners who were willing to listen, sought to provide them with information relevant to pending issues, and engaged in the same forms of public advocacy and stakeholder communication available to other organizations.

89. WW1 encountered opposition from hunting-rights groups soon after its formation. Within weeks of WW1's launch, Commissioner Thorburn contacted hunting advocates, including Dale Magart of the Northeast Washington Wildlife Group, and urged them to mobilize against the organization. In late September or early October 2021, Magart reported that Thorburn



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

had described Davis as "a problem," warned that the Commission's composition was "heavily slanted" and "could get worse," and urged hunters to demand the appointment of licensed hunters to the Commission. Magart also reported that Thorburn falsely claimed that the Conservation Policy developed by Commissioners Baker and Koontz came from WW1 and her characterization of the draft policy as an "'animals have rights' thing."

90. In December 2021, the National Rifle Association's Hunter Leadership Forum published an article describing WW1 as part of a "large scale, multi-year effort led by dark money extremist groups," even though at that time, WW1 had been publicly operating for less than two months.

**D. Spring Bear Hunting Becomes Divisive Issue**

91. The Commission's decision not to continue authorizing a special spring season for black-bear hunting became a pivotal dispute between the Commission and WDFW leadership. It was one of the only times in recent memory that the Commission rejected a recommendation from Director Susewind; it provoked an immediate and sustained backlash from hunting-rights groups; and it concerned a hunt of particular personal importance to Susewind, who had long enjoyed hunting bears in the spring.

1. <u>Commission Votes in 2021 to Suspend Washington's Spring Bear Hunt Over Susewind's Objections</u>

92. WDFW allows nearly all wildlife species a respite from hunting during the spring, when animals recover from winter and raise their young. Before 2021, the principal exceptions were turkeys, cougars, and black bears.

93. Susewind and his Executive Management Team justified the spring bear hunt as necessary for "management" purposes, including reducing bear-human conflicts and damage to tree farms. But as commissioners and wildlife advocates—including Smith, Davis, WW1, and others—pressed for evidence, WDFW leadership failed to substantiate a concrete management need for the hunt. Instead, they relied on uncertain and incomplete population data and offered shifting or inconsistent rationales for the hunt, while withholding or obscuring information from the Commission and the public.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

94. Opponents of the hunt also raised concerns that spring hunting could harm bears and bear populations by increasing hunting pressure and orphaning cubs still dependent on their mothers for survival.

95. Davis, WW1, Smith, and other opponents of the hunt challenged WDFW's representations regarding the hunt, exposed gaps between its claims and the underlying science, and advocated a more precautionary and scientifically grounded approach to the management of Washington's black bears.

96. Prior to 2021, the Commission routinely approved WDFW management's recommendation to authorize a spring bear hunt. In November 2019, it unanimously approved the 2020 spring bear hunt after only one member of the public testified against it.

97. In December 2020, however, a citizen advocate presented evidence that the hunt was disconnected from any demonstrated management need and that WDFW could not justify treating bears differently from other species. More than a dozen people, including Davis, testified against the hunt. Later that month, the Commission approved the 2021 hunt, with only Commissioner Baker dissenting, while expressing confusion about the consequences of its vote.

98. Davis subsequently represented citizen advocates in a suit against WDFW over the 2020 vote, alleging that WDFW had failed to notify the public adequately about the implications of the vote and that Assistant Attorney General Joe Panesko had misinformed the Commission about those consequences. In April 2021, a Thurston County judge upheld the Commission's decision approving the hunt but concluded that WDFW's process had barely satisfied the Administrative Procedure Act, assigning the agency "no better than a C grade."

99. When the hunt came before the Commission again in 2021, WW1 organized opposition and helped bring nearly 100 people to testify against it at the Commission's October 22, 2021, public hearing. On information and belief, this surge of opposition infuriated Susewind, who directed managers to mobilize hunting groups to defend the hunt. Immediately after the hearing, a WDFW game manager texted the head of a hunting group: "[r]egardless of



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

the semantics hunters knew that this hunt was in jeopardy and should have shown up to the hearing."

100. Hunting-rights groups responded that WDFW should have given them special notice and a separate opportunity to counter the "heavy input from the animal rights community." GMAC member Mark Pidgeon complained that "the ball was dropped" because "we as GMAC members were not given an opportunity to give the Commission our input." He concluded: "Shame on [the Commission] for not allowing a GMAC vote! Our voice deserved to be heard."

101. Although hunting groups had received the same notice and opportunity to comment as other members of the public, Susewind postponed the vote and extended the comment period. At a November 15, 2021, special hearing, WDFW staff answered commissioners' questions and conceded that they had no evidence that the spring hunt furthered any concrete management goal, confirming the concerns raised by Davis, WW1, Smith, and other wildlife advocates.

102. The Commission voted on the 2022 spring bear hunt on November 19, 2021. Smith raised ethical and scientific concerns about hunting bears immediately after they emerged from hibernation, pointed to a recent increase in bear mortality following the Commission's 2019 decision to double bag limits in parts of the state, and cited WDFW's warning that population declines might not be detected until bear numbers had already fallen substantially.

103. Susewind responded angrily that commissioners had "tweak[ed]" the facts but declined to identify how, stating that he did not "have time to go through everything [he] heard that [he] disagree[s] with." He urged the Commission to approve the hunt as a "good opportunity option."

104. With one Commission seat vacant, the vote was tied 4–4. Smith, Koontz, Baker, and Carpenter voted against the hunt. Because Commission approval was required, the tie vote prevented the 2022 spring bear season from proceeding.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

105. The vote marked a significant change in the relationship between the Commission and WDFW leadership. Although the Commission was responsible for setting policy, including hunting seasons, it had generally deferred to the director's recommendations. The spring bear vote demonstrated that commissioners were willing to independently research issues, question WDFW's recommendations, consider information from outside advocates and experts, and reject a recommendation from the director. That prospect threatened Susewind's practical control over the Commission and the policy process.

2. Amid Backlash, Commission Reaffirms Spring Bear Vote in 2022

106. The backlash was immediate and fierce. Bear hunters and other hunting-rights activists used letters, blogs, social media, petitions, and podcasts to demand removal of the commissioners who opposed the hunt and to portray the vote as the first step toward ending hunting in Washington.

107. Smith received the most sustained abuse. She was called "emotional," "unfit to serve," "envirowacko," a "PETA grass eater," and "a cancer that will not go away." Social-media comments sought her address and called for her and other opponents of the hunt to be "hung publicly to make an example of corruption." Smith reported these threats to Susewind and WDFW Enforcement Chief Steve Bear. Bear told her that the threats were not sufficiently specific to be actionable but instructed her to "keep [her] head on a swivel" and "operate with a heightened level of awareness."

108. Susewind publicly expressed his opposition to the Commission's decision. At a December 7, 2021, virtual open house, he said the suspension of the hunt was "just a pause" and promised that he and his staff would be "working our butts off…to keep it a pause." At a December 17, 2021, virtual open house, he referred to "dysfunction" within the Commission and discussed whether commissioners should be required to hunt or fish, while acknowledging that some commissioners who did not hunt or fish were "incredible advocates" for those activities.

109. The hostility surrounding the dispute contributed to Commissioner Koontz's resignation on December 13, 2021. In his resignation letter, he stated that the Commission was



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

"stuck in a politicized quagmire" and had "largely lost the ability to have civil public conversations."

110. Following Koontz's resignation, bear hunters petitioned the now seven-member Commission to reinstate the 2022 hunt, calling its suspension an "egregious crime perpetuated upon the sporting community and the fine citizens of Washington State." Pidgeon called the Commission's decision a "travesty of humungous proportions [that] was perpetuated upon the citizens of Washington State."

111. On January 21, 2022, the Commission voted 4–3 to accept a petition to restart rulemaking on the 2022 spring bear hunt. Smith, Baker, and Carpenter opposed reversing the decision made only two months earlier and warned that doing so would undermine the Commission's credibility.

3. <u>Governor Inslee Appoints Experts in Science and Wildlife Law to Fill Empty Commission Seats</u>

112. On January 26, 2022, Governor Inslee appointed three new commissioners with advanced degrees and specialized knowledge concerning wildlife management, species recovery, and wildlife law: Tim Ragen, John Lehmkuhl, and Melanie Rowland. Ragen filled the seat vacated by Carpenter, Lehmkuhl filled the eastern Washington seat left open after Dave Graybill's departure, and Rowland filled the at-large seat previously held by Koontz.

113. The new commissioners immediately confronted the spring bear controversy. On March 11, 2022, the Commission held a special web conference to hear briefing and public comment on management's proposed rule to restart the hunt. More than 50 people testified, including Davis and four other people associated with WW1. On March 19, 2022, the Commission rejected the proposed rule, with Smith, Baker, and all three new commissioners voting against it.

114. Susewind continued pursuing efforts to resume the hunt. On May 4, 2022, WDFW filed notice of its intent to begin rulemaking for a 2023 spring bear hunt. On July 15, 2022, however, the Commission voted 5–4 to direct management not to prepare the proposal and



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

indicated that it would develop a spring bear-hunting policy before considering any future proposal.

115. The Commission held a facilitated workshop on November 18, 2022, concerning the future of spring bear hunting. During a commissioner-only discussion, Susewind delivered an emotional appeal about the personal importance of spring bear hunting. He explained that the first animal he killed was a bear during a spring hunt approximately five decades earlier and that killing a bear in spring, when the snow was melting and the landscape was green, was a special experience that could not be replicated by waiting for the fall season. He told the Commission: "Don't tell me that it's the same thing, and [if] I kill a bear in the fall it's the same as killing a bear in the spring, it's just not."

116. Smith objected that the discussion was supposed to be among the commissioners and facilitators and said that Susewind's personal passion for the issue made her uncomfortable. Susewind responded angrily that Smith's objection was more offensive than his outburst because he was "the lead for the group who has brought these hunts to you for years."

117. On July 15, 2022, the Commission adopted a policy statement banning recreational spring bear hunting. Smith, Ragen, Lehmkuhl, Rowland, and Baker voted in favor. This decision showed the Commission's willingness to reject Susewind's recommendations, rely on information outside the Department's preferred sources, and adopt wildlife policies contrary to the demands of the hunting-rights groups that had historically received favored access and influence.

**E. Smith, Davis, and WW1 Oppose Susewind and Windrope on Numerous Issues**

118. While the spring bear decision was a flashpoint for Susewind, it was just one of the many topics during the past four years over which Smith, Davis, and/or WW1 have clashed with him and Windrope. Since she started as a commissioner in 2021, Smith has disputed recommendations made by Susewind and Windrope, disagreed with their views, endorsed policies that they opposed, resisted their attempts to bury inconvenient science, and demanded



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

that Susewind and Windrope be held accountable for the problems within WDFW, including the chronic safety violations that led to the avoidable deaths of two WDFW employees.

119. In Smith's very first meeting on January 28-30, 2021, she joined Commissioners Baker and Koontz in speaking and voting against the "cougar pursuit season" proposed by management, which authorized hound hunters to use their dogs for the "nonlethal" pursuit of cougars in what many characterized as an attempt to sidestep the voters' 1996 ban on hound hunting. At the following meeting, on February 12, 2021, Smith was the sole voice in opposition to management's recommendation to allow cattle grazing on the public lands WDFW had acquired for the purposes of maintaining wildlife habitat.

120. Both in the courtroom and in public forums, Davis has consistently challenged Susewind's leadership since he began as director in 2018. From the time WW1 began in 2021, Davis and other WW1 representatives have regularly criticized Susewind's and Windrope's policies; rallied members of the WA Wildlife Coalition and the public against their recommendations; highlighted science and facts that they sought to obscure or distort; and sought to hold them accountable for the failings of their administration, including their tragic failure to adhere to safety regulations. Davis and WW1 have exposed agency dishonesty and dysfunction and called for reforms, including Susewind's dismissal.

121. Issues on which Smith, Davis, and/or WW1 have expressed viewpoints disfavored by Susewind and Windrope include the following.

1. <u>Changes to Bear and Cougar Hunting Seasons</u>

122. Shortly after the final spring bear vote in 2022, leadership asked the Commission to approve a reactive proposal to allow hunters to kill more cougars in the Blue Mountains, after the preliminary results from the first year of a WDFW study on the Blue Mountain elk herd showed unusually high fawn mortality due to cougar predation. Two retired WDFW scientists challenged this proposal on the basis that it did not comport with the best available science, including information about how habitat and weather impacted the Blue Mountain elk herd, and studies showing that killing predators was ineffective at boosting ungulate populations. Smith



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

championed this work within the Commission, asking management hard questions about the proposal and persuading some of her colleagues to oppose the recommendation. Nevertheless, on July 15, 2022, the Commission approved management's proposal by a vote of 5-4. In subsequent years, the data on which this proposal relied proved to be an anomaly and additional research confirmed that predation was not a limiting factor for Washington's ungulate herds. Nevertheless, Susewind never recommended that the Commission reverse this decision.

123. In 2023, Davis submitted a rulemaking petition on behalf of WW1 and seven coalition organizations asking for the reversal of rules approved in 2019 and 2020 that increased bear and cougar hunting beyond the levels that WDFW's own scientists said were sustainable. WDFW's leadership conceded it could not dispute the facts and science in the meticulously researched 48-page petition, but Susewind nevertheless urged the Commission to deny it. Smith helped champion the petition, and it was approved by the Commission by a vote of 7-2 in December 2023. Smith pushed back against Susewind's attempts to delay rulemaking under the petition for several months, until the Commission adopted new cougar hunting rules over his objection by a margin of 8-1 on July 19, 2024. The Commission unanimously adopted new bear hunting rules on April 4, 2025.

2. Susewind's Push to Downlist Endangered Wolves

124. Removing protections for gray wolves has been at the top of Susewind's agenda since the start of his tenure. He initiated the process to downlist wolves from "endangered" to "sensitive" on the state endangered species list in 2022, even though wolves had not met the benchmarks for downlisting in the state's Wolf Management and Recovery Plan. Smith, Davis, and WW1 led opposition to Susewind's effort, raising concerns that WDFW's analysis departed from the best available science, relied on deeply flawed population projections, and downplayed ongoing threats to recovery, including significant increases in human-caused mortality, a rise in poaching, geographic underrepresentation, and the fragility of the small, recovering population. These concerns highlighted a broader pattern in which Susewind and his administration advanced policy conclusions that were not well or fully supported by the underlying science.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

After two years of debate, the Commission voted to maintain wolves' endangered status on July 19, 2024.

125. During the 2025 legislative session, state lawmakers proposed HB 1311, a bill that would have reversed the Commission's vote six months earlier to keep wolves as a state endangered species, overridden the listing provisions in the state's wolf recovery plan, and downlisted state wolves to "sensitive" status by legislative fiat. On information and belief, Susewind and his leadership team encouraged the legislation, contributed to its language, and supported it behind the scenes. In public, WDFW signed up with a "neutral" position, but staff gave a presentation at a House committee hearing that was supportive of HB 1311, without presenting the perspective of the commissioners who opposed the measure, or mentioning any of the legal, scientific, or practical concerns they had raised. Worse, Susewind did not inform the Commission about the bill, the upcoming hearing, or how staff intended to testify. Nor did he attempt to coordinate regarding the agency's position or offer to include one of the commissioners who opposed downlisting on WDFW's panel. Susewind thus defied the Commission's statutory authority: The Commission, which sets agency policy, had explicitly weighed in on this topic and decided that WDFW did not support prematurely downlisting wolves. Yet, without notice or consultation, Susewind acted directly contrary to WDFW's official policy position.

3. <u>Rulemaking to Set Standards for Killing State Endangered Wolves</u>

126. Smith supported changes to the rules governing the lethal removal of wolves in response to livestock predations, which were proposed in rulemaking petitions brought in 2020 by the Center for Biological Diversity ("CBD") and in 2023 by WW1, CBD, and a coalition of eight other wildlife advocacy organizations. The petitions raised concerns that WDFW's conflict protocol and lethal removal framework, was not grounded in the best available science and relied on a narrow and contested body of evidence while disregarding extensive scientific literature supporting non-lethal measures and questioning the effectiveness of lethal control. In both cases, the Commission denied the petitions, and in both cases, Governor Inslee granted petitioners'



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

appeals and ordered the Commission to engage in rulemaking. Smith voiced concern over management's efforts to sabotage the rulemaking process in response to the 2020 petition and the Commission voted 5-4 not to adopt a rule in 2022. After Governor Inslee granted the appeal on the second rulemaking petition in January 2024, Smith attempted to advance the rule in the wildlife committee she chaired, but management has nevertheless avoided taking action in response to Governor Inslee's order for more than two years.

4. Management of Chronic Wasting Disease

127. On February 25, 2022, Smith joined with Ragen and Rowland in arguing in favor of a citizen rulemaking petition asking the Commission to outlaw the baiting of deer and elk, to help delay the onset and reduce the spread of Chronic Wasting Disease ("CWD"). Management acknowledged these changes would help protect against CWD but said they were "premature" because WDFW needed time to do "human dimensions work" with hunters who use bait before proposing a ban. Susewind did not take action until nearly a year after CWD was first confirmed in Washington in August 2024 and had begun to spread, at which time he approved emergency rules to ban baiting and feeding deer and elk.

5. Expansion of Hatchery Production in Violation of SEPA

128. Since 2019, Davis and her law firm have represented multiple organizations in their efforts to force Susewind to comply with SEPA's requirement that WDFW assess the potential adverse impacts of major actions that could significantly impact the environment. In particular, she has represented WW1, Wild Fish Conservancy ("WFC"), and The Conservation Angler in successive actions WDFW has taken to expand salmon hatchery production and reduce science-based protections for wild fish without complying with SEPA. In documents the Governor's Office recently released under the PRA, Panesko concedes WDFW did not perform any SEPA analysis before it began to exponentially increase hatchery production in 2018, and that it often operates hatcheries in violation of the ESA. By evading SEPA, WDFW has avoided examination of the impact of its hatchery expansion, ignoring well-established science that shows the potentially devastating impacts that unrestricted hatchery production can have on wild



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

fish genetics, health, predation, and survival. Smith, Ragen, and Rowland were the only commissioners who consistently engaged with these concerns, asking WDFW management and scientists tough questions, urging them to comply with SEPA, and elevating the science that Susewind's administration often ignored or sought to suppress. Smith, Ragen, and Rowland were the only commissioners to speak out against the new hatchery policy management recommended in 2023, and the only votes against approval of that policy on October 27, 2023.

6. Development of the 2026 Game Management Plan

129. Smith was an early and consistent voice raising concerns about WDFW's development of a new GMP, which governs the management of all wildlife species classified as "game." She began expressing these concerns soon after taking office and continued raising them throughout the GMP's development process. She emphasized the need for transparency, scientific integrity, and a coherent, publicly accountable framework, including questioning the legal status of the prior GMP, pushing for a structured approach grounded in best available science, and urging the Commission to address broader public values and concerns beyond traditional hunting interests, particularly ecosystem function and health. Davis and WW1 reinforced and expanded these concerns through detailed public comments and advocacy during the GMP's 60-day public comment process in July-September 2025, challenged the adequacy of WDFW's SEPA review, and highlighted the GMP's failure to meaningfully incorporate scientific evidence, assess environmental impacts, or provide clear decision-making standards. These concerns culminated in WW1 filing litigation in March 2026 to challenge WDFW's violation of SEPA and its failure to develop and draft the GMP in accordance with its Mandate and its responsibilities as a public trustee.

7. Violations of SEPA

130. Commissioner Smith is particularly attuned to the requirements of NEPA and SEPA given her professional background in environmental compliance. Based on this knowledge, she has repeatedly questioned WDFW leadership's chronic failure to comply with SEPA's requirements, including by reaching unsupported determinations of nonsignificance for



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

its 2021 and 2023 hatchery policies and its 2026 GMP. Davis, WW1, and other wildlife advocates regularly, and independently, raise the same concerns through SEPA comments, testimony, and emails to the Commission, including pointing out that WDFW has shown a particular disregard for SEPA under Susewind's tenure. Documents revealed through litigation and in response to PRA requests suggest WDFW's disregard for SEPA is calculated and deliberate. Meanwhile, over the past 15 years, WDFW has entered into at least four consent decrees to settle federal lawsuits for violations of the ESA and NEPA that WFC brought using separate counsel.

8. WDFW's Toxic Workplace Culture

131. Soon after Smith's appointment to the Commission, employee complaints alerted her to issues with WDFW's workplace culture, including bullying and fear of management retaliation against people who dissent or report misconduct.

132. These employee concerns were confirmed by a September 13, 2021, report by the Washington State Auditor: Assessing the Workplace Culture at the Department of Fish and Wildlife ("2021 Auditor's Report"). The auditor found that 11% of WDFW employees reported experiencing retaliatory behavior as a result of reporting unethical or illegal behavior, challenging a supervisor, or even talking to the auditors. Meanwhile, more than two dozen employees interviewed by the auditors described decisions that WDFW had made on hot-button issues based on purely political considerations, ignoring WDFW's own research and expert recommendations, while less than half believed that managers are held accountable when they behave inappropriately. Alarmingly, one in ten WDFW employees reported directly witnessing a WDFW employee or supervisor commit a legal or ethical violation in the past year.

133. The auditor quoted employees who described the agency as a "good ole' boys" club, where only 7% of the employees were people of color and only 33% were women, and the atmosphere was aggressive and discriminatory. More than 20% of WDFW employees reported having been the victim of workplace bullying, including yelling, demeaning comments, or intimidation in the last year, while 30% said they had witnessed it happening to someone else.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Meanwhile, 25% of the employees interviewed reported gender discrimination at the Department. Of the 172 survey respondents who said they experienced aggressive behavior, 20% said they believed gender was a factor.

134. The auditor's report was released just a day after WW1's official launch, and Davis discussed it at length in the organization's first blog. Smith immediately expressed concerns about the report, saying during a public meeting that the agency should view it as a "wake up call," and that she would be monitoring the progress that Susewind and Windrope made in addressing the serious issues the auditor raised.

135. Since that time, employee whistleblowers have regularly contacted Smith, Davis, and others at WW1, describing retaliation they experienced for standing up against unethical orders, disclosing illegal conduct, and detailing instances where employee science was suppressed because it did not align with Susewind's personal agenda. Davis and WW1 have used this information to shape PRA requests, submit comments and testimony, and inform their campaigns, including their petition for Susewind's removal.

9. WDFW's Disregard of Safety Rules that Led to Two Employees' Deaths

136. Over the past decade, the Washington Association of Fish and Wildlife Professionals ("WAFWP"), which represents nearly 1,000 professional employees at WDFW, has been urging WDFW to correct hazardous workplace conditions and provide its employees with adequate safety training. Susewind and Windrope refused to address these concerns, leading to hazardous workplace conditions that have disproportionately impacted women. This failure led to the tragic deaths of two female employees in 2023 and 2024, the hospitalization of several employees, multiple citations from the state Department of Labor and Industries ("L&I") for "willful, serious" violations of workplace safety laws, hundreds of thousands of dollars in fines, and threatened suits for wrongful death.

137. On September 13, 2023, 31-year-old fisheries biologist Erin Peterson became entrapped in Class IV rapids while doing a snorkel survey for WDFW on a remote stretch of river. Peterson fought to keep her head above water for an hour and a half before drowning. She



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

was working alone, without a life jacket, and without the benefit of any agency training on whitewater hazards or swift/cold water survival.

138. Less than four months later, on January 23, 2024, 51-year-old scientific technician Mary Valentine drowned while working on a fish trap in another remote section of river. Valentine was also working alone, without a life jacket, and without the benefit of safety training. Her body was not discovered until the following day.

139. Since these incidents, there have been several near misses, including boat accidents on the Nisqually River in 2024 and 2026 that endangered and injured DFW employees. At least one employee has also been sickened by WDFW's failure to guard against the transmission of zoonotic diseases.

140. In connection with the two employee deaths, the first boat accident, and the zoonotic disease transmission, L&I cited WDFW for two "willful serious" and 21 "serious" violations of state safety regulations and levied fines of nearly $280,000. According to L&I: "A violation is classified as willful when an employer knew or should have known the safety requirements but did not follow them."

141. In investigating these incidents, L&I noted that "safety was [not] a focus of the agency" and "the agency as a whole appears to be nonchalant to hazards their field staff face on a daily basis." WDFW's human resources director told L&I investigators that WDFW usually does not bother to have staff training "until someone dies." L&I was so concerned about WDFW's disregard for safety rules that in 2024, it took the unusual step of issuing a press release calling attention to its willful violations.

142. In March 2025, WAFWP wrote to Governor Ferguson begging him to retain and appoint commissioners who would exercise meaningful supervision over Susewind and force him to take safety seriously. Wrote the union: "Management is failing its employees at the most fundamental level, and our members are literally paying for that failure with their lives."

143. Commissioner Smith has taken the lead on the Commission in advocating on behalf of employee welfare and safety, engaging with WAFWP and concerned employees,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

expressing deep concern over WDFW's failure to provide safe working conditions, and insisting Susewind and Windrope should be held responsible for the deaths that resulted from their failure to respond to the safety concerns raised by the union. In response, Windrope and Susewind downplayed their responsibility for the incidents and assured the Commission and the public that they had addressed the problem, despite ongoing union complaints, subsequent incidents, and additional L&I citations.

### F. Susewind and Windrope Join Hunting Rights Activists in Targeting Smith, Davis, and WW1

#### 1. <u>Sportsmen's Alliance, NRA, and Allies Retaliate Against Commissioners Who Voted to Ban Spring Bear Hunting</u>

144. Following the final vote on spring bear hunting 2022, hunting and guns rights organizations continued to escalate their attacks on Smith and other commissioners who voted to ban spring bear hunting. They aimed the most aggressive, derogatory, and offensive measures at Smith, including sexist, misogynistic, and threatening memes, posts, emails, and public testimony, for example, asking, "Where does she live?" or "When is it commissioner season again? I got 4 tags," calling her a "felon," "piggy," "old hag," c***," "f*****" or just demanding, "Hang her!" (language redactions ours).

145. In January 2023, Washingtonians for Wildlife Conservation ("WWC"), a state-based hunting rights organization announced it was filing suit against WDFW and Governor Inslee to have Smith, Baker, Lehmkuhl, Ragen and Rowland removed from the Commission, contending they had disrupted the balance of the Commission so it no longer favored hunting interests. WWC was headed by Mark Pidgeon, who on information and belief was a friend of Susewind's, and its board featured a long list of hunting rights advocates who interacted regularly with WDFW management, including by service on agency advisory committees. The court dismissed that case for lack of standing on September 15, 2023.

146. On March 6, 2023, the U.S. Sportsmen's Alliance Foundation ("SAF") sued Smith for serving on the Commission while she concurrently served on the Jefferson County Planning Commission—a fact Governor Inslee knew when he appointed her. SAF sought to have



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Smith removed from the Commission for violation of RCW 77.04.040, which forbids the appointment of commissioners who "hold another state, county, or municipal elective or appointive office." SAF promoted this action by selling its members "I sued Lorna" t-shirts and hosting a live auction in which people bid with "I sued Lorna" paddles. SAF ignored the fact that Linville, one of its favored commissioners, concurrently served on both a county planning commission *and* a local school board during the same time period. At the request of Panesko and the Governor's Office, Smith challenged SAF's interpretation of the statute in court, although she ultimately resolved the issue by resigning from the planning commission.

147. On September 11, 2023, SAF sent WDFW a complex, 22-part PRA request, seeking extensive records of communications from each commissioner who opposed the spring bear hunt. On January 27, 2025, SAF sued WDFW for delaying the production of substantive records in response to its public disclosure request. Although the court ruled against SAF in that action, which is now on appeal, the lawsuit had the effect of speeding up WDFW's response. On May 2, 2025, WDFW produced 16,484 records to SAF, and it made a final production of 25,952 records on May 30, 2025 (collectively, "SAF Production").

148. The Commission seats held by Ragen, Anderson, and Linville all expired at the end of 2024. By agreement with Governor-elect Ferguson, Inslee made appointments to fill two of these seats before leaving office, reappointing Ragen and replacing Linville with Ferry County rancher and environmentalist Lynn O'Connor.

149. However, SAF joined forces with other hunting rights groups and hatcheries advocates to pressure Governor Ferguson to make dramatic changes to Commission composition as soon as he was sworn in on January 15, 2025. On information and belief, Susewind and Windrope used their power within the agency to assist with these efforts and were instrumental in persuading the Governor to remove Commissioner Ragen and reappoint Commissioner Linville.

150. On or about February 6, 2025, Governor Ferguson rescinded Inslee's appointments and summarily dismissed Ragen, effective immediately, rather than following



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

custom by allowing him to continue to serve until his position was filled. On April 7, 2025, Ferguson announced that he had reappointed Anderson and Linville and replaced Ragen with Garcia.

151. On May 16, 2025, SAF filed a 25-page petition ("SAF Petition") with Governor Ferguson's office targeting the remaining commissioners who voted to ban the spring bear hunt (Smith, Rowland, Lehmkuhl, and Baker) (collectively, "Spring Bear Commissioners") and asking the governor to remove them from office under RCW 43.06.070, which allows the governor to remove appointed state officers who are not liable to impeachment for "incompetency, misconduct, or malfeasance in office."

152. The SAF Petition drew from the 16,484 records WDFW produced to SAF on May 2, 2025, to manufacture a series of claims that seemed primarily designed to embarrass commissioners while inflaming SAF supporters with sensationalistic language. SAF later separated these claims into small video installments with titles such as "FELONIES!?! Watch!," "'The Fanatical Four' Culture of Corruption," and "DEI in Washington." Many of these video installments were aimed specifically at Smith.

153. On June 27, 2025, SAF sent Ferguson a five-page supplemental petition ("SAF Supplemental Petition") containing allegations against Baker, Lehmkuhl, and Rowland based on documents pulled from WDFW's final production of documents at the end of May.

2. <u>Susewind and Windrope Seize Upon Opportunity to Oust Commissioners Who Oppose Their Agendas</u>

154. As Governor Ferguson assumed office, Defendants Susewind and Windrope seized the opportunity to try to oust Smith, Ragen, and Rowland—the three commissioners who regularly voiced dissenting viewpoints and challenged their hold over the agency. This effort was aided by, and conducted in concert with, SAF's campaign against the Spring Bear Commissioners, including its PRA request, its lawsuit against WDFW for PRA violations, and the SAF Petition.

155. On information and belief, supported by documents obtained through PRA requests, Susewind and Windrope tracked SAF's efforts to oust the Spring Bear Commissioners,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

including reviewing, or asking staff to review, documents gathered for SAF as part of its PRA request to find anything they could use to undermine Smith, Rowland, or Ragen.

156. Following his termination on or about February 6, 2025, former Commissioner Ragen promptly returned his WDFW laptop. Susewind and Windrope immediately directed staff to search Ragen's laptop for documents to use against Smith and Rowland. Defendants commandeered the Commission's administrative assistant—and only supporting staff member—to assist, instructing her to search for communications with Davis and/or WW1 and compile a list of potential meetings between Davis, WFC, and/or WW1 and Smith, Rowland, or Ragen.

157. Susewind and Windrope did not direct any similar search of the documents, communications, or calendars belonging to any of the other commissioners, including even the other Spring Bear Commissioners.

3. Defendants Enlist Assistant Attorney General Joe Panesko to Help Oust Commissioners

158. On or about March 19, 2025, Defendants Susewind and Windrope prepared, or directed staff to prepare, a memorandum "For Review by AGO," outlining potential allegations against Smith, Rowland, and Ragen, along with a few notes about Lehmkuhl and Myers ("AGO Outline"). The outline focuses on what Defendants called the "unprecedented" connections between these commissioners and WW1. On information and belief, Defendants prepared the AGO Outline so that Panesko could draft a brief summarizing these allegations for the Governor's Office.

159. On March 20, 2025, Panesko sent a memorandum, then designated as privileged, to Kristin Beneski, Chief Legal Counsel to Governor Ferguson, analyzing the Governor's legal authority to remove appointees. The Governor's Office publicly released this memorandum in response to Public Records Act requests on September 10, 2026, as described below.

160. On March 25, 2025, Panesko sent Beneski another memorandum, which was also designated as privileged before being publicly released, captioned "Liability Analysis" ("Panesko Memo"). Panesko wrote that the March 25 memorandum "details inappropriate conduct of certain Fish and Wildlife Commissioners, revealed through documents found on the



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

agency laptop turned in by former Commissioner Tim Ragen." He indicated he prepared the March 25 memorandum "with the support of WDFW senior management."

161. On information and belief, Defendants asked Panesko to prepare these materials for the purposes of supporting their campaign to oust Smith and Rowland from their Commission seats.

162. The Panesko Memo levels several allegations against Smith, Rowland, and former Commissioner Ragen, chief among which is that by "regularly meeting with, corresponding with, and implicitly 'partnering' with outside advocacy groups," they engaged in a pattern of "collusive" conduct violating the Commission's Rules of Procedure. It identifies no confidential information that Smith obtained or disclosed or financial or other benefit she received. The conduct it describes as misconduct is the association itself.

163. Panesko closed the memo by telling Beneski that the Governor "needs to be aware of these issues and decide whether they warrant action under the Governor's authority."

164. The Panesko Memo identifies WW1 and WFC as the two primary "outside advocacy groups" with which Smith and Rowland associated, and specifically calls out Davis, accusing her of unethical conduct, and threatening to take action to have her disciplined.

4. <u>Susewind Directs Thomas Knoll to Prepare Memo Summarizing Allegations</u>

165. On May 6, 2025, Susewind provided Thomas Knoll, an attorney whom Susewind employs in WDFW's enforcement division, with two partially filled boxes of documents that Windrope had carefully curated at Susewind's direction to suggest that Smith, Rowland, and Davis had engaged in misconduct ("Knoll Documents").

166. On May 8, 2025, Susewind sent Knoll a formal memo asking him to perform a "records review":

> Per our discussion…. I would like your independent assessment of the materials provided including a written opinion on whether the records indicate inappropriate conduct. For this review inappropriate conduct would include violating applicable laws and/or rules, violating policies (including the Commission's Rules of Procedure), creating a conflict of interest or the appearance of conflict of interest, other behavior that hinders or risks the agency's ability to complete its mission.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

167. On May 16, 2025—the same day SAF filed its Petition—Knoll finalized a memo summarizing Defendants' allegations against Smith, Rowland, Davis, and WW1 ("Knoll Memo").

168. The Knoll Memo quickly zeroes in on Smith and Rowland and their association with Davis and WW1, because the documents Susewind provided were curated to point Knoll in that direction. Regarding that relationship, he asserts that "it appears that the Commissioners may have been colluding with the special interest groups for the purpose of propagating an 'agenda' consistent with the private interest groups' desires."

169. While Smith's relationship with Davis and WW1 is the focus of the Knoll Memo, it also alleges that Smith delayed responses to PRA requests, improperly used a personal email account to conduct Commission business, attempted to violate the OPMA, and requested compensation for time worked that Knoll found to be "unrealistic."

170. Knoll mentions Davis and WW1 throughout the memo and suggests that Davis has violated the Washington State Bar Association's Rules of Professional Conduct by speaking to and emailing commissioners while she had cases pending against WDFW. In conclusion, Knoll suggests that his findings be shared with Governor Ferguson for consideration of actions to be taken against Smith and Rowland.

171. Susewind transmitted the Knoll Memo to Governor Ferguson's office almost immediately. On May 22, 2025, he emailed Governor Ferguson's Chief of Staff Shane Esquibel, attaching the memo and referring to it as "the evaluation we discussed."

### G. Susewind and Windrope Persuade Governor Ferguson to Launch Investigation

#### 1. Ferguson Hires Investigator to Pursue Allegations Against Smith and Rowland

172. On June 20, 2025, the Office of Financial Management ("OFM") signed a contract hiring Chiedza Nziramasanga to conduct an investigation into unnamed commissioners.

173. Nziramasanga is an attorney, licensed private investigator, and the owner and sole proprietor of CN Consulting LLC, dba Transformative Workplace Investigations. She advertises services to help "HR professionals conduct workplace investigations with equity, transparency



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

and accountability." She had worked for Governor Ferguson when he was Washington's Attorney General and launched her investigations firm roughly six months before she was awarded this contract, after leaving a post as a human resources consultant for UW Medicine.

174. Under the original contract, OFM would pay Nziramasanga $40,000 to interview up to 12 people, review documents, and deliver a report to Esquibel by October 7, 2025.

175. Nziramasanga did not start work on the contract immediately. She later wrote in her report that she did not begin her investigation until October 25 due to a "deliberate and reasonable decision by OFM to await the issuance of a memorandum outlining the concerns under review, in order to ensure that the scope of the investigation was clearly defined before interviews began." However, both memorandums "outlining the concerns under review"—the Knoll Memo and the Panesko Memo, had been completed weeks before she was hired.

176. On or about August 5, 2025, Susewind sent Ferguson an official letter requesting investigation into unnamed commissioners. His letter advised Ferguson that "RCW 43.06.070 provides the Governor the authority to 'remove from office any state officer appointed by him or her not liable to impeachment, for incompetency, misconduct, or malfeasance in office.'" It did not acknowledge that Susewind had actually requested this investigation at least as early as March 2025 or that OFM had already hired an investigator for this purpose.

177. To date, neither Susewind nor the Governor's Office have acknowledged that Susewind requested the investigation, encouraging the media to believe that the Governor launched the investigation as the result of SAF's May 16, 2025, Petition and Susewind's August 5, 2025, letter.

178. On August 14, 2025, *Columbia Insight* reported that Susewind had sent Governor Ferguson a letter requesting investigation into Spring Bear Hunt commissioners, and that the Governor's office had thereafter authorized an investigation because "the governor takes concerns from an agency director very seriously."

179. Nziramasanga interviewed Susewind on September 22, 2025, and Windrope on September 23, 2025, although she later wrote that her "formal investigation did not commence



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

until October 2025." Susewind and Windrope are the only people she interviewed before October 7, 2025, the deadline in her first contract for issuing a report to the Governor's office.

180. On December 5, 2025, OFM and Nziramasanga signed a new contract, extending the deadline for her to send the completed report to Esquibel to February 13, 2026, and authorizing payment of an additional $24,000. On information and belief, her contract was amended at least one additional time after December 2025 to authorize payment of additional compensation. OFM has paid Nziramasanga $82,271 for the investigation, in installments in December 2025, March 2026, and May 2026.

181. From September 22, 2025, to February 20, 2026, Nziramasanga reportedly interviewed just eight witnesses as part of her investigation: Susewind, Windrope, and Commissioners Anderson, Baker, Lehmkuhl, Myers, Rowland, and Smith. She interviewed both Susewind and Windrope twice: once before she began the investigation and again on February 20, 2026, after she had spoken to all other witnesses.

182. Nziramasanga interviewed Smith in two sessions on December 18 and 19, 2025, at which time Smith was still unaware of the Knoll Memo, the Knoll Documents, the Panesko Memo, or the fact that Defendants Susewind and Windrope had initiated the investigation into her several months before the existence of the investigation became public.

183. Nziramasanga did not interview any other people or groups who would have had first-hand knowledge of some of the events in question, including Davis, Ragen, WDFW staff, representatives from WW1, WFC, or others referenced in her report.

2. <u>Plaintiffs Learn of Susewind's and Windrope's Retaliatory Campaign and File Suit</u>

184. On January 28, 2026, OFM sent the Knoll Memo to Smith, Ragen, and Rowland, telling them that it had received a PRA request from a reporter that encompassed the memo, and that they had until February 11, 2026, to protest its release. OFM did not notify Davis about the memo or provide her with a copy. Smith, Rowland, and Davis sent separate letters to OFM raising concerns about the content of the memo, but OFM responded that it did not have grounds



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

to withhold it from disclosure and would release it to the *Washington State Standard* at the end of business on February 11, 2026.

185. The *Washington State Standard* published a story about the Knoll Memo on February 13, 2026, but did not make the memo available to the public. SAF later obtained the memo through a PRA request and posted it publicly on March 31, 2026.

186. After receiving the Knoll Memo and learning about the two boxes of documents on which it is based, Smith filed a PRA request for those documents, first with OFM and then with WDFW. On or about February 20, 2026, she traveled to Windrope's office in Olympia to pick up a box that Windrope indicated "likely" contained the same documents that were provided to Knoll. However, Windrope acknowledged that as the box sat in her office over the prior year, some documents may have been added or removed. Windrope denied that WDFW had collected these documents in electronic form and provided Smith with photocopies that contained no metadata to identify who authored, altered, sent, or received the documents, or when they were created and/or transmitted.

187. Plaintiffs filed their first complaint in this action on April 2, 2026.

3. Final Investigative Report Released After Many Delays

188. On April 3, 2026, the *Washington State Standard* reported that, after three delays, it expected Governor Ferguson's office to publicly release Nziramasanga's report by April 13, 2026. Although the public was unaware of it at the time, Nziramasanga submitted her Final Investigation Report to the Governor's office on April 6, 2026 ("Final Report"), four days after Plaintiffs filed this action, and more than nine months after she was retained.

189. On information and belief, the Governor's office provided the Final Report to Defendants Susewind and Windrope for review months before releasing it to the public. Unsatisfied with Nziramasanga's findings that the allegations were "partially substantiated" or "unsubstantiated," Defendants persuaded Governor Ferguson to delay public release of the Final Report while they looked for additional documents to bolster their allegations against Smith and Rowland.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

190. On June 10, 2026, more than two months after Nziramasanga submitted the Final Report to Ferguson's office and Plaintiffs commenced this action, Windrope transmitted additional records to Nziramasanga through WDFW employee Tami Lininger. These additional records targeted Smith and Rowland and were related to their responses to public records requests. Nziramasanga did not interview either Smith or Rowland regarding this additional evidence.

191. On July 10, 2026, Nziramasanga finalized the Addendum to the Final Investigation Report ("Addendum"), setting out a revised finding on the PRA allegation that superseded the corresponding finding in the April 6, 2026, Final Report.

192. On information and belief, Governor Ferguson's office shared the Addendum with Windrope and Susewind prior to its public release.

193. Despite Smith's repeated requests to see a copy of the investigation concerning her *before* it was made public, the Governor's office never provided her with a copy of the Final Report or the Addendum—either before or even *after* its public release.

194. On July 31, 2026, Governor Ferguson's office released the Final Report and Addendum to members of the public who had submitted PRA requests for the investigative report, including Smith's counsel and a WW1 representative. The Governor's Office withheld Appendix A of the report, containing copies of the evidence that Nziramasanga reviewed.

195. The Final Report confirms Susewind was responsible for instigating the investigation, and that he dictated the allegations that it would explore.

196. It addresses five categories of alleged misconduct raised in the AGO Outline, Panesko Memo, and Knoll Memo: (1) failure to comply with the PRA; (2) failure to comply with the OPMA; (3) violations of the e Commission's Rules of Procedure ("Commission Rules"); (4) treatment of staff; and (5) Smith's timekeeping and compensation.

197. The Final Report finds the claim that Smith engaged in improper timekeeping and requests for compensation to be wholly "unsubstantiated," and finds the other four categories of allegations only "substantiated in part." It refuses to substantiate most of Defendants' allegations



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

within each of these four categories, including all of the most serious accusations, rejecting assertions that Smith or other commissioners had engaged in intentional or self-interested wrongdoing, unlawful litigation collusion, or statutory conflicts of interest.

198. The Final Report concludes that that "commissioners did not consistently comply with PRA requirements," noting a few specific examples, but finds no evidence that Smith deliberately evaded the PRA or attempted to conceal records. It also determines that some "commissioners" had inadvertently engaged in "serial meetings" in violation of the OPMA but said the evidence did not indicate that any had done so knowingly. The report found there had been a "significant breakdown in trust" between some commissioners and leadership, most of which arose from Susewind's request for the Governor to investigate those commissioners, and a few examples of tense exchanges between commissioners and staff. It found no evidence of systemic harassment of staff or retaliatory action against the Director.

199. Unfortunately, Nziramasanga bought into Defendants' fundamental assertion that it was somehow wrongful for commissioners to associate with Davis and WW1, finding that doing so "reflect[ed] appearance concerns, institutional risk, and inconsistent compliance with the Commission's own disclosure standards."

200. The remedial measures the Final Report recommended are institutional rather than individual: comprehensive training on the OPMA, PRA, and Commission Rules; operational protocols governing commissioner communications; strengthened records-management infrastructure; and periodic compliance reviews. The Final Report cautioned that any formal corrective action directed at individual commissioners should be determined in consultation with legal counsel and with consideration of the systemic conditions and mitigating factors.

201. Nothing in the Final Report supports the outcome Defendants sought when they delivered the Knoll Memo to the Governor, including the removal of Smith from office for "incompetency, misconduct, or malfeasance" under RCW 43.06.070.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

4. <u>Governor's Office Scolds Smith and Orders Her to Cease Protected Conduct</u>

202. On August 31, 2026, Franklin Plaistowe, Governor Ferguson's chief operations officer, emailed a letter to Smith admonishing Smith for some of the conduct Defendants had alleged ("Plaistowe Letter"). On information and belief, Commissioner Rowland was the only other commissioner to receive a letter from Plaistowe.

203. Plaistowe's letter included objectively false statements, such as his claim that Susewind had provided the Governor's Office with "details outlining concerns of misconduct by members of the Commission" on August 5, 2025, when the documents establish that Susewind had begun sharing his "concerns" in March 2025, and forwarded the Knoll Memo in May 2025.

204. His letter strains the boundaries of the Final Report's findings, accentuating them with adjectives, omitting context, and singling out Smith and Rowland. Although it would take a quorum of at least five commissioners to violate the OPMA, Plaistowe only sent letters to scold Smith and Rowland for allegedly doing so. He noted that Nziramasanga concluded there was "significant breakdown in trust" between Smith and agency leadership but omitted the finding that Susewind's actions had contributed substantially to that strain. He recharacterized the Final Report's determination that claims against Smith for improper compensation claims were unsubstantiated as a finding that her timekeeping had "technically" not violated rules or policy.

205. Plaistowe's comments about Smith's association with Davis, WW1, and WFC were most alarming. He noted that this association "undermined the perception of impartiality and transparency" and wrote that "our Office is concerned about your conduct creating a perception of a conflict of interest." He instructed Smith that, going forward, she must recuse herself from "matters of personal or organizational relationships that can even create an appearance of a conflict of interest." Plaistowe also vaguely warned Smith against "engagement in retaliatory conduct against anyone who participated in the investigation," in language that could be interpreted as forbidding her from proceeding with the instant action against Susewind and Windrope for retaliating against her on the basis of constitutionally protected speech and expression.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

206. Although his letter did not impose any formal sanctions, Plaistowe was clear about what would happen if Smith did not fall into line: "Failure to meet these expectations will result in the removal from your position prior to the time you leave the Commission at the end of your term expiring on December 31, 2026."

207. Plaistowe's letter is the direct and foreseeable result of Defendants' conduct. The allegations it recites are the allegations Defendants supplied or directed their agents to supply through the AGO Outline, the Panesko Memo, and the Knoll Memo. The findings on which it focuses were based largely on these same documents, as well as the supplemental documents that Windrope transmitted to Nziramasanga on June 10, 2026. Defendants set this letter in motion and intended the result that it threatens: removal of Smith for engaging in constitutionally protected speech and association.

5. Governor's Office Releases Report Appendix with Previously Privileged Memos

208. After several delays, the Governor's Office finally released the Appendix to the Final Report on September 10, 2026, in response to PRA requests. It revealed that the Final Report was based on the review of just 76 documents spanning 1,198 pages and provided copies of each of these documents. In addition to revealing the limited amount of evidence provided to Nziramasanga, the Appendix was most notable for containing several previously privileged documents authored by Panesko, including the Panesko Memo.

## VI. DEFENDANTS' RETALIATORY CAMPAIGN

209. Although discovery has not yet begun, and WDFW has resisted compliance with relevant PRA requests for more than a year, Defendants' own actions speak for themselves, displaying classic hallmarks of illegal retaliatory action on the basis of protected speech, association, and political expression, with the malicious intent of inflicting harm. Susewind, Windrope, and their agents:

a) established and acted upon a pattern of animus toward Smith, Davis, and WW1 based on their protected activities and viewpoints;

(b) searched for, selected, and curated records concerning Plaintiffs for the purpose of portraying their protected communications, associations, advocacy, and petitioning as



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

misconduct, and transmitted those materials to Knoll, the Governor's Office, and Nziramasanga in a manner calculated to support Defendants' preferred conclusions;

(c) characterized Plaintiffs' protected speech, association, political expression, petitioning, and public-interest litigation as evidence of wrongdoing;

(d) relied on vague and elastic concepts—including "collusion," "inappropriate conduct," and the "appearance of a conflict"—to imply misconduct without identifying a concrete rule violation, prohibited benefit, or specific harm;

(e) advanced their allegations through selective presentation of evidence, misleading statements, unsupported insinuation, and materially false or misleading characterizations;

(f) applied purported rules and standards selectively, treating Plaintiffs' conduct as improper while permitting or overlooking comparable conduct by commissioners, organizations, and individuals whose viewpoints aligned with Defendants' policy preferences;

(g) coordinated, directly or indirectly, with outside hunting-rights activists and used or disclosed information in ways that amplified attacks on Plaintiffs, strengthened related efforts against them, and foreseeably increased the risk of threats and harassment; and

(h) concealed their role in initiating and shaping the campaign against Plaintiffs, withheld material information from Smith and other affected persons, and provided incomplete or misleading accounts to the Commission, the public, the Governor's Office, and other decisionmakers.

### A. Defendants Displayed Longstanding Animus Toward Plaintiffs on the Basis of Protected Conduct

210. Defendants' conduct was not an isolated response to events in 2025 or 2026. It followed years of hostility toward Plaintiffs because they criticized WDFW leadership, challenged agency policies, petitioned the Commission and other government officials, pursued public-interest litigation, and associated with commissioners and organizations that advanced conservation-oriented viewpoints. That hostility is reflected in Defendants' treatment of Davis, WW1, and Smith, as well as in the memoranda and investigative materials later used to target them.

1. Defendants Resented Davis's Public-Interest Litigation and Advocacy

211. Davis has repeatedly represented WW1 and other wildlife organizations in administrative proceedings and public-interest litigation challenging WDFW's policies and conduct. Her advocacy has addressed, among other matters, wolf-management decisions, bear and cougar hunting, hatchery expansion, environmental review, public-records compliance, and



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

the Game Management Plan. Through that work, Davis publicly criticized WDFW leadership, questioned the scientific and legal basis for agency decisions, and sought judicial and administrative remedies for alleged violations of law.

212. Davis's advocacy constituted protected petitioning and political expression. Defendants nevertheless viewed her litigation, communications with commissioners, and relationships with wildlife organizations as threats to WDFW leadership and its policy agenda. On information and belief, Susewind's hostility toward Davis intensified after litigation and administrative advocacy exposed nonpublic information about WDFW programs, prompted additional scrutiny of agency decisions, and limited Defendants' ability to implement policies without public or judicial review.

213. Susewind, Windrope, and members of WDFW's executive management team repeatedly expressed hostility toward Davis in communications and meetings with staff and others. They portrayed her advocacy as an improper attempt to interfere with agency operations and treated her criticism of WDFW as a personal challenge to Susewind's authority. Defendants' later treatment of Davis's communications with commissioners and representation of her clients as evidence of misconduct was consistent with that longstanding hostility.

2. <u>Defendants Treated WW1 as a Disfavored Advocacy Organization</u>

214. Defendants also displayed hostility toward WW1 starting shortly after its formation in 2021. WW1 publicly criticized WDFW's policies, organized participation in Commission proceedings, submitted administrative petitions and public comments, provided scientific information to commissioners, and pursued litigation concerning agency conduct. Its advocacy frequently presented views that differed from those favored by Defendants and by the hunting, fishing, commercial, and other consumptive-use interests that had regular access to WDFW leadership.

215. Rather than treating WW1 as an ordinary stakeholder, Susewind, Windrope, and members of WDFW's executive management team disparaged WW1 and its representatives to agency staff and commissioners. They dismissed WW1 as an "animal rights" organization,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

portrayed its scientific submissions as unreliable because WW1 advocated for wildlife protection, and warned commissioners and staff not to associate too closely with WW1 or Davis. Defendants' statements conveyed that WW1's representatives were disfavored and that employees and commissioners who communicated with them risked criticism or retaliation.

216. Defendants' disparagement affected how staff and commissioners interacted with WW1. Commissioners increasingly limited their communications with Davis and other WW1 representatives to brief greetings, whispered conversations, or surreptitious gestures at Commission meetings. Staff members who supported Davis or WW1 were afraid to challenge Defendants' characterization of them or to communicate openly with them because of the risk of management retaliation. These facts support the inference that Defendants sought to isolate Davis and WW1, restrict their access to information and decisionmakers, and prevent their views from reaching the Commission.

217. Panesko's treatment of WW1 representatives at Commission meetings further illustrates this disparate treatment. Panesko regularly attended Commission meetings and maintained close relationships with Susewind, Windrope, and members of WDFW's executive management team. On one occasion, Panesko was overheard recounting a hunting trip with WDFW Director of Wildlife Eric Gardner and boasting about the number of deer he had "blown away" that year.

218. On at least two occasions, Panesko blocked representatives of WW1 from obtaining coffee and water at the back of the meeting room, admonishing them that those refreshments were "for commissioners only." At the same meetings, Panesko allowed hunting-rights activists to obtain water, coffee, snacks, and leftover lunch items from the same area. The differential treatment was visible to staff, commissioners, and members of the public and conveyed that WW1 representatives were disfavored because of their organizational affiliation, protected associations, and views concerning fish and wildlife policy.

219. Panesko's conduct was consistent with the broader pattern in which Defendants and their allies treated WW1 and other wildlife advocates as suspect or illegitimate while



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

accommodating hunting- and fishing-aligned advocates. This disparate treatment is relevant to Defendants' viewpoint-based motive. It shows that Defendants objected not simply to contact between commissioners and outside organizations, but to Plaintiffs' views concerning the protection, preservation, and perpetuation of fish, wildlife, and habitat and to the individuals and organizations who advanced those views.

3. Susewind and Windrope Disliked Smith From the Start Because She Held Dissenting Views, and Sought to Bring New Perspectives to the Commission

220. Susewind displayed animus toward Smith soon after her appointment in 2021 because she immediately began to challenge his pronouncements and was instrumental in the Commission's decision to ban recreational spring bear hunting, thereby threatening a pastime that was personally important to him. From the beginning, Smith acted as Governor Inslee had appointed her to act: she advocated for wildlife and contended that WDFW must evolve to meet changing conditions if it was to fulfill its mandate to protect, preserve, and perpetuate fish, wildlife, and habitat for the benefit of all Washingtonians.

221. Susewind's hostility toward Smith increased as she continued to challenge his recommendations concerning protections for wolves; hunting seasons for cougars and bears; elk and deer baiting; development of a new Game Management Plan; hatchery production; the findings of the 2021 Auditor's Report; and WDFW's failure to protect its employees through adequate safety equipment, training, and workplace practices.

222. For years, Susewind, Windrope, and other members of WDFW's Executive Management Team ("EMT") went out of their way to denigrate, belittle, and ridicule Smith when speaking to agency staff, members of the public, and others. They did so during weekly program meetings, Windrope's weekly "coffee chats," employee-recognition events, and other gatherings at which staff were present. They often attacked Smith together with Commissioner Melanie Rowland and, to a lesser extent, former Commissioner Tim Ragen.

223. During these tirades, Susewind, Windrope, and other EMT members mimicked or repeated talking points used by hunting-rights activists. They instructed or encouraged staff to disregard these commissioners—including Ragen, the former scientific director of the U.S.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Marine Mammal Commission—because they allegedly refused to "follow the science," were controlled by outside advocates, or were pursuing a radical "animal rights" agenda. Susewind, Windrope, and other EMT members referred to them as the "anti-hunting commissioners," "special interest commissioners," and "problem commissioners."

224. These statements were not isolated expressions of disagreement. They were repeated to staff over time and were intended, or were reasonably likely, to shape how employees viewed and interacted with Smith, Rowland, and Ragen. By portraying dissenting commissioners as illegitimate, disloyal, or controlled by outside interests, Defendants discouraged staff from communicating with them, sharing information with them, or treating them as members of the body responsible for overseeing WDFW. Commissioner Myers later acknowledged during his interview with Nziramasanga that these statements and related conduct had "contributed to distrust and institutional friction."

225. Susewind and Windrope also made their animosity toward Smith clear in direct interactions. Although their relationships with Smith were often respectful and cordial on the surface, that façade sometimes broke when Susewind or Windrope became angry. On those occasions, they berated Smith during meetings and denigrated her in emails.

226. Panesko admitted he shared Susewind's animus toward Smith and other commissioners. In the Panesko Memo, he wrote: "For numerous reasons which I will not take time to document herein, I and WDFW senior management have had concerns about conduct of certain Fish and Wildlife Commissioners over the past four years. I never pursued action previously because I never had any concrete evidence proving conduct that 'crossed the line.'"

227. Panesko's statement confirms that he and WDFW senior management had been monitoring the conduct of certain commissioners and looking for a basis to pursue official action against them for years.

228. The subsequent search of Ragen's computer, preparation of the AGO Outline, creation of the Panesko and Knoll Memos, and referral of allegations to the Governor's Office



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

were the mechanism Defendants used to convert that longstanding hostility into official action against Plaintiffs.

229. Susewind, Windrope, and other EMT members deliberately isolated Smith, Rowland, and Ragen from WDFW staff. They enforced "no contact" rules against those commissioners while allowing commissioners who supported their policy agenda substantially greater access to agency personnel. Leadership prohibited employees from speaking directly with Smith, Rowland, and Ragen without prior authorization and threatened retaliation against employees who did so.

230. This isolation prevented potential whistleblowers from bringing complaints to commissioners who were willing to listen. It also allowed Susewind and Windrope to control the narrative about the "problem commissioners." As a result, much of what staff heard about Smith, Rowland, and Ragen came from leadership's assertions that they ignored science, disrespected staff, or caused the Commission to be "dysfunctional." Staff members who supported Smith, Ragen, and Rowland were afraid to challenge that narrative or communicate openly with them because of the risk of management retaliation.

231. Susewind and Windrope also enlisted staff and other commissioners to keep them "looped in" about Smith's work, including Baker and the Commission's administrative assistant. The SAF Production contains multiple examples of individuals informing Windrope about Smith's plans to hold hearings, bring motions, or introduce topics before the Commission, followed by discussions about how to counter, contain, or control her efforts.

232. Baker sometimes assisted in Defendants' efforts to control Smith, but Defendants' conduct also made Baker uncomfortable. Following a "pre-meeting" on May 8, 2023, concerning an executive session about the wolf-downlisting proposal on which Smith was leading the opposition, Baker texted Windrope, Susewind, and Linville:

> In the future, please do not invite me to meetings like the one that happened today. I really don't want to be any part of "managing" the commission. We collectively had an opportunity to give real meaning to all the work we've been doing at least since I've been on the commission— the strategic plan, the draft conservation plan, the work of the WAG and all of the biodiversity



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

> hopes and funding. …I don't like being part of an effort that is antithetical to the outcome I so believe in and thought we all did, especially when there were other completely viable, legal options.

233. Defendants even succeeded in changing Commission rules, customs, and practices in their effort to silence Smith and prevent her from bringing information to the Commission that might undermine their agenda.

234. Before Smith assumed the role of chair of the Commission's wildlife committee, it was longstanding Commission practice—endorsed by both Windrope and Chair Baker—to allow committee chairs broad discretion to determine their agendas, including whether to invite outside speakers, host panels, or receive presentations from members of the public. For example, on October 19, 2021, Windrope and Baker deferred to then-chair Kim Thorburn regarding whether the wildlife committee would hear a presentation from a Klickitat County group concerned about cougar management. Baker explained at the time: "I have staunchly defended the chairs' ultimate authority to set committee agendas."

235. That approach changed after Smith became chair of the wildlife committee in April 2023. In September 2023, Smith planned to host a panel discussion during a public committee meeting concerning carnivore-livestock conflicts (the "2023 Carnivore Seminar"). She invited several scientists and experts to participate, including Washington cougar expert Dr. Mark Elbroch and Dr. Adrian Treves, director of the University of Wisconsin–Madison's Carnivore Coexistence Lab and a nationally recognized expert on wolf-livestock conflict. Dr. Treves has published peer-reviewed research indicating that policies relying on lethal wolf removal following livestock conflicts—such as those implemented by WDFW under Susewind—do not reduce future livestock predation and may in fact exacerbate it.

236. Chair Baker initially approved Smith's plan to host the panel. After learning of the proposed speakers, however, Defendant Susewind reacted angrily, saying "[t]his thing is a major stinker from the start" and characterizing the proposed panel as an improper effort by Davis and WW1 to influence Commission policy. Internal emails show that the point of dissension was simple: leadership feared commissioners would learn information at the seminar



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

that might undermine Commission support for Susewind's wolf policies. At Defendant Susewind's insistence, Baker reversed her position and banned Smith from hosting the panel at a wildlife committee meeting.

237. Because several experts had already agreed to participate, Dr. Treves transitioned the panel into a webinar hosted by the Carnivore Coexistence Lab. He worked with Smith to facilitate commissioner attendance at the event by taking precautions to ensure that it complied with the OPMA: it was publicly advertised, open to the general public, and structured so that audience members—including commissioners—could not see, talk to, or message one another. By making it impossible for commissioners to interact or have discussions, Smith followed guidance set forth in a formal opinion of the Washington Attorney General explaining that members of a governing body may attend a third-party event as long as they do not "meet" to take "action" during the gathering.

238. Nevertheless, on the eve of the webinar, Assistant Attorney General Panesko warned commissioners that if more than four of them attended the webinar—even as off-camera observers who did not speak—it could constitute an OPMA violation. This warning not only contradicted the Attorney General's formal opinion on the topic; it also marked an abrupt departure from WDFW's approach to compliance with the OPMA, both before and since. Staff have routinely suggested that commissioners attend outside meetings and seminars without anyone raising concerns about creating a quorum. Indeed, just two months before the Carnivore Seminar, a senior WDFW staff member sent an email urging all commissioners to attend "educational wolf workshops" put on by another outside wolf expert, which promised to provide "insight to what lay ahead in Washington's wolf management challenges." Because that expert met with Susewind's approval, neither he nor Panesko raised any concern about the number of commissioners attending those workshops or any objection that the participation of more than four commissioners might violate the OPMA.

239. Panesko's warning effectively discouraged commissioners from attending Treves's webinar, with at least two cancelling their plans to attend as a result. Defendants and



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

their agents thus succeeded in blocking the Commission from hearing from Dr. Treves, Dr. Elbroch, and other respected scientists on the panel whose research might call Susewind's policies into question—first by preventing Smith from allowing the scientists to present during a properly noticed, public wildlife committee meeting, and then by warning commissioners against attending a webinar featuring the same speakers on the ground that it was not a properly noticed meeting.

**B. Inquiry Was Pretext for Retaliatory Action Designed to Chill Opposition**

1. <u>Defendants Identified Commissioners to Target Before Inquiry Began</u>

240. Concerns about Smith and Rowland did not arise organically or from an objective inquiry; Susewind and Windrope set out to target them. Defendants were far more focused than their allies in the hunting community. While SAF went after all the Spring Bear Commissioners (Smith, Rowland, Baker, and Lehmkuhl), Defendants zeroed in on Smith and Rowland from the start. The reasoning is clear: Although Lehmkuhl and Baker had defied Susewind on the spring bear hunt, it was clear they did not pose any serious threat to his agenda.

241. A hunter himself, Lehmkuhl had admitted to being shaken by the backlash from his vote against spring bear hunting, especially from hunters whom he had regarded as his friends. He took care not to repeat this mistake. When leadership asked the Commission to increase cougar quotas in the Blue Mountains shortly afterwards, Lehmkuhl said publicly that the science did not support leadership's recommendation. Nevertheless, he voted in favor of this proposal. In emails within the SAF Production, Lehmkuhl admits that he supported the proposal in hopes of mollifying hunters and mitigating the backlash for his vote on spring bear. When hunters nevertheless continued to hound Lehmkuhl on that issue, he publicly expressed both anger and astonishment, indignantly assuring them in his public remarks that he sided with them frequently. These protestations continued in the letter he wrote to Nziramasanga, where he emphasized that his record showed he had "voted to approve every single hunting season proposed by staff, other than spring bear[.]"



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

242. Baker once stood as the sole representative for non-consumptive interests on the Commission and has historically opposed Susewind's recommendations on some issues—especially when she was comfortably in the minority. However, as Baker herself recounted in a frustrated text sent to Windrope on May 10, 2023, she "spend(s) much of [her] political capital protecting Kelly and the agency." Baker has at times shared Susewind's resentment of WW1 and its criticisms of WDFW; backed Susewind on key issues such as hatchery expansion and wolf policy; consistently championed Susewind and Windrope when their leadership has been called into question; and as chair, served as a key ally in their efforts to control the Commission and its agenda. In fact, internal documents show Baker and Windrope often worked together closely to monitor Smith and block her from functioning effectively.

2. Defendants Advanced New, Subjective Theories of Wrongful Conduct

243. In targeting Smith, Davis, and WW1, Defendants avoid specific accusations that could be proven or disproven by objective facts, in favor of vague claims designed to accommodate disparate treatment based on subjective judgments. Not only are most of Defendants' allegations false, misleading, exaggerated, or unsubstantiated, but the vast majority are based on normative "rules" that have never been enforced before; subjective judgments such as whether conduct creates the "appearance" of a conflict of interest; or vague concepts with the flavor of impropriety, such as "collusion," a term that implies wrongful associations and communications, but has no legal meaning.

244. Susewind, Windrope, and their agents employed these concepts to shape their accusations from the beginning of their pretextual inquiry. They used them to assemble and label the Knoll Documents, which Susewind then gave to Knoll with the vague directive to evaluate potential violations of the Commission Rules, any "appearance of a conflict of interest," and "other behavior that hinders or risks the agency's ability to complete its mission." Knoll responded with enthusiasm, leveling multiple charges of "possible collusion," claims of conduct that "appears" to violate the Commission Rules, and even reference to activity that "appears to be suspicious."



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

245. Defendants employ similar language in the AGO Outline, referring to facts as evidence of "colluding," and "coordination" that they asserted created "operational" and "reputation" risks as well as Commission "dysfunction."

246. But it is the Panesko Memo that really brings these concepts together, breaking free of the objective boundaries imposed by existing legal concepts to invent novel theories of wrongdoing, based on subjective judgments and dictionary definitions. Conceding there is no *legal* basis for asserting it was wrongful for Smith, Ragen, and Rowland to associate with Davis and WW1, the Panesko Memo grounds its analysis in three vague "expectations" set by the Commission Rules, which indicate commissioners should: (1) "Represent all citizens of the state (who own the resource), not constituents from a particular area or special interest"; (2) "Not engage in any activity which gives rise to a conflict of interest or appearance of conflict of interest as a Commission member"; and (3) "Refrain from using the meeting to further a personal agenda." The Panesko Memo asserts the "repeated and intentional disregard" of these expectations "would constitute misconduct under the dictionary definition of the term," alleges that the three commissioners' communications meetings with Davis, WW1, and WFC show such a disregard, speculates that these contacts were "intentionally secretive," and concludes that their conduct thus meets the dictionary definition of "collusion."

3. <u>Defendants Curated and Screened Documents to Target Plaintiffs</u>

247. Every step of the way, Defendants' actions demonstrate that their goal was retaliation, not an objective investigation borne of legitimate concerns, starting with their process for assembling documents for their own evaluation, review by Knoll and Panesko, and Nziramasanga's purportedly "independent" investigation.

*a. Defendants Began with Documents Requested by a Special Interest Group for the Express Purpose of Ousting the Spring Bear Commissioners*

248. The Knoll Memo concedes that the documents it discusses were "gathered or developed" pursuant to SAF's PRA request. That request focused solely on the Spring Bear Commissioners, for the express political purpose of finding information it could use to remove the commissioners who opposed spring bear hunting. By using these documents as a starting



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

point, Defendants automatically exempted current commissioners Anderson, Linville, and Parker, and former commissioners Thorburn and McIsaac from scrutiny, based on the litmus test of their position on spring bear hunting. Commissioner Myers was also largely excluded from examination, absent a handful of documents discussing his delays in responding to PRA requests and absences from meetings.

249. Defendants thus began their inquiry by consulting documents related to PRA requests submitted by an outside special interest for the express purpose of removing commissioners who opposed Susewind on the spring bear issue. As Baker wrote Nziramasanga:

> [SAF is] a large, out of state interest group involved here because they disagree with a decision this commission made almost 3 years ago. They set up a litigation team to fight against anything or anyone who would "stifle their way of life." The bad cookies they target in this petition are those who voted against a tiny bear hunt in the spring that was wildly unpopular with the majority of our commenters. And they want us replaced by "fresh, good cookies." Cookies that undoubtedly agree with them. The hypocrisy of this approach is remarkable.

250. While it is not unusual for an outside special interest group to single out commissioners based on their views, Defendants crossed a constitutional line by using state authority and resources to capitalize on this politically motivated campaign.

*b. Defendants Zeroed in on Documents Related to Smith and Rowland*

251. Because Susewind and Windrope were only interested in ousting Smith and Rowland, however, they narrowed the scope of their review even further, largely ignoring documents related to the conduct of Lehmkuhl and Baker except to the extent they were also useful in targeting Smith and Rowland. As discussed further below, this was despite the fact that Defendants could have made nearly all the same allegations against Lehmkuhl and Baker based on documents in the SAF Production. The SAF Petition and Addendum illustrate this point, as they direct individualized attacks at both Lehmkuhl and Baker, and attach numerous documents that they claim support these allegations.

252. But Susewind, Windrope, and their agents elected not to include most of these documents in the collection of materials they provided to Knoll, thus making, in the words of the



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Knoll Memo, the conclusion about where he should focus his review "rather obvious." The Knoll Memo thus ignores Lehmkuhl and Baker entirely, while the Panesko Memo mentions Lehmkuhl only as part of implicating Smith and Rowland in a purported OPMA violation, and Baker only as an ally in pursuing concerns about Smith.

253. The Appendix to the Final Report reveals that Defendants likewise did not provide Nziramasanga with documents specifically related to the conduct of either Baker or Lehmkuhl other than the SAF Petition, Addendum, and attachments. Although the Final Report mentions issues related to Baker and Lehmkuhl, Nziramasanga appears to have sourced these facts from the SAF Petition, Addendum, and attachments; her interviews with Baker and Lehmkuhl; and the documents that Baker and Lehmkuhl themselves submitted to Nziramasanga.

*c. Defendants Only Looked Beyond SAF Production to Find Additional Documents to Target Smith, Rowland, Davis, WW1, and "Animal Rights" Groups*

254. Defendants appear to have looked beyond the SAF Production for three primary purposes: (1) to search for materials connecting Smith and Rowland with outside groups that Defendants disfavored, which they carelessly (and inaccurately) lumped under the category of "animal rights" groups; (2) to try to find documents that they believed might discredit, embarrass, or intimidate Davis and WW1; and (3) to try to locate additional documents they could use to incriminate Smith and Rowland, especially after the Final Report failed to substantiate any of their serious allegations against them.

255. As the Panesko Memo reports, WDFW staff "analyzed" Ragen's laptop and searched his calendar for meetings with "animal rights related groups." Defendants and their agents then compiled these meetings into a variety of lists and charts; (mis)characterized their number, participants, and subject matter in various summaries; and used this work in both the Knoll Memo and the Panesko Memo to cast aspersions on Smith, Rowland, and Ragen on the basis of protected First Amendment associations.

256. Defendants were even more zealous about obtaining documents related to Davis and WW1, revealing their level of obsession with discrediting a private citizen and nonprofit group whose advocacy they resented. Defendants specifically instructed Commission staff to



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

comb through Ragen's calendar to count the number of times that he, Smith, and/or Rowland met with Davis and/or WW1 and to search the email accounts of Ragen, Smith and Rowland for any communications from those sources. When staff encountered any links in those emails, they followed them and attempted to open and download them, even when they connected to private document share sites.

257. Finally, the Panesko Memo reveals that Defendants directed an unprecedented amount of scrutiny at Smith and Rowland, and Smith and Rowland alone, which continued even after the filing of the original complaint in this matter. The memo concedes that WDFW is examining their records "under a microscope" and comparing the records turned in by Smith and Rowland against the records found on Ragen's computer that included them as recipients or senders. On information and belief, which Plaintiffs will seek to confirm during discovery, Susewind and Windrope have never mounted any similar analysis with regard to *any other commissioner*, even when they have known or had good reason to believe that commissioners were deliberately erasing or withholding documents directly responsive to PRA requests.

258. Although Panesko told Beneski that WDFW staff were "still reviewing" these records as of March 25, 2025, however, Defendants were apparently unable to turn up any additional evidence against Smith and Rowland before Nziramasanga finished the Final Report *more than a year later.* On information and belief, Susewind and Windrope reviewed the Final Report months before it was released to the public, and when they discovered that it did not substantiate any of the serious allegations they had leveled against Smith and Rowland, they engaged in yet another search for additional records about Smith and Rowland. This search resulted in Windrope conveying just a handful of additional documents to Nziramasanga on July 7, 2026—more than a year and a half after Defendants launched their initial inquiry.

*d. Final Investigation Was Based on Conclusory Memos Dictating a Predetermined Outcome*

259. The Appendix finally released on September 10, 2026, reveals the absurdity of any claim that Nziramasanga's investigation was "independent." Even though it appears Nziramasanga did her best to retain objectivity within the narrow strictures of her assignment,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

the documents she was provided as the basis of her inquiry consisted predominantly of conclusory memos that directed her toward Defendants' predetermined outcome.

260. On August 14, 2025, Plaistowe contacted Nziramasanga to discuss Susewind's "formal request" and schedule an "initial intake meeting." This intake meeting took place on August 19, 2025, during which Plaistowe referred Nziramasanga to the Knoll memo as the "starting point" for her investigation, while noting that it was "maybe a little conclusory." Plaistowe forwarded the Knoll Memo to Nziramasanga two days later, commenting again that "it can be a good starting point to understand the issues that DFW had flagged." He also sent her a "few documents that we received from an outside organization," which appear to have consisted of the SAF Petition and Addendum.

261. The Appendix reveals these documents were not merely a "starting point" for Nziramasanga; along with the equally "conclusory" Panesko Memo, they formed the central basis for her investigation. Defendants and their agents provided Nziramasanga with only a handful of primary documents from which she could draw her own conclusions, and a tiny fraction of what they provided to Knoll. In fact, most of the primary documents Nziramasanga received were by way of the SAF Petition and Supplemental Petition, which attached redacted versions of the documents around which SAF has based its attacks on Baker, Lehmkuhl, Rowland and Smith.

262. The contrast is striking. In one week, Knoll purportedly reviewed 458 documents comprising 2,091 pages, most of which were primary documents. Over a contract that spanned nearly 13 months, for which she was paid more than $80,000, Nziramasanga purportedly reviewed just 76 documents spanning 1,198 pages, including tangentially related legal briefs and court opinions; a 240-page Excel chart; and numerous memos, letters, petitions, and emails through which Susewind, Knoll, Panesko, and SAF and its affiliates summarized and characterized the facts they wanted her to consider and the conclusions they wished her to reach.

263. Nziramasanga also reviewed letters and documents provided to her by the Spring Bear Commissioners under investigation. However, Smith—and, on information and belief,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Lehmkuhl, Baker, and Rowland—assumed that the documents they provided were merely supplements to a deeper investigation. Under the mistaken impression that Nziramasanga already had access to the basic facts and related underlying documents, they therefore submitted letters that summarized the facts from their perspective and enclosed only a handful of attachments.

264. Nziramasanga did not (or was not allowed to) broaden her investigation to any materials not provided to her. She did not confirm the information in the memos and summaries provided to her by consulting the records Defendants had gathered for Knoll or Susewind, publicly available agency documents, Commission records, or other readily available public information about central events. Nor did she review the publicly available recordings of Commission meetings during which some of the conduct in question took place or engage in independent research that would have resolved conflicting testimony, provided context, and corrected some of her report's most obvious errors.

265. The documents supplied to Nziramasanga for review thus provided little basis for an objective review of the allegations leveled by the Panesko Memo and the Knoll Memo. When Nziramasanga nevertheless concluded that Defendants had failed to substantiate their allegations, they were given plenty of opportunity to try again. Not only did Nziramasanga interview Windrope and Susewind a second time, presumably to allow them to rebut and respond to any contrary information, but on information and belief, the Governor's Office gave them months after Nziramasanga finished her report to find additional evidence to prove their claims.

266. Given the fact that her "independent investigation" was structured to ensure that she would reach predetermined conclusions, Nziramasanga's refusal to validate most of Defendants' allegations is all the more striking. Indeed, it speaks volumes about the lack of substance and credibility of their accusations that Defendants were given every opportunity to prove them, through a process heavily weighted in their favor, but still failed to do so.

*e. Defendants and Their Agents Deceived Smith, Withheld Information, and Gave Her Conflicted Legal Advice*

267. One of the documents included in the Appendix is an email from Susewind to Baker dated June 13, 2025, in which he suggests that they jointly send an email to all the



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

commissioners informing them that "Barbara and I have reviewed a subset of the records that are concerning and shared them with the Governor's office," and offering to make them available to the commissioners for review. Baker responded the same day, asking Susewind to reframe the email so that it did not falsely suggest that she was part of the decision to send the documents to Ferguson, because she did not "want any commissioners to think that I would, as chair, turn them into the governor's office. I see my role differently than that."

268. Baker also asked Susewind to allow her to think about the message over the weekend. On Monday, Baker emailed Susewind that she had concluded that email was unnecessary and she "can't see any value in fueling internal dissension at this point." She wrote that she had spoken with Parker, Anderson, and Myers, who said they were not interested in reviewing the documents, and that "Lorna, Melanie, and John all understand the situation and can ask to review if they'd like."

269. As Susewind and Windrope knew, however, "Lorna" did *not* "understand the situation." Neither Susewind, Windrope, Panesko, nor Baker had informed Smith of the existence of the Investigation Outline, Panesko Memo, Knoll Memo, or Susewind's request to the Governor to dismiss her. In fact, Smith did not know that Susewind had asked for her removal until it was publicly reported on August 14, 2025; she did not see the Knoll Memo until OFM emailed it to her at the end of January 2026; she did not see the Knoll Documents until she filed a PRA request for them in February 2026; and she did not know about the Panesko Memo until the Governor's Office provided it to her attorney on September 10, 2026, in response to a PRA request.

270. Nevertheless, Smith was growing increasingly concerned about whether she was receiving unbiased counsel on how to respond to the allegations made against her by SAF, especially as Susewind's hostility toward her grew more overt and he privately expressed support for the allegations in the SAF petition. She was especially concerned because Panesko was also behaving in a hostile manner toward her, making her uncomfortable about continuing to rely upon him for legal advice on how to respond to the SAF petition.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

271. As a result, Smith arranged a meeting with Chief Deputy Attorney General Laura Watson and Deputy Attorney General Kristen Mitchell on June 12, 2025, informing them of the hostility that Susewind and Panesko had demonstrated toward her, expressing concern about Panesko's ability to fairly represent the interests of both Susewind and the targeted commissioners, and asking Watson to assign her separate counsel. Watson responded that she could not provide Smith with an independent lawyer because it was not a legal matter.

272. Documents released by the Governor's office on September 10, 2026, show that this statement was not true. Several weeks earlier, Panesko had sent the Panesko Memo to the Governor's Chief Legal Counsel, containing a "liability analysis" that it indicated had been prepared "with the support of WDFW senior management." In that memo, Panesko had explicitly raised Smith's conduct as a legal concern, including by asserting that it "highly suggests misconduct and malfeasance, if not outright criminal theft."

273. At the time Panesko wrote that memo, he was acting as legal counsel to WDFW, in a role that included providing legal advice both to Susewind and to the Commission on which Smith sat. Washington Rule of Professional Conduct 1.7 prohibits attorneys from representing two clients with conflicting interests, unless both clients give written informed consent after being informed of the conflict. The rule applies when the clients' interests are "directly adverse" or "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Even though Panesko had been involved in building a legal case against Smith and other pro-wildlife commissioners at least as early as March 2025 and Smith had specifically told his supervisors that she believed he suffered from a conflict of interest, Panesko continued to offer advice to Smith and the rest of the Commission without disclosing his conflict of interest.

274. Smith has continued to be kept in the dark. Before the Governor's Office publicly released the Final Report, she learned that it had been circulated to WDFW leadership and to Anderson. However, Smith was not allowed to see a copy of the report before it was released



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

publicly, despite making repeated requests so she could prepare herself for possible public backlash and potential attendant security concerns.

### C. Defendants Leveled Accusations Directly Attacking Protected Speech, Association and Political Expression

275. Some of the clearest indications that Defendants targeted Smith, Davis, and WW1 on the basis of protected First Amendment activity are the accusations themselves, which are explicitly aimed at free speech, association, and political expression.

1. Defendants Targeted Plaintiffs Based on the Viewpoints They Expressed

276. As a commissioner functioning in a quasi-legislative capacity, where free speech and debate are essential to producing thoughtful outcomes, Smith enjoys the highest level of First Amendment protection for views she expresses in that capacity on subjects of public importance.

277. Defendants' allegations against Smith centered around her views on topics about which she disagreed with Susewind's agenda. Defendants started with the SAF Production that explicitly focused on the spring bear debate and then expanded their scope to search for meetings and communications related to other issues on which Smith had expressed dissent: cougar hunting seasons, wolf protections, hatchery expansion, and WDFW's failure to comply with SEPA. Defendants then highlighted these communications in the AGO Outline and the Panesko Memo prepared based on that outline, as well as in the Knoll Documents and the Knoll Memo prepared based on those documents.

278. Virtually all the allegations Susewind and Windrope raised as evidence of misconduct during their interviews with Nziramasanga related to issues on which Smith challenged their recommendations, disagreed with their views, or sought a result that they opposed—including some instances where the issue had never come to a vote and some issues on which Smith had eventually voted in favor of Susewind's desired result. These issues included the election of Ragen as Commission vice-chair, spring bear hunting, development of the conservation policy, cougar hunting, the 2026 GMP, hatchery funding, and wolf policy.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

279. Internal documents show that Defendants' reasons for targeting Smith went beyond her speech as a commissioner to target her private opinions. For example, early drafts of the Knoll Memo reveal Defendants were also considering going after Smith for a "personal opinion email from her gmail account," in which she expressed views about hunting that differed from Susewind's, as well as private discussions about pending legislation that she had in her role as a private citizen. Other documents highlight comments Smith made in her private capacity, including posts from her private Facebook account, while internal emails suggest Defendants were researching opinions Smith expressed before she even joined the Commission, when she was working as the executive director of Western Wildlife Outreach.

280. Defendants were unequivocal about targeting Davis, WW1, and other groups in the WA Wildlife Coalition based on their protected speech. They identified documents related to groups they deemed to represent the "animal rights" viewpoint, by which they seemed to mean any organizations advocating for the interests of fish or wildlife, as opposed to hunters and anglers. The Panesko Memo and the Knoll Memo count all the meetings that Ragen, Smith, or Rowland purportedly scheduled with these "animal rights related groups." The Panesko Memo points out meetings where Davis is listed as a scheduled attendee that concern topics on which Davis and WW1 dissented from the Susewind administration, including "high-profile, controversial, and litigation-related topics, such as wolves, hatchery practices, and various rulemaking petitions."

281. Perhaps most telling is Defendants' depiction of the views advanced by Davis, WW1, and other animal advocates as somehow subversive, fraudulent, or seditious, such that any attempt to promote these views was wrongful. For example, the Knoll Memo is explicit in claiming that the fact that Smith had private meetings with "animal rights interest groups" suggests that she "may have been colluding" for the nefarious purpose of "propagating an 'agenda' consistent with the private interest groups' desires"—or in other words, speaking with outside groups about viewpoints and ideas that conflicted with *Susewind's* agenda and desires.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

2. Defendants Focused on Plaintiffs' Protected Right to Association

282. Many of Defendants' accusations against Smith are expressly based on her association with Davis, WW1, and other groups sharing views that Defendants label as related to "animal rights," both before she became a commissioner, and after. The plain language of these accusations shows Defendants' intent to retaliate against both Smith and Davis and the basis of this association, and to chill any future associations with WW1, its representatives, and any other organizations that hold similar viewpoints.

283. The Final Report indicates Defendants raised both past and present associations as purported evidence of wrongful behavior, with Windrope describing "Commissioners Smith and Rowland as closely aligned with Washington Wildlife First and Claire Davis [and] noting that Commissioner Smith had spoken at Washington Wildlife First events and that both commissioners had longstanding personal and professional relationships with leadership of that organization."

284. Defendants explicitly directed Commission staff to count the number of times Ragen, Smith, and Rowland had scheduled meetings with Davis, WW1, and affiliated groups and then assembled compilations and charts to highlight these meetings, while ignoring all others. Defendants incorrectly assumed that all these meetings took place and that all potential attendees participated in them—and then used this information to claim the existence of "strong ties to Washington Wildlife First that are unlike any we have seen with NGOs in the past."

285. The Panesko Memo and the Knoll Memo build upon this theme. The Panesko Memo finds it damning that Ragen's calendar included "dozens of private meetings scheduled between multiple commissioners and WFC, WWF, and other animal rights related groups." The Knoll Memo concludes that the number of meetings listed on Ragen's calendar with "animal rights" groups is proof that Smith and Rowland had "colluded" with these "special interest groups." Neither Panesko nor Knoll purported to have any information about what happened at these meetings, and both ignored the many meetings scheduled on the same calendar with individuals and groups holding different points of view.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

286. Defendants zeroed in further on meetings that listed Davis as a scheduled attendee, identifying 20 meetings on Ragen's calendar to which Davis was purportedly invited over a two-year period. The Panesko Memo finds the fact that these meetings might have included Davis "more concerning" than even the meetings with "animal rights related groups," while pointing to the "tenor" of communications with Davis and the fact that Smith "engaged with Davis on this level of familiarity" as evidence they were "colluding."

287. It is telling that during their interviews with Nziramasanga, Susewind and Windrope referenced associations with Davis and/or WW1 as evidence of misconduct in three of the five categories of allegations under investigation. Windrope linked Smith's purported PRA violations to emails, Zoom links and documents that purportedly showed "coordination" with WW1 and WFC. Susewind raised OPMA concerns regarding meetings that just four commissioners purportedly had with representatives of WW1 "both before and after" Commission meetings, inventing a new category of OPMA violation by accusing those commissioners of functioning as a "de facto ad hoc committee operating outside public view." The concerns Susewind and Windrope raised about purported conflicts of interest, the "appearance" of conflicts, and alleged "collusion" all centered around associations with the person and organizations that had been their most outspoken opponents, both in and outside of court: Davis, WW1, and WFC.

288. The Final Report found that the evidence did not "establish unlawful collusion, statutory conflicts of interest, or direct coordination of specific litigation strategy with opposing parties." Nevertheless, it reached a conclusion that reiterated and reinforced Defendants' allegations that centered around protected association, finding that the meetings between commissioners, Davis, and WW1 created "appearance concerns, institutional risk, and inconsistent compliance" with the Commission Rules.

289. The Plaistowe Letter doubles down on this finding, writing that the Governor's Office is concerned that Smith's association with WW1 "undermined the perception of impartiality and transparency" and "our Office is concerned about your conduct creating a



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

perception of a conflict of interest." It also issues a warning conveying that Smith's continued service on the Commission is conditioned upon her surrender of either her right to speak as a Commissioner or her First Amendment right to free association, instructing her that she must recuse herself from "matters of personal or organizational relationships that can even create an appearance of a conflict of interest." Rowland received a similar letter.

290. On information and belief, the Governor's Office has never before issued any similar warning to a commissioner, even when they have had personal interests in the issues before them (such as the desire to take advantage of a hunting or fishing season they were approving), stood to gain financially (such as operating businesses that could profit from commission decisions), or had been consulting for or working closely with commercial special interest groups while using their positions on the Commission to gain policy outcomes beneficial to those interests.

3. <u>Defendants Sought to Punish and Chill Exercise of the Right to Petition the Government for a Redress of Grievances</u>

291. The Supreme Court has repeatedly emphasized that the "core," "heart," and "highest rung" of First Amendment values is the protection of the right to speak and associate with others for the purposes of criticizing the government, advancing political ideas, and influencing public policy. Defendants' actions aimed directly at this "heart" of First Amendment protections.

292. Defendants' allegations reveal that their real motivation for targeting Smith, Davis, and WW1 was to punish them for their past exercise of the right to political expression through speech and association, and to chill any future exercise of that right.

293. From the beginning, Defendants' pretextual inquiry was focused exclusively on instances where Smith and other commissioners had promoted policy positions that conflicted with Susewind's agenda—and especially, on those few occasions where these commissioners had thwarted Susewind's agenda by persuading their colleagues to resist Susewind's recommendations. Defendants' search of documents thus focused on meetings and communications surrounding the Commission's votes to end spring bear hunting, impose



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

restrictions on the number of cougars hunters could kill each year, and reject Susewind's attempt to weaken protections for endangered wolves.

294. The Knoll Memo explicitly aims at protected political expression, focusing on the belief that Smith and other commissioners share the "desires" expressed by "animal rights interest groups" and had been working with them to promote a joint "agenda." Meanwhile, the Panesko Memo asserts that Smith engaged in "collusive" conduct by holding meetings to "strategize the implementation of the advocacy groups' goals and objectives."

295. Defendants and their agents also targeted Davis, WW1, and WFC for participating in public advocacy litigation against the government—an activity that the Supreme Court has explicitly recognized is entitled to enhanced protection under the First Amendment right to petition the government for a redress of grievances. Defendants repeatedly alleged it was wrongful for commissioners to communicate or meet with representatives of WW1 and WFC while they were engaged in active litigation against WDFW, or with Davis while she is the attorney representing active litigants against WDFW.

296. Defendants continually implied that such meetings are evidence of improper collusion to advance private litigation interests, but they did not (nor could they) point to evidence that Davis or the litigants ever requested, or any of the commissioners ever provided, any confidential or privileged information related to active litigation; they did not (nor could they) identify any strategic litigation advantage the litigants gained (or could have gained, given the nature of their APA record review claims) as a result of these communications or meetings; and they did not (nor could they) point to any indication that Davis or the litigants ever provided legal advice to or coordinated legal strategy with, any of the commissioners. Indeed, Defendants and their agents repeatedly conceded that they did not have any evidence that the commissioners ever even discussed active litigation with Davis or the nonprofit litigants—to the contrary, Nziramasanga's interviews and documents in the SAF Production expressly negate such a conclusion.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

297. Defendants' allegations of alleged impropriety were merely a pretext for an unconstitutional attempt to shut down the channels of public advocacy available to Davis and WW1 because they have also chosen to use the courts as another "lawful means to achieve legitimate political ends." *See NAACP*, 371 U.S. at 430.

298. Defendants' allegations make clear their intent to make wildlife nonprofits choose between seeking redress in the courts and advocating for policy changes at the Commission; and to force Davis to recuse herself from her role as a public advocate on behalf of WW1 because she also brings public interest litigation against WDFW in her role as an attorney with Animal and Earth Advocates.

299. For example, several documents drafted by or at the direction of Defendants claim that because Davis and WFC had sued WDFW over its failure to follow SEPA with regard to its hatchery expansion plans and policies, they were precluded from talking to commissioners about the separate policy issue of hatchery funding. In an email provided in response to a public disclosure request, Panesko even goes so far as to assert that it was wrongful for WW1, WFC and others to write a public letter to the Commission about hatchery funding and for Davis and WFC representatives to testify on the subject during open public comment, but that this conduct was "tolerated" because it "could arguably be defended under the constitutional right to petition the government."

300. Indeed, Defendants have asserted through many channels, including the Panesko Memo and their interviews with Nziramasanga, that it was wrongful for Davis and any wildlife advocacy litigants to provide commissioners with publicly available pleadings or other public information related to litigation; to meet privately with commissioners during the pendency of any litigation, *regardless of the topic* discussed; and to advocate to the Commission as a whole in testimony during public meetings. Defendants even attempted to extend this restriction beyond litigants, asserting it was also wrongful for wildlife advocacy groups to meet with commissioners if they had submitted a *rulemaking petition* asking the Commission to consider changing fish or wildlife policy. The individuals and organizations most likely to file rulemaking petitions and



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

lawsuits against WDFW are those at odds with its policies and critical of its conduct. Defendants sought to silence and handicap those critics by forcing them to choose between two constitutionally protected avenues of political expression: They could *either* petition for a redress of grievances from the Commission *or* seek judicial redress from the courts, but not both. Fortunately, the Constitution does not allow the government to force its citizens to abandon one fundamental right in order to secure another.

301. The Final Report found "insufficient evidence to conclude that commissioners shared nonpublic litigation strategy, provided legal advice to litigants, or coordinated specific legal arguments with opposing parties" and no evidence of "financial benefit, quid pro quo arrangements, or personal gain." Nevertheless, it found that the "documented pattern of repeated meetings with litigants and their counsel" created "appearance concerns and institutional risk."

### D. Disparate Treatment Shows Allegations Were Only a Pretext for Targeting Plaintiffs for Protected Conflict

302. Defendants have a pattern of disparate treatment as to every allegation they directed at Smith, Davis, and WW1, rendering the claims they forwarded to Nziramasanga and the Governor's Office false and misleading, and showing them to be a mere pretext for adverse actions based on protected First Amendment conduct. In each instance, Defendants have either encouraged or ignored equivalent (or more egregious) conduct by other commissioners, advocates, and nonprofits, or directly engaged in equivalent (or more egregious) conduct themselves. In most cases, they have done both.

1. <u>Defendants Falsely Alleged Smith's Relationship with Davis and WW1 was Unusual</u>

303. Defendants and their agents claimed that the number of meetings and nature of communications between Smith, Ragen, and Rowland and Davis, WW1 and other "animal rights" groups was "unlike any we have seen with NGOs in the past" with a level of "frequency and coordination" that was "atypical." They took this a step further to claim this association was not only unusual but improper in a number of vague ways, asserting that it created the "appearance of favoritism," raised "serious concerns about impartiality and the representation of all stakeholders"— and, their favorite accusation, that it was evidence of "collusion."



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

304. But Defendants had never before shown any concern about commissioners working too closely or meeting too frequently with outside individuals or advocacy groups. They raised this objection only because certain *types* of commissioners were working with specific *categories* of advocacy groups and particular *kinds* of individuals—characteristics that they defined solely on the basis of the viewpoints held by these commissioners, groups, and individuals.

305. Baker had a front row seat as this new concern evolved and described it frankly to Nziramasanga. The Final Report notes that Baker "acknowledged that Director Susewind believed some commissioners were too closely aligned with organized groups on the conservation side of the political spectrum but stated expressly that such relationships are not illegal and do not necessarily constitute misconduct, noting that every commissioner, including herself, communicates with and receives input from outside organizations and individuals."

*a. WW1 Talked with Every Commissioner Willing to Listen*

306. In singling out Smith and Rowland, Defendants and their agents failed to mention how often WW1 and Davis spoke to or met with *other* commissioners.

307. When it began operations in September 2021, WW1 committed to attending every Commission meeting, and it kept this promise even when it was operating on a shoestring and staffed entirely by volunteers. Since that time, WW1's staff, volunteers, and board members have been ubiquitous at Commission meetings, with at least one representative attending every full, in-person meeting and Commission workshop; typically arriving at the meetings before they begin, and remaining until the bitter end; often coming early to sit on the committee meetings held the day before; and frequently staying at the same hotel as commissioners who had traveled in from of town.

308. Although they were sometimes joined by members of the WA Wildlife Coalition, this often meant that the WW1 representative was the only member of the public present. When WW1 began operations, almost nobody attended Commission meetings (and nobody stayed for entire meetings), and even as controversy grew and attendance increased, most people who



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

attended came only for hearings on hot-button issues or to speak at open public comment, leaving the meeting as soon as those sessions were over. Only WW1 regularly sat through all the briefings, routine transactions, and uneventful votes, meaning its representative was also there to speak to commissioners before meetings began and after they ended, during coffee and restroom breaks, over lunch, and even when commissioners retired to their hotels.

309. Granted, WW1 representatives have not communicated frequently with commissioners who were obviously hostile or who made it clear they were unwilling to listen to WW1's information and perspective. But WW1 used this frequent, close interaction to try to build a relationship with each commissioner who showed an open mind, so that it was natural to call or email them to discuss both upcoming issues and events at meetings just past, or to set up formal meetings to discuss substantive topics.

310. This was not "collusion." WW1 did not obtain inside access to the Commission as the result of some secretive cabal. Its representatives developed relationships with commissioners through hard work, dedication, and consistency—just as any other group could have done by investing a similar level of effort. As Commissioner Lehmkuhl reportedly told Nziramasanga: "Washington Wildlife First requested meetings with him, whereas the Sportsmen's Alliance did not," and he "would have met with hunting groups had they sought contact."

*b. Active Commissioners Met Frequently with Advocates and Stakeholders*

311. Defendants also omit mention of the number of meetings Ragen, Smith, and Rowland had with *other* types of interest groups, even though the records they reviewed showed regular meetings and communications with a variety of people, including hunting rights activists. Indeed, Smith, Rowland, and all had "open door" policies for any person who wanted to discuss fish or wildlife policy—at least until relentless harassment caused Smith to limit her "open door" to people who were willing to be civil.

312. In this respect, Smith and Ragen were not unique. Some past and current commissioners have invested little time in the position, so they have been generally difficult to



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

reach and largely unavailable to meet with anyone. Others have been selective, making time just for those whose views and interests they wish to promote. But the commissioners who are the most active and engaged have generally been willing to meet with anyone who asks.

313. The proof of this regular engagement is found throughout the Final Report: the report indicates that Windrope "acknowledge[ed] that commissioners routinely engage with advocacy groups"; that Commissioner Anderson described such meetings as "normal and appropriate" and noted that he "regularly engages with recreational and commercial fishing groups, hunters, environmental organizations, and animal rights advocates"; that Commissioner Myers acknowledged that he "frequently discusses commission issues outside of formal meetings, not only with other commissioners, but with outside experts and stakeholders whose knowledge he believes will inform his decision-making"; and that Commissioner Lehmkuhl "described meetings with advocacy and interest groups as a routine part of his role as a commissioner[.]"

314. Susewind and Windrope were only able to characterize the relationships that Smith, Rowland, and Ragen had with Davis, WW1, and other "animal rights" organizations as "atypical" and "unusual" because they provided no basis for comparison. Nor could they. On information and belief, Defendants have never counted, tracked, or reviewed the meetings and communications between commissioners and *any other nonprofits or individuals.*

*c. Defendants Have Ignored Clear Favoritism and Close Alignment with Other Special Interest Groups Verging on Genuine Conflicts of Interest*

315. Even though Susewind and Windrope have never attempted to catalogue interactions with outside groups before, they are nevertheless well aware that some commissioners have had ties with other special interests that were far more "atypical," created a much greater "appearance of favoritism," and raised far more serious "concerns about impartiality and the representation of all stakeholders." The difference is that these prior associations have been with interest groups of which Defendants approve.

316. Some commissioners have made no secret of favoring certain groups and prioritizing their interests over those of the rest of the public. Commissioner Linville has



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

defiantly claimed during public Commission meetings that she believes her role is to represent the interests of ranchers and the 2% of the Washington public that still hunts and traps.

317. Former Commissioner Kim Thorburn worked openly with hunting rights groups to solicit their support on pending issues, attack Davis and WW1, and denigrate and attempt to unseat some of her colleagues, including Smith in particular. When the proposed conservation policy was pending before the Commission, for example, Thorburn wrote an open letter to leading hunting rights advocate Mark Pidgeon that was later posted on a hunting forum, urging hunters to write and testify before the Commission, because the "commission needs to hear from constituents other than radical anti-consumptive animal rightests who present the bulk of the public testimony in our meetings these days."

318. Indeed, many commissioners have referenced their concern for the interests of hunters and anglers as the primary motivating factor for the votes and positions they take, sometimes citing to comments from hunting and angling groups as the decisive word on particular subjects. Many commissioners hunt or fish themselves. Recently, one commissioner took to social media to ingratiate himself with hunting groups by bragging about the size and number of animals he had killed, assuring them that "some of us on the Commission DO hunt, fish and have the interests of sportsmen and women in mind" and urging them not to "paint us with the same broad brush as the bad apples." One hunter responded by assuring the commissioner that he wasn't being "lumped in with the troublemakers Smith and Rowland."

319. Some outside interest groups have publicly boasted about having commissioners in their pockets. Ron Garner, president of the Puget Sound Anglers state board, wrote a lengthy screed (later sent to Susewind and Windrope) bragging that he had gotten former Commissioner Don McIsaac appointed and claiming McIsaac had gone on the Commission to accomplish specific goals on behalf of the fishing lobby: eliminating scientific safeguards in place to protect wild fish that had been blamed for constraining hatchery production; passing new hatchery policies that backtracked on WDFW's commitment to hatchery reform; and "get[ting] 50 million additional hatchery Chinook approved for Washington state." Sure enough, McIsaac



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

masterminded strategies to accomplish all three goals before announcing he was leaving the Commission.

320. Several commissioners, including McIsaac, continued to hold other positions while serving on the Commission that created the "appearance" of conflicts if not actual statutory conflicts. While he was commissioner, McIsaac operated a private consulting company that offered to assist commercial fishing interests using his "broad knowledge of the governmental processes that control fishery and conservation decision-making" and to help represent them in a variety of forums, including governmental forums. Former Commission Chair Larry Carpenter operated a fishing boat dealership, which received online customer endorsements and referrals because of Carpenter's votes in favor of fishing interests. Former Commissioner Dave Graybill posted blogs, spoke on radio shows, and promoted products as Washington's "Fishin' Magician." And former Bob Kehoe concurrently served as the president of the Seattle-based Purse Seine Vessel Owners Association, which promoted the commercial interests of the Puget Sound purse seine fleet. Susewind and Windrope were in office during the service of each of these commissioners yet never raised any concerns that any of these economic ties to outside interest groups created either an actual conflict of interest or the "appearance" of one.

*d. Consumptive Interests Enjoy Superior Access to WDFW Leadership and Staff*

321. Susewind and Windrope were not bothered by any of the close alliances or financial ties that Commissioners maintained with consumptive interests because they matched the same historic bias that they worked to maintain within the department as a whole.

322. From 1932 to 1987, the wildlife arm of WDFW was the "Department of Game," and although the name changed nearly 40 years ago, the approach to WDFW's responsibilities has not. To the contrary, although prior administrations made some progress toward elevating the agency's Mandate to "preserve, protect, perpetuate, and manage" fish and wildlife, Susewind's administration has regressed, making it WDFW's top priority to please hunters and anglers—whom he views as the agency's true "stakeholders."



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

323. Examples abound. Susewind's team delayed the implementation of measures that would have slowed the introduction of CWD for years because they did not have approval from the hunting community. WDFW leadership has admitted the dangers that lead ammunition poses to scores of species but refused to do more than engage in a voluntary program to discourage its use. And it has championed the importance of preserving the recreational "opportunity" to continue to kill members of numerous species that are rapidly declining and vulnerable, including those that its own scientists have deemed to be of "greatest conservation need."

324. Indeed, WDFW has institutionalized its bias in favor of hunters and anglers by giving them special access to the agency and its staff through seats on Budget Policy Advisory Group, Game Management Council, Wolf Advisory Group, and dozens of hunting and fishing advisory committees both big and small—many of which WDFW created for the sole purpose of advancing hunting and angling interests.

325. By contrast, WDFW leadership has never knowingly chosen a WW1 employee, board member, or volunteer to sit on any of its advisory committees, although some have been putting in for applications. Last year, Susewind rejected the application of WW1 Science and Advocacy Director Dr. Francisco Santiago-Ávila, a research scientist and leading national expert on carnivores and wildlife ethics, to join WDFW's Wildlife Diversity Advisory Council. Rather than add Santiago-Ávila to a position he was abundantly qualified for, through which he could bring significant value to the agency, Susewind chose instead to leave two seats open.

326. But the relationship between WDFW leadership and hunting and fishing advocates goes far deeper than just these official channels. On information and belief, many hunting rights advocates are close friends and hunting buddies with members of leadership, although WDFW has refused to provide WW1 with documents that would reveal how deeply these relationships run.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

327. For example, on February 9, 2026, WW1 filed a PRA request seeking Susewind's communications with prominent hunting rights organizations and their leaders. To date, WDFW has produced only one installment of records in response, consisting of several screenshots of a text message chain between Susewind and Mike Herz, a representative of HOWL for Wildlife and the American Bear Foundation, and one of the co-founders of the Conservation Coalition of Washington, a state group that works closely with SAF. The text chain shows frequent phone calls and meetings between Susewind and Herz, during which Susewind provides Herz with information and advice on defeating Commission proposals. Herz referred to Susewind as his "buddy" as the two swapped complaints about commissioners and wildlife advocates who prioritize conservation measures or support limits on predator hunting and strategized about how to defeat those measures.

328. On information and belief, Susewind and other members of his leadership team maintained a close relationship and communications with hunting rights advocate Mark Pidgeon, including while Pidgeon was promoting a petition for Smith to be removed, calling her an "incompetent buffoon," and denouncing former Commission Chair Carpenter as a "Judas" for voting against spring bear hunting, proclaiming that he was "full of dung" and "pathetic."

329. Susewind and members of his leadership team regularly coordinated with members of the hunting rights lobby to promote Susewind's agenda with the Commission. Immediately following a 2021 hearing on the spring bear hunt that hunting rights groups failed to attend, Game Division Manager Anis Aoude began frantically texting and calling the leaders of those groups to plead with them to get involved. Susewind followed up with a similar plea the following year while the spring bear controversy continued to rage, making a special visit to the GMAC to urge members to join together to advocate in front of the Commission and talk about "what hunting means to them," because, according to the notes, WDFW needs "hunter advocacy more than ever" and "we" need to "work together, be inclusive, focus on policy, not be as fragmented."



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

<u>Other Commissioners and WDFW Leadership Maintained Close Relationships With Other Parties With Litigation Pending Against WDFW</u>

330. Defendants' allegations of supposed litigation "collusion" were carefully targeted, at Smith and Rowland, ignoring the same or similar conduct by other commissioners and WDFW leadership.

*e. Davis, WW1, and WFC Met With Other Commissioners While They Had Pending Litigation and Rulemaking Petitions*

331. Over the past five years, Davis, WW1, and WFC have met privately with all, or nearly all, serving commissioners, even as they have had litigation pending against the department. WW1 has had active litigation against WDFW almost continually since shortly after it was formed in 2021, while WFC has had at least one case pending against the agency throughout the same period, and Davis has continuously represented nonprofit entities against WDFW in at least one case throughout this time period, and often, more.

332. Yet the main relationship Davis, WW1 and WFC had with the agency during this time period was in their role as advocates, not litigants. Throughout the relevant period, Davis has served as the president of WW1, and sometimes, its executive director, while both WW1 and WFC have engaged extensively in advocacy and education regarding a variety of fish and wildlife issues before the Commission. It is in these advocacy roles that Davis, WW1, and WFC have met numerous times with nearly all commissioners, including during Commission meetings, over meals or coffee, and by web conference or telephone. Although these meetings were never about pending litigation, they often included discussion of issues related to the general subject matter of litigation, such as wolf, carnivore, and hatchery policies.

333. Not only were these meetings not improper; it would have been improper for commissioners to refuse to meet with Davis, WW1, or WFC solely on the basis that they had pending litigation against WDFW. Both public advocacy and public interest litigation are protected by the First Amendment rights to assemble, speak, and petition the government for a redress of grievances. Agents of the government may not lawfully condition the exercise of one



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

right (the right to lobby policymakers on an issue) on the relinquishment of another (the right to seek redress from the courts for governmental misconduct).

334. The Panesko Memo casts the exercise of these rights as misconduct. In fact, Panesko implied it was improper for Davis, WW1, and WFC, to *publicly* engage the Commission as a whole on the topic of hatcheries funding while they had a case pending that claimed WDFW's past actions to expand hatcheries had violated SEPA. The Panesko Memo indicates leadership only tolerated this "direct engagement" of the Commission because it could "arguably be defended under the constitutional right to petition the government."

335. Panesko suggested he would also ban interest groups (or, at least, those who oppose Susewind's policies) from speaking with commissioners after submitting citizen rulemaking petitions for the Commission's approval. His memo alleges that Smith and Rowland violated the "appearance of fairness rule" by meeting with Davis and WW1 before the Commission voted on a rulemaking petition WW1 had filed asking for a change in cougar hunting rules. It concludes this allegation with an aside: "Unsurprisingly, the commissioners who attended these private meetings with the advocacy groups voted in support of the petition."

336. This claim illustrates the shocking degree of ignorance underlying Panesko's allegations. It also confirms Susewind and Windrope decided on the commissioners they would target before their inquiry began; and then did not bother to perform even a cursory inquiry into the behavior of anyone else. Had Defendants reviewed the emails or calendar entries of the rest of the Commission during this same time period—or even spoken to any of the commissioners—they would have discovered that Davis, WW1, and WW1's co-petitioners attempted to meet with *all* sitting commissioners while both the cougar *and* the wolf rulemaking petitions were pending. They also would have found that all but one commissioner accepted these meeting requests. To avoid issues under the OPMA, petitioners met with the commissioners in groups of two or three to make their case for the pending petitions, taking care not to tell any of them what had been said in prior meetings.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

337. Contrary to Panesko's confident assertion, all the "commissioners who attended these private meetings" with WW1 and its co-petitioners did *not* vote in support of the petitions.

338. These meetings were not unusual. Other parties with pending rulemaking petitions have reported taking the same approach. Nor were they improper. To the contrary, by meeting with commissioners to argue on behalf of the lawful petitions they had submitted for consideration, petitioners were exercising the rights at the heart of First Amendment protections; to speak, association, and petition the government for redress on matters of public interest.

*f. Susewind and Other Commissioners Maintained Close Relationships with Other Parties With Pending Litigation Against WDFW*

339. On information and belief, not only did Susewind and Windrope speak directly with other litigants with cases pending against WDFW, but they also explicitly or implicitly allowed and encouraged other commissioners to have these discussions.

340. Susewind, members of his EMT, and individual commissioners regularly met and spoke to, and on information and belief, maintained close personal relationships with, representatives from Washingtonians for Wildlife Conservation, both before it filed a lawsuit seeking to expel all commissioners perceived as pro-wildlife and during the pendency of that action. In fact, multiple WWC representatives actively served on key WDFW advisory committees during the pendency of the lawsuit, including WWC president Mark Pidgeon, Bill Essman from the Kittitas County Field and Stream Club, Jason Bolser of the Washington State Archery Association, and Dave Duncan of the Washington Cattlemen's Association.

341. Pidgeon, who also headed the Hunters' Heritage Council political action committee, was at that time a fixture at WDFW headquarters in Olympia, meeting frequently with Susewind to discuss fish and wildlife issues. On information and belief, Susewind and Pidgeon were personal friends during the pendency of the WWC lawsuit and continued to communicate frequently during that time. WW1 asked for any such communications in a PRA request filed more than half a year ago, but WDFW has thus far refused to provide more than a handful of responsive documents.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

342. Several commissioners indicated publicly that they had spoken to the attorney for and representatives of SAF after it filed suit against WDFW and filed a petition seeking removal of the Spring Bear Commissioners. SAF representatives appeared at a public Commission meeting during the pendency of the suit, and Chair Baker absented herself for a portion of the meeting so she could meet with them privately in the hallway to discuss the suit and its potential settlement. During a break at another Commission meeting during the pendency of the SAF suit, another commissioner mentioned within the hearing of Susewind and Windrope that he planned to talk to friends involved with SAF about their petition seeking to remove commissioners.

2. Defendants Fail to Articulate Rational Theory of Alleged "Litigation Collusion," While Aiding Litigants Against WDFW in Pursuit of Smith, Davis, and WW1

*a. Defendants Have Targeted Davis's Right to Speak, Associate, and Petition by Threatening Her Profession and Livelihood*

343. Defendants have failed to articulate a theory about how Smith, Rowland, and Ragen, did, or even potentially *could have* aided Davis or WW1 in litigation against WDFW that was based on a set administrative record. Their claims of such collusion were entirely speculative—they conceded they had no evidence to back them up, and multiple people interviewed by Nziramasanga refused the suggestion of any such conduct. Accordingly, the Final Report rejected Defendant's assertions that Davis had engaged in unlawful litigation collusion.

344. Nevertheless, Defendants and their agents repeatedly made false, misleading, and unsubstantiated accusations that Davis had engaged in unethical conduct under the Washington State Rules of Professional Conduct. They did so because of Davis's protected speech, association, and petitioning activity, including her representation of clients in public-interest litigation and her communications with commissioners and other public officials concerning matters of public concern. The accusations appeared in, among other places, the Knoll Memo, the Panesko Memo, the AGO Outline, and the interviews that Susewind and Windrope gave to Nziramasanga.

345. The Knoll Memo portrays Davis's communications and relationships with Smith, Rowland, and Ragen as evidence of improper "collusion" or an inappropriate relationship



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

between a lawyer and commissioners. The Panesko Memo goes further, asserting that "Davis's repetitive private correspondence and meetings with commissioners who were named defendants in active litigation violates Rule of Professional Conduct 4.2 (Communication with a Person Represented by a Lawyer), and I intend to pursue action for that violation."

346. These allegations against Davis were not neutral efforts to provide legal guidance or protect the integrity of the profession. Defendants used the Rules of Professional Conduct as a pretext to characterize Davis's protected petitioning, speech, and association as ethical misconduct. Davis's communications with commissioners and other public officials concerned public policy, alleged governmental violations, and proposed corrective action. Her litigation and administrative advocacy likewise constituted petitioning activity protected by the First Amendment.

347. By casting protected activities as professional misconduct, Defendants sought to deter Davis from communicating with public officials, associating with commissioners and advocacy organizations, and petitioning the government through litigation and other public processes. Defendants also sought to place Davis and the clients and organizations she represented in an unconstitutional dilemma: either Davis and her clients could pursue judicial remedies for governmental misconduct, or they could communicate with policymakers regarding important issues of public concern, but they could not do both. In effect, Defendants attempted to force Davis and her clients to choose between two protected forms of petitioning—the right to seek redress in court and the right to ask government officials to take corrective action.

348. Davis has no knowledge that Panesko ever followed through on his threat, made approximately eighteen months before the filing of this Complaint, to pursue disciplinary action against her. But the absence of an immediately filed disciplinary complaint does not eliminate the threat or its chilling effect. Panesko, Susewind, and Windrope intentionally, knowingly, or recklessly used the threat of professional discipline and the accompanying accusations of ethical misconduct to burden Davis's ability to practice law, represent clients, associate with advocates and public officials, and continue petitioning the government on matters of public concern.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

349. Susewind, Windrope, and Panesko knew or should have known that the Knoll Memo was not privileged and would be subject to disclosure under the Public Records Act. Nevertheless, they directed, authorized, facilitated, or approved its preparation; used it as a foundation for further allegations against Davis, Smith, Rowland, and WW1; and transmitted or caused it to be transmitted to other governmental officials, including the Governor's Office.

350. They did so despite knowing, or recklessly disregarding, that the Knoll Memo contained unsubstantiated accusations that Davis had violated professional-conduct rules and that disclosure of those accusations could threaten her livelihood, professional reputation, client relationships, and ability to continue engaging in protected speech, association, and petitioning.

351. Defendants' use of the Knoll Memo and Panesko Memo was retaliatory and discriminatory because the accusations focused on the substance and viewpoint of Davis's advocacy, the clients and organizations with whom she associated, and the governmental officials and bodies she petitioned. Defendants did not merely criticize Davis's conduct in the abstract. They targeted her because she represented clients and organizations that challenged WDFW's policies and legality, associated with commissioners who questioned WDFW leadership, and pursued litigation and administrative advocacy opposing Defendants' preferred policy outcomes.

352. By treating Davis's representation of clients, communications with commissioners, and public-interest litigation as evidence of ethical misconduct, Defendants burdened Davis's protected speech, expressive association, and petitioning activity and sought to deter her clients and other advocates from engaging in similar activity.

353. Following publication of the Knoll Memo, at least two social-media posts called upon members of the hunting-rights community to submit disciplinary complaints against Davis. Those posts referenced the Knoll Memo as the source or basis for the demand that Davis be investigated or disciplined.

354. On information and belief, Susewind, Windrope, or Panesko provided, or caused to be provided, additional information to individuals or organizations involved in soliciting or



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

preparing disciplinary complaints against Davis. Several complaints included specific allegations described in the Panesko Memo and other internal WDFW materials but not in the Knoll Memo. Those facts support the inference that Defendants or their agents intentionally or recklessly amplified the accusations against Davis and helped transform internal governmental allegations into an externally coordinated campaign against her professional license and practice.

355. Defendants' conduct was reasonably calculated to produce, and did produce, adverse consequences for Davis. It exposed her to professional discipline, reputational injury, client-related consequences, emotional distress, and the risk that she would be unable to continue representing clients in public-interest matters involving WDFW and other governmental defendants.

356. It also threatened her clients' ability to petition. If Davis could face professional discipline merely for communicating with public officials or commissioners about pending governmental violations while representing clients in related litigation, Davis and her clients would be deterred from exercising both their right to petition the courts and their right to petition executive, legislative, and quasi-legislative officials for governmental redress. Defendants' conduct thus burdened not only Davis's own protected activity but also the petitioning and associational rights of the clients and organizations she represented.

357. Between August 31, 2026, and September 1, 2026, Davis received communications from the Washington State Bar Association's Office of Disciplinary Counsel ("ODC") informing her that nine grievances filed against her had been dismissed. The grievances quoted or cited the Knoll Memo as a basis for the allegations against her.

358. On September 2 and 3, 2026, Davis received emails from ODC attaching two letters informing her that two of the complainants had appealed ODC's dismissal of their grievances. As a result, those matters were referred to a Review Committee of the Disciplinary Board for consideration. The letters also attached the submissions and supporting materials the complainants had provided in support of further review.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

359. The disciplinary complaints and appeals were foreseeable consequences of Defendants' decision to prepare, use, and circulate the Knoll Memo and related materials. Defendants' conduct created or materially contributed to the conditions under which third parties used governmental allegations to target Davis's law license and professional practice. The fact that third parties filed the grievances does not sever causation where, as alleged, Defendants intentionally or recklessly supplied, amplified, or facilitated the accusations that formed the basis of those grievances.

360. Defendants' conduct described above constituted adverse governmental action because it would deter a person of ordinary firmness from continuing to engage in protected speech, association, and petitioning. It also demonstrates viewpoint discrimination because Defendants targeted Davis and her clients based on the substance and viewpoint of their advocacy, their opposition to WDFW policies and leadership, their association with commissioners and wildlife advocates, and their use of litigation and administrative processes to challenge alleged governmental violations.

361. Defendants' actions were undertaken under color of state law and were motivated, at least in substantial part, by hostility toward Davis's protected advocacy, her representation of clients who challenged WDFW, her association with Smith, Rowland, Ragen, WW1, and other advocates, and her petitioning activity in court and before governmental decisionmakers. The actions caused and continue to cause Davis professional, reputational, economic, emotional, and associational injuries, and have chilled her willingness and ability to continue representing clients and engaging with public officials concerning matters of public concern.

*b. Defendants' Concerns About "Litigation Collusion" and Potential Liability Were Pretextual, as Shown by Their Conduct Creating Significant Liability*

362. Defendants' pattern of conduct demonstrates that their purported concerns that Davis was engaging in "litigation collusion" and subjecting WDFW to potential liability were pretextual.

363. Throughout their retaliatory campaign against Davis, WW1, Smith, and Rowland, Defendants and their agents have claimed that they were acting to protect WDFW from the



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

potential liability and "institutional risks" purportedly created by Plaintiffs' speech, associations, petitioning, and litigation-related activities. In reality, Defendants' own conduct created substantial liability risks for WDFW and the State. In their efforts to silence, discredit, and punish Plaintiffs, Defendants created, directed staff to create, or facilitated the creation of a series of nonprivileged documents subject to disclosure under the PRA. Those documents contain false, misleading, and/or unsubstantiated allegations against Smith and Rowland and, as alleged below, include statements and materials that may be used as admissions, evidence of retaliatory or otherwise unlawful conduct, or evidence of PRA and other violations by WDFW and its officials. Thus, Defendants' asserted concern about agency liability was pretextual: they invoked the risk of litigation to target Plaintiffs while creating additional and potentially significant exposure for WDFW through the manner in which they investigated, documented, characterized, and disclosed Plaintiffs' protected activity.

364. First, Defendants compiled the Knoll Documents by assembling, or instructing staff to assemble, documents into purported categories of liability. Defendants or their agents made notes concerning those collections, developed theories of purported liability, and drafted false, misleading, and incomplete summaries designed to create the impression that Smith and Rowland had engaged in unethical or illegal conduct. None of this work was protected by the attorney-client privilege, and Defendants knew or should have known that the materials would be subject to disclosure under the PRA.

365. Second, Defendants instructed Knoll to draft an inflammatory, nonprivileged memorandum containing false, misleading, and unsubstantiated claims against Smith and Rowland. The allegations in the Knoll Memo could be used to support claims against WDFW, including claims that the State or its officials engaged in unlawful retaliation, viewpoint discrimination, improper investigations, or PRA violations. Defendants compounded the problem by wrongfully withholding the Knoll Memo from SAF, first in response to a PRA request and later during discovery.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

366. Thus, the Knoll Memo not only provided SAF with ready-made arguments and factual material for its pending litigation against WDFW; Defendants' alleged withholding of the memo also exposed the State to potential PRA violations, discovery sanctions, and other litigation consequences. SAF relied on the existence of the Knoll Memo and WDFW's alleged withholding of it as the basis for a motion to reopen the litigation after a superior court had ruled in WDFW's favor on the merits. Following denial of that motion, SAF has relied on Defendants' alleged wrongful conduct as a basis for its appeal.

367. On information and belief, the Knoll Memo directly led to, or will directly lead to, several new lawsuits against WDFW, including one suit alleging OPMA violations that the plaintiff shared with WW1, as well as other potential suits discussed or referenced on public websites or social media.

368. Third, Defendants knowingly, recklessly, or negligently waived, or facilitated the waiver of, attorney-client privilege with respect to memoranda and emails authored by Panesko and included in Appendix A, including the Panesko Memo. Those documents were subject to attorney-client privilege when Panesko drafted them and shared them confidentially with Governor Ferguson's Chief Legal Counsel, Kristin Beneski. The privilege was later waived when the documents were forwarded to Nziramasanga for use as the basis or part of the basis for her investigation.

369. As a result, the Governor's Office was legally required to produce the formerly privileged documents in response to PRA requests for documents relating to the investigation, which it did only after substantial delay. Collectively, those communications constitute a trove of information for current and potential litigants. They contain additional false, misleading, and unsubstantiated allegations against Smith and Rowland; may be used to support claims concerning WDFW's liability in the ongoing SAF litigation; identify PRA requests that Panesko contended could support successful claims against WDFW; expose previously unknown legal vulnerabilities; and describe or attach documents that potential litigants may use in future claims against WDFW and its officials.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

370. Defendants' conduct supports the inference that they either intended to assist hunting-rights activists in bringing successful claims against WDFW or were so focused on silencing, discrediting, and punishing a private citizen, a nonprofit organization, and two wildlife commissioners whose terms were scheduled to end in just over two months that they recklessly or negligently failed to consider the substantial liability they were creating for the State.

371. Nziramasanga did not need Panesko's privileged memoranda to identify the documents relevant to her investigation or to reach independent conclusions. If Defendants had been interested in a fair and even-handed investigation, they would have provided Nziramasanga with the primary documents and allowed her to evaluate the evidence and reach her own conclusions.

372. Instead, Defendants supplied or facilitated the supply of advocacy-driven legal memoranda that framed the issues, characterized the evidence, and pressed Nziramasanga toward predetermined conclusions concerning Smith's and Rowland's alleged misconduct. In attempting to push Nziramasanga toward the "right" conclusions, Defendants exposed WDFW and the State to substantial potential liability, including liability arising from the creation, disclosure, withholding, and use of the investigative materials themselves.

3. Defendants Make Novel Use of Commission Rules to Justify Broad Allegations

373. On information and belief, Defendants' allegations against Smith and Rowland mark the first time that the Commission Rules have been used to formally sanction commissioners for their behavior. The rules contain guidelines for running meetings, unenforceable expectations for behavior, and details regarding issues such as how the Commission will elect a chair or decide the membership of committees. Although members of the public have sometimes implored the chair to enforce the expectations in the Commission Rules, neither the chair, the director, nor the Governor has ever attempted to do so before—even for the most egregious violations.

374. From the beginning of their inquiry, Defendants and their agents relied on the Commission Rules as the foundation for their allegations against Smith. This was a novel



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

approach. Neither Commission nor WDFW leadership had previously objected that commissioners failed to "[r]epresent all citizens of the state," even when commissioners openly proclaimed that they only intended to serve "constituents from a particular area of special interest." Neither Commission nor WDFW leadership had raised prior concerns that commissioners had either a "conflict of interest" or an "appearance" of one, even when commissioners were engaging in business activities that appeared to directly profit from their Commission service. Neither Commission nor WDFW leadership had balked in the past that commissioners were using a "meeting" to "further a personal agenda," even when commissioners were promoting measures that had a direct connection to both their personal and business interests. And neither Commission nor WDFW leadership publicly voiced concern when commissioners openly insulted and denigrated their colleagues, in violation of the rule requiring them to "Be respectful of other Commissioners." Former Commissioner Thorburn flaunted this rule frequently and flagrantly, attacking fellow commissioners during meetings, in published articles, and internal correspondence, including by denouncing Smith and Koontz as soon as they were appointed.

375. Yet lacking any statutory or regulatory authority, Defendants and their agents alleged Smith and Rowland had violated the amorphous provisions of the Commission Rules, stretching and bending the rules to fit the conduct. In particular, they leaned heavily on a provision advising commissioners to "[k]eep other Commission members informed on individual activities of Commission business," claiming it required Smith and Rowland to disclose all the meetings at which they discussed matters related to Commission business. Windrope depended upon this provision to portray meetings with Davis, WW1, and affiliated groups as wrongful, conceding to Nziramasanga that it was routine, expected, and "not inherently unlawful" for commissioners to meet with members of the public, but asserting that these meetings "were not consistently reported as required." Susewind similarly feigned "serious concern" regarding the "lack of disclosure surrounding those interactions."



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

376. Panesko took this allegation further in his then-privileged memo to Beneski. He began with a patently false description of Commission practice: When commissioners report out about their activities at the beginning of each monthly Commission meeting, Panesko claimed, “Commissioners would normally share when they attended events, or met with interest groups.” Because Smith, Rowland, and Ragen had not used these sessions to report about their meetings with Davis, WW1, or WFC, Panesko asserted that their “silence strongly suggests that their conduct with those advocacy groups was intentionally secretive to strategize the implementation of the advocacy groups’ goals and objections, which conduct would thus be collusive.”

377. Unfortunately, Nziramasanga took Panesko’s interpretation of the Commission Rules as gospel, writing in the Final Report that they “require commissioners to provide summaries of meetings attended as representatives of the Commission.” This reading of the Commission Rules led to some of Nziramasanga’s harshest criticism of commissioner conduct:

> Regardless of how commissioners characterized these exchanges, the volume, regularity, and subject matter of the contacts, particularly those involving active litigants and their counsel, were not disclosed to other commissioners or department counsel as required and created an appearance of conflict inconsistent with the Commission's Rules of Procedure.

378. Nziramasanga would have known better if she listened to tapes of this portion of the Commission meetings over the prior four years. Had she done so, she would not have heard Commissioner Anderson report about the regular engagement he had admitted having with “recreational and commercial fishing groups, hunters, environmental organizations, and animal rights advocates,” Commissioner Myers describe his regular discussions with “outside experts and stakeholders,” or Commissioner Lehmkuhl discuss his “routine” discussions with advocacy and interest groups.

379. This is because, as Susewind, Windrope and Panesko knew full well, up until that point *nobody* had previously interpreted the Commission Rules to either encourage or require commissioners to divulge *all* “individual activities” in which they had engaged as a commissioner since the prior meeting. Rather, each commissioner has historically taken just a few minutes during this portion of the meeting to report conventions, events, seminars,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

workshops, or WDFW-hosted activities at which they had spoken or attended as a representative of the Commission. It would have been highly unusual for any to discuss phone calls or Zoom meetings with advocacy groups or other members of the public.

380. Indeed, the Panesko Memo demonstrates the falsity of its own assertion that commissioners who did not report all their phone calls and Zoom meetings at the start of each Commission meeting were being "intentionally secretive," as it spends nearly a page discussing a meeting between Ragen, Rowland, Smith, WW1 and WFC, that Panesko knew about only because *Ragen told him.*

4. Defendants Equate Questions from Smith and Rowland as "Disrespect," While Looking the Other Way When Other Commissioners Insult and Demean Staff

381. Defendants and their agents broadly accuse Smith and Rowland of showing disrespect to staff, but their examples belie the truth of this allegation. Other than descriptions of isolated discussions with public disclosure staff where frustrations with technology may have run high, they refer to isolated instances in which commissioners asked staff thoughtful questions following their presentations at meetings or voiced disagreement with leadership recommendations.

382. Windrope's purported concern that Smith, Ragen, and Rowland created "dynamics" that were "demoralizing to staff and harmful to agency morale" were particularly disingenuous in context. Both Susewind and Windrope had brushed off Smith's concerns about the devastating 2021 Auditor's Report that portrayed WDFW as a hostile work environment dominated by a "good ole' boys" club, in which 11% of staff reported that management had retaliated against them, 20% said they had been bullied in the workplace, and fewer than half believed management was held accountable for its misconduct. Similarly, they had resisted Smith's attempts to inquire about the workplace deaths and accidents that L&I had ruled were caused by leadership's "willful, serious" violations of safety regulations, circumstances that had led to WAFWP's allegation in March 2025 that "Management is failing its employees at the most fundamental level, and our members are literally paying for that failure with their lives."



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

383. Susewind's claim to Nziramasanga that he had made "deliberate efforts to shield lower-level staff from conflicts involving commissioners" is particularly ironic, given that he and members of his leadership team commonly use staff meetings and other gatherings as occasions to insult and demean Smith and other commissioners that they had publicly termed "the problem commissioners." Indeed, Myers raised this issue during his interview, observing that "some tension in staff-commission relations has been exacerbated by high-level agency administrators speaking negatively about the Commission to staff, which he believes has contributed to distrust and institutional friction. "

384. When touting their efforts to shield staff from Commission disrespect, Susewind and Windrope failed to mention their lack of concern when commissioners had supported leadership's agenda by attacking and attempting to discredit agency scientists. After five staff scientists worked with the Washington Academy of Sciences to produce a report espousing the risks of salmon hatcheries that undermined former Commission McIsaac's push for radical hatchery expansions, he dismissed the final report as just a "draft," labeled it as "overly simplistic," dismissed some of its findings as "questionable" and "highly inflammatory;" and worked with outside groups to discredit it. On information and belief, neither Susewind nor Windrope took any action to defend their scientists or their work. Both also stood by silently as former Commissioner Thorburn used a public meeting to read a lengthy statement accusing a retired agency scientist who opposed a leadership proposal to kill more cougars of either "ignorance" or "malevolent dishonesty." Nor did Susewind and Windrope object when Thorburn published a letter in the Journal of Wildlife Management attempting to discredit a study by WDFW scientists that seemed to weigh in favor of a decrease in cougar hunting, maligning it with false and misleading statements and gibberish that baffled her fellow commissioners and agency scientists attempting to make sense of it.

385. Susewind and Windrope do not allege that Smith participated in any similar conduct or ever spoke disrespectfully of staff. Indeed, the recordings of Commission meetings are replete with Smith's praise of WDFW's scientists and expressions of gratitude for their



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

work—especially when the Commission was dealing with difficult and controversial issues such as spring bear hunting and wolf protections. Nevertheless, Windrope characterizes Smith's questions of staff and disagreement with leadership during the debate over the wolf downlisting proposal as "repeated public criticism" and faults her and other commissioners for voicing "repeated public disagreement and criticism" during the spring bear debate. For Susewind and Windrope, it is disrespectful for anyone to dissent from the opinions they hold.

5. Defendants Accuse Smith and Rowland of Evading the PRA, While They Engage in the Same Conduct, Withhold Documents, and Ignore Intentional Deletion of Records

*a. Defendants Fault Smith for Use of Private Email and Text Accounts Even as They Use the Same Means to Communicate with Other Commissioners*

386. A consistent theme running through the AGO Outline, Panesko Memo, Knoll Documents, Knoll Memo, and Defendants' statements in the Final Report, is the claim that Smith committed misconduct by using her personal email account for Commission business. For example, in his memo to Beneski, the Governor's attorney, Panesko claims Smith and Rowland use personal emails and texts "significantly more than any other current commissioner," asserting this was further proof of their "collusion," because they "appear intent on hiding their associations and coordination with outside advocacy groups[.]"

387. Even a cursory review of the SAF Production—the records on which Defendants' allegations were based—shows Panesko's claims were, *at best*, reckless and ill-informed. It shows nearly all commissioners used their personal email accounts for some Commission business, while some commissioners used these personal accounts almost exclusively—and *far* more often than Smith or Rowland. Commission leadership helped establish this as routine, as former Commission chairs Carpenter and Baker relied primarily on their personal accounts to communicate regarding Commission business. In fact, the practice was so widespread that when Commission staff circulated contact sheets to the commissioners, they sometimes included *only* private email addresses for some commissioners.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

388. While Susewind, Windrope, and Panesko claimed to have frequently instructed commissioners not to use their private email accounts, the documents in the SAF Production also reveal that they routinely took advantage of the practice themselves.

389. For example, those documents show Panesko transmitted communications that he labeled “privileged and confidential” to commissioners’ personal email accounts, even after those commissioners had been assigned official WDFW addresses and equipment. Some of these messages addressed the controversial spring bear vote, while others contained advice concerning ethics obligations and public-records retention requirements.

390. The SAF Production also reveals that both Windrope and Susewind participated in discussions about sensitive and controversial Commission business using private Commissioner emails and phone numbers. Windrope, in particular, frequently corresponded with Baker using her personal accounts.

391. The SAF Production includes more than 30 pages of text messages between Windrope and Baker on Baker’s private phone, and another three pages of texts that also include Susewind and Linville. Windrope used these text messages to strategize with Baker about how to steer the Commission, control Smith, Rowland, and Ragen, and reserve more power for Susewind, often *during* Commission meetings when the Commission was discussing issues including wolf rulemaking, spring bear hunting, and hatchery expansion.

392. Windrope also routinely communicated with Baker using Baker’s personal email account, including exchanges discussing controversial topics before the Commission and efforts to monitor and control Smith, Rowland, and Ragen. Windrope’s regular use of private commissioner email accounts did not stop her from scolding Smith for the same conduct, however. For instance, on September 7, 2023, Windrope exchanged emails with Baker on her private account about Smith’s activities. Just four days later, Windrope chastised Smith for using her personal email account for agency business dealing with “controversial issues”—before then continuing *the same* discussion on an email chain that included two private Commissioner email addresses.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

393. Susewind, Windrope, and Panesko knew that multiple other commissioners relied upon personal email accounts and personal phones to exchange messages and texts through at least 2023. Nevertheless, in statements and memos aimed at convincing Governor Ferguson to investigate Smith and Rowland and designed to steer the investigation, they deliberately and repeatedly mischaracterized Smith's and Rowland's use of personal accounts and devices as unusual and excessive, and made false statements asserting that it exceeded any other commissioner's reliance on personal devices.

*b. Defendants Declare Smith "Incompetent" for Speed of PRA Responses, Even as Many Commissioners Struggle and WDFW Drags Requests Out for Years*

394. Throughout their retaliatory campaign, Defendants and their agents have alleged that Smith and Rowland purposefully delayed compliance with the PRA, straining the facts regarding these responses, omitting context showing the degree to which systemic agency problems created the delays—and, at the very same time, refusing to respond to PRA requests directed at them in a timely manner. Panesko took this allegation against Smith the farthest in the memo to Beneski that he believed would be protected by the attorney-client privilege. The Panesko Memo asserts that Smith failed to respond to SAF's PRA request in a "timely fashion" and mocks the "excuse" he says she offers, that "WDFW staff doesn't provide enough support to commissioners, she is confused, and she is not technically adept to be able to understand and manage her records." Panesko seems to contend that Smith's difficulties with technology and records management are enough to justify her removal: "On face value, this admission proves incompetence to serve as a commissioner."

395. By this measure, Governor Ferguson would have to dismiss most of the Commission, which is almost entirely composed of people well over retirement age. Commissioner Baker, for instance, spoke to Nziramasanga about the "technical and usability challenges that affect her compliance, noting that commissioners in her age group have limited familiarity with technology and often rely on staff assistance to navigate the records portal." Commissioner Myers told the investigator about several technical challenges he had faced in responding to PRA requests, including difficulty accessing his WDFW account, problems using



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

his WDFW phone, and confusion about how to search his records. Commissioner Lehmkuhl likewise "acknowledged structural challenges affecting compliance," including difficulties with accessing WDFW equipment when he was away from home and mistakes related to document retention. As Smith noted in her interview, "the average age of commissioners is approximately sixty-five to seventy and… significant technological advances have outpaced commissioners' familiarity with current systems."

396. Moreover, the commissioners are not entirely to blame for difficulties with WDFW technology. There is widespread documentation of the failures of WDFW-provided equipment and software, both in relationship to the Commission as a whole and Smith in particular. For instance, Smith is on her third computer in five years, after WDFW's Information Technology ("IT") department "recalled" the first two due to various technical glitches. IT's technical support log for Smith's devices shows she has made more than 80 separate calls or other requests for help, including reporting problems with computers, phones, programs, applications, and report-filing mechanisms. IT resolved some of these issues by walking Smith through use of the technology, but others were so intransigent that IT support staff had to travel to Smith's location in Port Townsend to resolve them. Once, the responding technical support staff member was so baffled by the inexplicable glitches with Smith's computer that he simply issued her a new one.

397. Defendants also failed to mention that the burden of complying with the PRA was not felt evenly by all commissioners. The commissioners who voted to end the spring bear hunt had been inundated with large, repetitive, and unrelenting PRA requests, with Baker telling Nziramasanga that she had gotten 50 requests since the beginning of the year and had more than 23 currently active. Nobody has been targeted more often than Smith, who has received well over 100 PRA requests—far more than any other commissioner.

398. Defendants also failed to note that WDFW typically takes several months to respond to even simple PRA requests seeking discrete, clearly identified, and readily available documents (such as packets of information Susewind considered in issuing wolf kill orders) and



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

years to respond to any request that requires a records search, and often only seems to take its PRA responsibilities seriously once litigation is brought or threatened. As of the date of this filing, WW1 and its representatives have 12 PRA requests to WDFW that have been outstanding for more than a year, more than half of which have been pending for more than three years. This includes one request submitted over 13 months ago for Susewind's communications related to the Commission, WW1, and SAF, for which WDFW has only produced a single installment of 201 records to date, consisting almost entirely of non-responsive, highly duplicative documents. The only nod to these severe problems is a footnote in the Panesko Memo, admitting that "WDFW exposure in this PRA case is not solely attributable to conduct by certain commissioners—there were oversights by other WDFW staff on this particular record request that further exacerbate WDFW's financial exposure in the case."

6. Defendants Bury Evidence of Potential PRA Violations by Windrope and Other Commissioners, while Putting Smith's Compliance under a "Microscope"

399. The Panesko Memo admits that beginning in early 2025, leadership had put Smith under a "microscope" to try to find potential violations of the PRA, instructing staff to compare the records she produced to those found on Ragen's computer to try to identify any gaps. After Nziramasanga had completed the Final Report, Windrope provided Nziramasanga with a small batch of documents she had collected as the result of an exhaustive search that took well over a year, which she claimed represented documents that Smith and Rowland had not provided to WDFW. Many documents appear to fit the definition of transitory records not subject to retention obligations, are personal records not subject to disclosure, or are messages that were originally sent to or from at least one official WDFW address (sometimes including Smith's)—meaning WDFW would have been able to search for them independently. Of the rest, Nziramasanga concluded that they show individual instances of inadequate search or incomplete production.

400. While Defendants were putting Smith under a "microscope" to try to identify documents she had missed while responding to well over 100 PRA requests during her term as a



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

commissioner, they were purposefully ignoring information they had before them that showed potentially far more serious PRA violations.

401. This is consistent with Susewind's and Windrope's past conduct. On information and belief, they had never admonished, reported, or taken action against past or current commissioners, even when they knew they had violated the PRA, including one commissioner who erased his entire hard drive before returning it to WDFW and at least two whom they knew had erased or were continuing to erase text messages related to Commission business.

402. The Final Report references some of these documents. Although it does not mention the names of the people involved, it describes a text from Baker to Windrope, attaching a voicemail that she had received from Smith and describing her approach to the upcoming decision about spring bear hunting. Baker ends her text by telling Windrope: "**Please delete.** Sending it along only to illustrate the kind of pushback I'm getting. Lorna is not the only one. It will be rocky but we will get through it." When Windrope does not respond, Baker follows up with complaints about other commissioners, also writing that she "probably shouldn't have sent you Lorna's voicemail," asking her to "[p]lease keep it to yourself." This time, Windrope answers, but she does not address Baker's request that she delete the prior message. In another text, Baker texts Windrope a complaint about a discussion she'd just had with a member of the EMT regarding a Commission issue, ending the message with "Please delete." This time, Windrope responds: "I know. And agree."

403. The SAF Production also includes nearly 40 pages of private texts between Baker and Vice-Chair Linville that include several references to deleting messages. In one, Baker texts Linville about a meeting leadership asked her to join with Ruth Musgrave, the former natural resources advisor for Governor Inslee, expressing her concern that she was being lured into "conspiring against fellow commissioner," before ending her message by saying "But for now, please delete." Linville responds: "Good luck and no you are not conspiring. And deleted." Baker updates Linville later in the same string: "Ruth is going to talk to our rogue commissioners



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

after tomorrow to let them know all of this is very disappointing to the gov. And… delete. ("D" from now on)."

404. Susewind, Windrope, and Panesko knew about most or all of these communications, either because they had directly participated in them, or because they had been brought to their attention, including by SAF. However, they did not provide records of any of these communications to Nziramasanga or reference them in their interviews with her. Nor did Defendants mention these documents in the AGO Outline, the Knoll Memo, or the Panesko Memo, despite Panesko's professed concern about potential PRA liability. On information and belief, Nziramasanga knew about some of these communications because they were highlighted by, and attached to, the SAF Petition and Addendum, and Baker addressed them in her interview with Nziramasanga, informing her that "counsel expressed no significant concerns." The Final Report nevertheless notes that these messages are concerning: "However, the use of deletion shorthand in communications discussing commission dynamics raises legitimate records-retention concerns and undermines any suggestion that the references were limited to purely personal content."

405. The reasons Defendants did not highlight these messages are clear. They were not targeting Baker, who was usually an ally. They did not want to implicate Linville, who had never failed to issue the expected rubber stamp or expressed disagreement with any of Susewind's recommendations. And they certainly did not want to highlight Windrope's involvement in conspiring against Smith, Rowland, and Ragen by means of private email account and text messages to a private phone number—much less her complicity in plans to destroy public records.

7. <u>Defendants Nonsensically Push Claims of OPMA Violations Against Just Two Commissioners</u>

406. Through the AGO Outline, the Knoll Memo, and the Final Report, Defendants advance sweeping and unsubstantiated allegations that Smith deliberately violated the OPMA, including by associating with WW1 and expressing views to her colleagues with which Susewind and Windrope disagree. Defendants' efforts to weaponize the OPMA against just two



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

commissioners is self-defeating, however, because it takes a quorum of at least five commissioners to cause an OPMA violation.

407. Defendants nonetheless did their best, planting select information regarding their suppression of the 2023 Carnivore Seminar in the Knoll Documents as purported evidence of Smith's intent to violate the OPMA. The Knoll Memo in turn showcased the incident as a prime example of Smith's misconduct, claiming her attempts to bring information from these outside experts to the Commission showed that "to Smith, the end justified the means." Knoll twisted Smith's precautions to *avoid* potential OPMA violations into something sinister, characterizing the limitation that prevented commissioners from seeing or communicating with one another during the webinar as "simply dishonest behavior." Ignoring the basic principles of the OPMA, Knoll saw the precaution that made it impossible for commissioners to use the seminar to "meet" or "take action" as an *evasion* of the OPMA, accusing Smith of thinking it was acceptable to violate the law when "nobody is thought to be looking." He then used this imagined violation as a springboard for wild speculation: "Based on Smith's analysis above, I wonder in what other ways she has bent procedure and/or laws to fit her perception of justifiable conduct. Quite possibly, she may have also stretched the truth about her responses regarding public record requests."

408. Panesko wisely sidestepped discussion of the 2023 Carnivore Seminar, in which he advised commissioners that it would violate the OPMA if more than four of them passively, and invisibly, watched a presentation at the same time. Instead, he alleged that Smith and Rowland engaged in "vote counting" and the "intent" to violate the OPMA in connection to Ragen's election as Commission vice-chair. Panesko's support for this allegation consists of three brief texts (which he labeled "extensive text messaging") that Smith sent to Ragen before the vote, on a chain that did not even involve Rowland, in which Smith urges Ragen to talk to Lehmkuhl "or" Parker before the vote and offers to send Parker a note. Even if one of these discussions with either Lehmkuhl or Parker had taken place, it would not have violated the OPMA, and other documents and Commission records make plain that it did not: far from



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

engaging in efforts to "lobby" for votes, Ragen did not even secure another commissioner to nominate him, and messages show that his final decision to run came as news to both Smith and Rowland.

409. Nevertheless, Susewind and Windrope continue to push this issue in their interviews with Nziramasanga, in comments that make clear their concern was not about the OPMA, but about threats to their own power. Windrope, for example, focuses on a group of *four* commissioners[1] who self-deprecatingly referred to themselves as the "Gang of Four" in an isolated email. She told Nziramasanga that she believed this group functioned "as an undisclosed subcommittee that was never formally acknowledged," that "established its own priorities, including efforts to control commission agendas, and did not communicate those internal discussions to staff or to the full Commission." These allegations make Windrope's real objection clear, even though a glance through the Commission's voting records would show that following the spring bear decision, Lehmkuhl rarely, if ever, voted with Smith, Rowland, and Ragen when they opposed a leadership recommendation. More to the point, even if these four commissioners had met regularly, they would not have constituted a quorum, making it *impossible* for them to have violated the OPMA.

410. Unfortunately, Plaistowe seized upon this allegation in his letter to Smith and Rowland, stretching the findings of the Final Report and nonsensically scolding those two commissioners—and *only* those two commissioners—for "engag[ing] in multiple meetings in violation of the Open Public Meetings Act."

8. <u>Defendants Make Unsubstantiated Claims of Fraud Because Smith Worked Too Hard</u>

411. Starting with their compilation of the AGO Memo and the Knoll Documents, Defendants repeatedly alleged Smith was guilty of fraud, and even theft, without the slightest support for that allegation. As a basis for this claim, they assert that Smith claimed compensation for every day in 2024 except Christmas, New Years' and five other days, and that as a result she

[1]Nziramasanga incorrectly identifies these four commissioners as Smith, Rowland, Linville, and Ragen, but Windrope presumably meant to include Lehmkuhl, not Linville.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

was paid more than any other commissioner—for a whopping total of less than $36,000 for a year of more-than-full-time work.

412. As Defendants conceded, however, both the law and the reporting system used by commissioners indicated that they could claim the $100 stipend for every day that they worked at least an hour—without requiring any description of that work. Windrope had told Smith that this meant she should claim the stipend if she spent at least an hour on any Commission-related business—which would include activities such as reviewing proposals, researching relevant issues, reading stakeholder input, responding to email, participating in telephone calls, attending meetings, and responding to PRA requests. Nevertheless, the AGO Memo alleges Smith "has leveraged her position for financial gain," while the Panesko Memo labels the idea that Smith worked at least an hour most days of the year "highly suspicious and concerning," suggesting that her submission of hours suggests "misconduct and malfeasance, if not outright criminal theft."

413. Defendants' claims to the contrary notwithstanding, it was not that unusual for dedicated commissioners to claim compensation for working most days of the year. Payroll documents provided in response to a PRA request show that from January to November 2022 (when the records end), former Commissioner McIsaac claimed compensation for working nearly every weekday and most weekends. On information and belief, Defendants never raised any objections or concerns regarding the hours that McIsaac logged, presumably toward helping them achieve their fishery and hatchery objectives.

414. Defendants claimed Smith's request for compensation was clearly inappropriate because it was more than the amount that Baker, the Commission chair, claimed for her work—depending on the document, they allege Smith claimed anywhere from twice to three times as much. What Defendants knew better than anyone, however, was how hard Smith worked. Indeed, that was one of the reasons they despised her—she educated herself on a wide range of issues, spoke to experts (both within and without the Commission) independently, followed WDFW's work, and gave extensive thought to how the Commission could fulfill its Mandate.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Rather than "staying in her lane" as a part-time volunteer who deferred to management, Smith attempted the impossible, by trying to live up to the vast responsibilities entrusted to the Commission by statute.

415. The difference between Smith's approach to the job and Baker's is apparent from the interviews recounted by the Final Report: while Baker described "limited" and "sporadic" engagement with stakeholder groups, Smith described frequent interactions with people of all types to discuss a wide variety of issues, including to share scientific research and policy information. Indeed, even those who disagreed with Smith on most issues acknowledged how hard she worked, praising her for her "passion and hard work," marveling at the long hours she spent focused on commission issues, and asking her in amazement: "How do you stay so on top of things?"

**E. Defendants Intentionally, Knowingly, and Recklessly Incited Dangerous, Anti-Woman Extremists**

1. Defendants Intended, Knew or Should have Known That Their Inflammatory Allegations Would Add Fuel to a Potentially Dangerous Situation

416. Defendants' false, defamatory, and malicious allegations and the chain of events they put in motion have been used as rage bait for hunting-rights extremists, feeding into obscene, misogynistic, homophobic, and dehumanizing rants and insults aimed at Smith, Davis, and other representatives of WW1 in testimony, emails, blogs, posts, and social media comments.

417. Defendants deliberately, knowingly, and/or recklessly inflamed heavily armed, potentially dangerous extremists, and channeled their fury at Smith, Davis, and other representatives of WW1. Defendants understood the threatening, abusive, intimidating, and potentially dangerous conditions that would result from their actions, because for the past five years they have incited, encouraged, observed, and/or been told about prior abusive and threatening conduct toward commissioners and public wildlife advocates.

418. Smith had previously informed Defendants and WDFW's chief enforcement officer of the threats, hostile language, and misogynistic comments directed toward her following



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

the Commission's decision to ban spring bear hunting and votes on other controversial issues. Over the past three years, members of the public have also sent Defendants copies of offensive, sexist, misogynistic, obscene, and violent content aimed at commissioners believed to be anti-hunting and public wildlife advocates, particularly women.

419. On December 1, 2023, the Washington Chapter of the Sierra Club raised concerns over the safety of wildlife advocates at Commission meetings after hunting rights activists crowded an October 2023 Commission meeting, and mocked, jeered at, and harassed wildlife advocates, particularly women. Attendees observed that some of these activists smelled of alcohol, openly carried hunting knives on their belts, and had concealed firearms.

420. Defendants knew or should have known that their inflammatory allegations against Smith, Davis, and WW1 would become public, through PRA requests for the documents they assembled or caused to be assembled, summaries they composed or caused to be composed, memos they wrote or caused to be written, and the information and interviews they provided to the investigator whom Governor Ferguson hired at their urging.

421. Defendants knew or should have known that public disclosure of information related to their allegations against Smith, Davis, and WW1 would create a hostile, dangerous, or potentially dangerous climate, by inflaming the emotions of extremists within the hunting rights community, who, as a group, are heavily armed, and who had previously shown their rage toward WW1 and its representatives; described them in dehumanizing, sexist, misogynistic, and obscene terms, and called for violent action, or issued threats of violent action, against them.

2. <u>Defendants Leaked, or Caused to be Leaked, Confidential Information Designed to Generate Anger and Heighten Tensions</u>

422. On information and belief, Defendants have intentionally or knowingly exacerbated this situation by leaking confidential information regarding their retaliation campaign and pretextual investigation to hunting-rights extremists, to ensure that their false, defamatory, and inflammatory allegations would be broadcast and amplified.

423. On information and belief, Susewind coordinated with and sought assistance from friends and allies in the hunting community in his effort to discredit, marginalize, and silence



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Smith, Davis, and WW1. This coordination included leaks to people who posted (and sometimes subsequently deleted) some of the details about Defendants' efforts long before they were publicly known.

424. For example, on March 25, 2025, Panesko completed the then-privileged Panesko Memo and emailed it to Beneski. The Panesko Memo indicates that it "details inappropriate conduct of certain Fish and Wildlife Commissioners, revealed through documents found on the agency laptop turned in by former Commissioner Tim Ragen" and includes inflammatory allegations against Smith, Davis, and WW1.

425. At this time, no information about Defendants' pretextual investigation, review of documents from Ragen's computer, or purported liability concerns had been made public, and the Panesko Memo was subject to attorney-client privilege.

426. On or about March 26, 2025, Allen Ernst of the Safari Club, a former member of the GMAC and associate—if not friend—of Susewind's, posted on a public hunting blog that "highly questionable stuff" had been found on Ragen's laptop. Just a few hours later, Ernst made an urgent request for moderators to delete his message.

427. Ernst posted this content at 7:03 p.m. on March 26, 2025. Fifty-one minutes later, at 7:54 p.m. that same evening, Kelsey Ross of the Conservation Coalition of Washington emailed three members of Governor Ferguson's staff, copying Defendant Susewind's office and Chair Baker, under the subject line "Allegations of Misconduct for WDFW Commissioner." Ross wrote that "multiple reports in recent days" had informed her that Ragen "may have possessed inappropriate or problematic information on his department computer or email account, which was attempted to be deleted but was recovered through forensic analysis." She reported that Ragen and "others" may have violated the OPMA and urged the Governor to investigate before appointing anyone to the Commission.

428. Ernst and Ross were private hunting rights advocates with no lawful access to Ragen's laptop, communications regarding WDFW's review of that computer, or to the Panesko



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Memo. Both nonetheless described its subject matter within thirty-six hours of the memo's transmission to the Governor's Chief Legal Counsel,

429. On May 6, 2025, Susewind provided Knoll with two partially filled boxes of documents that Windrope had carefully curated at Susewind's direction to suggest that Smith, Rowland, and Davis had engaged in misconduct. The Knoll Documents were not public at that time.

430. On or about May 7, 2025, hunting rights activist Dale Magart posted on the Facebook group "Predator Watch" that a "high-level source" told him that "a whole bunch of correspondence exhibiting collusion has been unearthed between Melanie Rowland and Lorna Smith and various animal rights/ environmental groups and that they will not be able to survive the brewing storm." Magart reported that he "was asked" to pass this news along and to urge the people in the hunting community to "'keep their ear to the ground'" and "when the times comes to aid in holding their feet to the fire." The first response to this post commented that "Trump is ready for them!"

431. Magart was a private hunting rights advocate with no lawful access to Ragen's laptop, the Knoll Documents, or other summaries of the content on that computer, or the Panesko Memo. Nevertheless, he reported that a "high-level source" asked him to pass along" information that seemed to reference the Knoll Documents, for the purposes of inflaming hunting rights activists so they would be ready to pounce on Smith and Rowland when the time came.

432. On information and belief, Susewind and/or Windrope have continued to coordinate with hunting rights advocates to defame, discredit, and bully Smith, Davis, and WW1 through the date of this amended complaint, including by feeding them information that is then referenced in blogs, social media posts, testimony, and discussion forums as coming from unnamed inside sources and senior officials.

433. Most recently, on August 31, 2026, Governor Ferguson's Chief of Staff Franklin Plaistowe sent letters that he marked as "confidential" to Smith and Rowland. On information and belief, Susewind and Windrope received copies of these letters before Plaistowe sent them to



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Smith and Rowland. A hunting rights advocate posted about the contents of these "confidential" letters roughly an hour after they were emailed to Smith and Rowland—before Smith had seen or read the letter to her—attributing his information to "inside sources." A reporter had a copy of the "confidential" letter by the following day, although neither Smith nor Rowland provided it to him.

3. Defendants Have Inflamed Rage-Filled, Woman-Hating, Heavily Armed Extremists

434. Each new chapter of Defendants' retaliatory campaign, and information leaked or made public regarding that campaign, has incited a new wave of defamatory allegations, personal abuse and insults, and threats and intimidation, toward Smith, Davis, WW1, and its donors and supporters. On information and belief, Defendants purposefully caused and depended upon that reaction to further their efforts to defame, marginalize, intimidate, and silence Smith, Davis, and WW1; destroy their reputations; endanger the continued existence of WW1; and frighten and silence other Washington wildlife advocates, and advocates in other states.

435. This reaction has increased exponentially with each new development and release of information related to Defendants' retaliatory campaign: starting with limited reactions caused by Defendants' early leaks, blossoming following the public release of the Knoll Memo, surging after the release of the Final Report and Addendum, and increasing in fury following the leak of the Plaistowe Letter. In recent months, this story was elevated to social media sites with a larger national reach, resulting in thousands—if not tens of thousands—of posts, reels, and comments in response to each new development or release of information.

436. With each new development related to Defendants' retaliatory campaign and release of documents or information related to that campaign, thousands of emails, online statements, social media post and reels, blogs, comments, and letters have amplified Defendants' false, misleading, baseless, and defamatory allegations about Smith, Davis, and WW1, including the following statements and countless more like them (errors in original):

- It is call a felony and is a crime 1st degree!!!!
- So you're also telling me they didn't take bribes. Getting real sick of people that we pay f****** thinking they make the rules.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

- I would bet the anti-hunters are 'contributing' $$$ to the Commissioners !!
- Because they are getting kickbacks , they listen to Anti hunt groups
- Probably lot of money changing hands
- Malfeasance, up to life in prison.
- Under. The. Table pay out
- Follow the money.
- I"m sure they all ended up with nice 2nd homes under somebody else's name.
- There had better be felony charges coming. Fishing and hunting are not going to take this deception lying down.
- Obviously, those groups were getting money from somewhere and sticking to left liberal policy sexual favors and other extortion may be in step!

437. Each new development related to Defendants' retaliatory campaign and release of documents or information related to that campaign has resulted in a flood of emails, online statements, posts, blogs, comments, and letters promoted Defendants' goals of punishing, marginalizing, ousting, and silencing Smith, Davis, WW1, and other wildlife advocates, including the following statements and countless more like them (errors in original):

- Anyone who doesn hunt or fish or do any outdoor sports should be gone. If you have ties to any outside animal rights groups or belong to any gone.
- There should be a law that says, no one can sit on any board that makes any decisions for the fish and wildlife that was not fished and hunted for at least 20 years in the state they are making those decisions for.
- Any meeting with anti-hunting groups should result in losing your seat on the commission, as in, immediate dismissal without recourse.
- No anti hunters should ever have anything to do with state hunting laws.
- Anti hunting groups need to be shut down. As well as anti gun groups and its members arrested and assets seized.
- These anti-hunting, anti-gun libturds have infiltrated our game departments for years. They should All be removed, there employment terminated. No one that doesn't Hunt, Fish or Trap belongs in our Fish and Game departments!

438. Each new development related to Defendants' retaliatory campaign and release of documents or information related to that campaign has unleashed a torrent of emails, online statements, posts, blogs, comments, and letters containing obscene, sexist, misogynistic,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

dehumanizing, racist, and homophobic insults directed at Smith, Rowland, Davis, and prominent female supporters of or donors to WW1. A sample of these statements is included in Appendix 1. They include comments using obscene slurs for women; derogatory comments about their physical appearance and intelligence; calls for women to be removed from all positions of power and authority; characterizations of women as subhuman; and a random overflowing of filth and venom aimed at gays, Muslims, immigrants, and other minority groups.

439. Each new development related to Defendants' retaliatory campaign and release of documents or information related to that campaign led to outbursts of rage, violent references, threats of violence, and calls to take violent action, largely aimed at Smith, Rowland, Davis, and female donors to WW1. A sample of these statements is included in Appendix 2. They include images of nooses and gallows; descriptions of violence to animals; calls for Smith, Rowland, Davis, and WW1's prominent female donors to be raped, shot, hanged, hunted, tarred and feathered, or fed to wildlife; demands for their addresses to be released; and promises that they will soon be paid nighttime visits and suffer painful deaths.

### F. Defendants Intentionally, Knowingly, and Recklessly Inflicted Foreseeable Harm

440. Defendants have intentionally and foreseeably harmed Smith, Davis, and WW1 and continue to take actions to exacerbate those harms. Defendants have intentionally and foreseeably chilled protected speech, expression, and the exercise of the right to petition for the redress of grievances and continue to take actions to exacerbate that harm. Defendants have intentionally and foreseeably inflamed an angry, well-armed mob and created a potentially dangerous environment, and continue to take actions to exacerbate that situation,

441. Unless this Court intervenes and prevents Defendants Susewind and Windrope from continuing their retaliatory conduct, Plaintiffs will continue to suffer harm and the chilling effect on protected speech, association, and political expression will intensify. Monetary damages cannot fully address these harms or make Plaintiffs whole.

442. Each new action by Defendants to disparage, marginalize and silence Smith, Davis, and WW1; new iteration and development in the investigation Defendants manufactured



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

as a pretext for these adverse actions; and each new document revealed to the public that is related to Defendants' retaliatory campaign renews, exacerbates, and increases the harm caused to Smith, Davis, and WW1, and freezes speech, public discourse, free association, and governmental engagement, not only in Washington but in other wildlife commissions and departments around the country.

1. Damages to Plaintiff Lorna Smith

443. Smith seeks compensatory damages for reputational injury, lost opportunities, emotional distress, mental anguish, humiliation, anxiety, embarrassment, loss of enjoyment of life, impairment of her ability to perform her duties as a commissioner, and out-of-pocket expenses proximately caused by Defendants' conduct.

444. Over a career spanning approximately 48 years, Smith built a substantial reputation through paid and volunteer service on behalf of wildlife, the environment, and the public. Defendants damaged that reputation by targeting Smith for a pretextual investigation, compiling and disseminating allegations impugning her honesty and integrity, advocating for adverse action against her, and supporting efforts to remove or discipline her as a commissioner.

445. Defendants' conduct prompted hunting-rights activists and allied organizations to demand that Smith be prosecuted, disciplined, and removed from the Commission. Those demands, and the allegations on which they were based, have been disseminated through public records, media reports, websites, social-media platforms, public testimony, emails, letters, and other communications.

446. Smith's Commission term expires on December 31, 2026. The Final Investigation Report, Addendum, and related materials remain relevant to decisions concerning her continued public service and have been used to criticize her conduct and threaten her removal. The August 31, 2026, letter from the Governor's Chief of Staff also warned Smith that failure to comply with restrictions concerning her conduct and associations would result in her removal before the end of her term.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

447. As a result of Defendants' conduct, Smith has suffered and continues to suffer reputational and professional harm, including damage to her standing in the environmental and wildlife communities, loss of opportunities, impairment of her ability to serve effectively as a commissioner, and uncertainty concerning her future public service.

448. Defendants' conduct and the public campaign it generated have also caused Smith substantial emotional distress, mental anguish, humiliation, anxiety, embarrassment, loss of enjoyment of life, and fear for her personal safety. Public abuse, ridicule, harassment, and threats directed at Smith have intensified at Commission meetings, in press coverage, and across social-media platforms.

449. Smith has experienced sleeplessness, headaches, and other physical symptoms. She has begun taking medication for depression, anxiety, and sleep, which she had not previously required. She has installed security cameras at her home, changed how she parks at Commission meetings, remained alert to vehicles near her home, and altered her conduct because of concerns for her safety and the safety of her dogs.

450. Defendants' conduct has also chilled Smith's protected activity. She has curtailed her communications, advocacy, participation in Commission activities, and association with individuals and organizations because of Defendants' actions and the threat of additional governmental retaliation.

451. Smith also seeks reimbursement for reasonable out-of-pocket expenses directly attributable to Defendants' conduct, including documented expenses incurred for safety measures and other costs caused by the retaliatory campaign. The amount of those expenses will be established through evidence.

2. Damages to Plaintiff Claire Loebs Davis

452. Plaintiff Davis seeks compensatory damages for reputational injury, professional and economic harm, emotional distress, impairment of her advocacy, interference with professional and client relationships, lost or diminished opportunities, and reasonable out-of-pocket expenses proximately caused by Defendants' conduct.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

453. Davis is a Washington-licensed attorney, public-interest wildlife advocate, founder and leader of WW1, and managing partner of Animal & Earth Advocates, PLLC. Her professional work and advocacy depend on her credibility, reputation, ability to communicate and associate with public officials, relationships with actual and prospective clients, and ability to petition and participate in public wildlife-governance processes.

454. Defendants used their official authority, agency resources, personnel, and governmental processes to portray Davis's advocacy, litigation, communications, and relationships with commissioners as improper, unethical, or collusive. Defendants also attempted to deter commissioners, agency personnel, advocates, and other members of the public from communicating or associating with Davis.

455. Defendants' conduct caused damage to Davis's personal and professional reputation, impaired her ability to function effectively as a public advocate, interfered with her relationships with clients and policymakers, and chilled her speech, advocacy, petitioning, litigation-related activity, and association.

456. Defendants' allegations also generated professional and disciplinary consequences for Davis. A public call was made for individuals to file grievances against her, and at least nine grievances were filed with the Washington State Bar Association's Office of Disciplinary Counsel. The Office of Disciplinary Counsel dismissed those grievances, but two dismissals have been appealed and referred to a Review Committee of the Disciplinary Board for further consideration.

457. The filing, investigation, and continuing review of those grievances have caused Davis professional harm, emotional distress, reputational injury, and additional interference with her ability to practice law and represent clients effectively.

458. Davis seeks recovery for lost or diminished legal, consulting, speaking, advocacy, and other professional opportunities; lost or diminished actual or prospective client relationships; impairment of her law practice and professional standing; and reasonable and necessary expenses incurred to respond to the retaliatory conduct and its consequences, including expenses



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

associated with responding to bar grievances, defending her reputation, and protecting her professional and personal safety.

459. Davis's damages are ongoing and will continue to accrue as Defendants' allegations remain available through public records and continue to be disseminated, repeated, or used to discourage others from communicating or associating with her.

3. Damages to Plaintiff Washington Wildlife First

460. Plaintiff WW1 seeks compensatory damages for organizational, reputational, economic, fundraising, operational, and out-of-pocket injuries proximately caused by Defendants' conduct.

461. WW1 is a nonprofit advocacy and government-watchdog organization whose work depends on its credibility, ability to communicate with commissioners and other public officials, participation in agency and Commission proceedings, coordination with coalition partners and experts, public education, and ability to obtain charitable donations, grants, and other financial support.

462. Defendants used state resources and official processes to stigmatize WW1 and its representatives, characterize association with WW1 as improper "collusion," and deter commissioners, agency personnel, advocates, and members of the public from communicating or associating with WW1.

463. Defendants also caused or facilitated the dissemination of allegations concerning WW1 and its representatives to hunting-rights activists and allied organizations. Those allegations were then repeated and amplified through public records, media reports, websites, social-media platforms, public testimony, emails, letters, and other communications.

464. As a direct and foreseeable result, WW1 has suffered reputational harm, loss of credibility, impairment of its relationships with policymakers and supporters, and reduced effectiveness in carrying out its advocacy and watchdog functions.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

465. Defendants' conduct has impaired WW1's ability to obtain the access, cooperation, trust, and association necessary to provide information to decisionmakers, coordinate advocacy efforts, educate the public, and advance its organizational mission.

466. WW1 has also been required to divert scarce organizational resources to respond to Defendants' conduct and its consequences. Those diverted resources include staff and leadership time and the costs of contractors, consultants, and other services used to review and respond to allegations, correct or address misinformation, respond to public attacks, communicate with supporters and funders, preserve organizational credibility, and evaluate or implement enhanced security measures.

467. WW1 seeks recovery for lost or diminished charitable donations, grants, fundraising opportunities, and other financial support where the evidence establishes that the loss was caused by Defendants' conduct.

468. WW1 also seeks recovery for lost or impaired organizational opportunities, including advocacy, educational, coalition, watchdog, and public-engagement activities that were cancelled, delayed, disrupted, curtailed, or made more costly because of Defendants' conduct.

469. WW1's damages are ongoing and continue to accrue as Defendants' allegations remain available through public records and continue to be disseminated, repeated, or used to discourage others from communicating or associating with WW1.

4. Damages and Relief Common to Plaintiffs

470. Plaintiffs seek compensatory damages for their individualized injuries described above. Plaintiffs do not seek duplicative recovery for the same injury.

471. Plaintiffs seek nominal damages for violations of their First Amendment rights. If Plaintiffs prove a constitutional violation but do not prove compensable monetary loss in a particular category, Plaintiffs seek nominal damages as recognition and redress for that constitutional injury.

472. Plaintiffs seek punitive damages against Defendants Susewind and Windrope in their individual capacities. Defendants acted intentionally, maliciously, recklessly, or with



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

callous indifference to Plaintiffs' clearly established rights to speak, associate, petition the government, and advocate on matters of public concern without governmental retaliation or viewpoint discrimination.

473. Plaintiffs seek declaratory and prospective injunctive relief to prevent continuing or future retaliation, viewpoint discrimination, stigmatization, interference with protected speech and association, interference with petitioning activity, and retaliatory use of agency personnel, resources, counsel, or official processes.

474. Plaintiffs seek reasonable attorneys' fees and litigation costs under 42 U.S.C. § 1988 and other applicable law.

475. Plaintiffs seek pre-judgment and post-judgment interest to the extent permitted by law.

476. Plaintiffs' damages continue to develop. Plaintiffs will supplement their allegations and disclosures as required by the Federal Rules of Civil Procedure and as additional information becomes available through discovery, public-records productions, third-party evidence, witness testimony, financial records, and other competent evidence.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983: First Amendment Viewpoint Discrimination and Retaliation

*Plaintiff Lorna Smith Against Defendants Susewind and Windrope,*
*Individually and in Their Official Capacities*

477. Smith realleges and incorporates the preceding paragraphs as if fully set forth herein.

478. Under 42 U.S.C. § 1983, a party may seek injunctive relief and damages against a party who, under color of law of any state, deprives a person within the jurisdiction of the United States of any rights, privileges, or immunities secured by the U.S. Constitution and other applicable laws.

479. The First Amendment to the U.S. Constitution guarantees the freedom of speech, association, and assembly. U.S. CONST. AMEND. I.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

480. Smith engaged in speech protected by the First Amendment, including speech on matters of public concern relating to WDFW governance, wildlife policy, and agency accountability expressed during Commission policy debates, public statements in other forums, and in communications with members of the public and agency stakeholders.

481. Before Defendants vendetta escalated into a Governor-level investigation, Smith questioned Defendants' leadership of WDFW, including the fact that they jeopardized staff safety by allowing staff to operate in dangerous conditions without equipment and training sufficient to satisfy state safety laws and regulations, and their failure to resolve pervasive internal issues with bullying, illegal and unethical behavior, sexual discrimination and misogyny, retaliation, and a lack of leadership accountability.

482. Smith has long associated with conservation organizations, wildlife advocacy organizations, and private wildlife advocates. These associations long predate and exist independently of Smith's Commission service, and Governor Inslee was aware of them when he appointed her to serve on the Commission. Smith has been a wildlife advocate for more than forty years and served as executive director of Western Wildlife Outreach before her appointment. She has long maintained her own personal relationships with many groups, and/or current and past representatives of those groups, including WW1, Wild Fish Conservancy, Olympic Forest Coalition, Endangered Species Coalition, Sierra Club, Mountain Lion Foundation, Backcountry Hunters and Anglers, Kettle Range, Conservation Society, Predator Defense, Jefferson Land Trust, Washington Environmental Council, Audubon Society, SeaDoc, and Center for Biological Diversity, National Wildlife Federation, Washington Wildlife Federation, Coalition for Washington Fish and Wildlife, Port Townsend Marine Science Center, Friends of Malheur NWR, Deep Green Wilderness, Save the North Pacific Right Whale, Great Old Broads for Wilderness, Washington Trails Association, Wilderness Society, American Bird Conservancy, Washington Ornithological Society, Rainforest Biodiversity Group, Cornell Lab of Ornithology, North Cascades Institute, Olympic National Park Association, The Rewilding Institute, Wildlife for All, National Wildlife Refuge Association, Defenders of Wildlife, National



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Parks Conservation Association, Xerxes Society, Ducks Unlimited, Snohomish Wetlands Alliance, and Washington Conservation Association (formerly Washington Environmental Coalition). No statute, rule, or duty of her office requires her to maintain those relationships, and none of them owes its existence to her Commission responsibilities.

483. Both predating and during her Commission service, Smith associated with individuals and groups who advocated on behalf of fish and wildlife for the purpose of advancing political beliefs, sharing ideas, and obtaining information on issues of public importance.

484. Prior to her appointment to the Commission, when Smith was the executive director of Western Wildlife Outreach, she worked cooperatively with many groups on carnivore issues, including the Mountain Lion Foundation, Predator Defense, Center for Biological Diversity, and Kettle Range Conservation Group.

485. While serving on the Commission, she has continued many of these relationships through volunteer work, such as when she organized the annual Christmas bird count for her local Audubon chapter, mobilized local advocates to call for the protection of the seabirds of Protection Island, including surveying the mid-Salish Sea for seabirds, taught a natural history course for the Jefferson Land Trust, served on the Cape George Environmental Committee and worked with the Olympic Cougar Project.

486. Smith has continued to speak as a private citizen throughout her Commission service, in forums no Commission duty reached. She expressed personal opinions about hunting and wildlife policy on her personal social media accounts, which Defendants collected. She discussed pending legislation in her capacity as a private citizen, which Defendants also collected. She spoke at events hosted by private advocacy organizations, including WW1 events, in appearances that were later treated as evidence against her while she was under investigation.

487. Both as part of her service as a commissioner and apart from that service, Smith challenged Defendants for: showing favoritism to organized hunting groups and hunting rights activists; suppressing agency science that undermined their recommendations and policy



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

preferences and seeking to block the Commission from hearing from outside experts; and establishing a practice and culture at WDFW that excused the routine violation of laws, including SEPA and the APA.

488. Smith expressed her disagreement, in Commission proceedings and also in settings unconnected to the Commission, with Susewind and Windrope on numerous issues, including but not limited to: the need for WDFW to prioritize the conservation and protection of wildlife, given increasing existential threats of climate change, overexploitation, and habitat loss and destruction; WDFW's obligation to represent the interests of all current and future Washington residents, rather than giving favorable treatment to consumptive interests; Defendants' quest to remove protections from endangered wolves at both the state and federal level; the lack of consistency, reason and science to support WDFW's approach to policies relating to carnivores, leading to the overexploitation of species including cougars; the need to develop a GMP that would offer sufficient protections to essential species like carnivores and beavers, vulnerable and sensitive species, and species for which WDFW lacked sufficient information to determine population status; the continuation of the spring bear hunt; the threat that the unrestrained expansion of salmon hatcheries poses to wild fish and Southern Resident killer whales; the importance of subjecting agency proposals to careful environmental review as required by SEPA; and the protection of vulnerable, sensitive, threatened, and endangered species.

489. Smith also associated with people who held information Defendants wanted withheld from the Commission. She sought out and met with WDFW scientists and other agency employees who came to her about agency dysfunction, hostile working conditions, suppressed science, and the safety failures that preceded two employee deaths. Several of those employees approached her as whistleblowers. She consulted scientists and subject-matter experts outside the agency on bear and cougar population dynamics, wolf science and recovery, the effects of hatchery expansion on wild salmon and Southern Resident killer whales, and WDFW's



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

compliance with SEPA. She used what she learned to ask questions and request briefings that agency leadership had not offered.

490. Smith's private associations are now the subject of official state findings. The investigation Defendants procured examined who Smith met with, how often she met with them, and how familiar those relationships appeared. It concluded that her association with a private nonprofit and its executive director violated state ethics rules. The Governor's office then directed Smith to recuse herself from matters touching those relationships and told her that failure to comply would cost her seat before her term expires. Smith is being required to give up private associations as the price of continued public service.

491. Acting under color of state law, Defendants have attempted to prevent Smith from, and retaliated against her for, associating with people and groups expressing viewpoints and holding positions with which Susewind and Windrope disagree, including but not limited to Davis and other individual wildlife advocates; people associated with WW1, WFC, and other organizations that Defendants have broadly classified as "animal rights" organizations; experts both within and outside the agency with knowledge of science and information that Susewind sought to suppress; and WDFW employees, who sought out Smith as whistleblowers to discuss agency dysfunction, hostile working conditions, and safety violations that have led to employee deaths.

492. Acting under color of state law, Defendants sought to prevent Smith from, and retaliated against her for, fulfilling her obligation as a public official serving in a quasi-legislative capacity to take positions on controversial public issues, express her viewpoints on issues presented to the Commission for consideration, present information and science to inform Commission decisions, and engage with her colleagues in free and spirited debate. Defendants thus infringed upon Smith's right to speak on matters of public concern, a right that is subject to enhanced protections under the First Amendment to fulfill its central commitment that "debate on public issues should be uninhibited, robust, and wide-open."



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

493. Acting under color of state law, Defendants Susewind and Windrope attempted to prevent Smith from exercising her First Amendment right to free speech and association by subjecting her to controls not imposed on other commissioners, restricting the forums in which she could speak, and pressuring her to suppress her views.

494. Defendants controlled the information that reached Smith. They limited her access to staff, dictated what staff were permitted to tell her, and presented the Commission with the director's recommended course of action and the science supporting it, without alternatives and without contrary data. When Smith sought information on her own, Defendants treated the request as a problem to be managed.

495. Defendants characterized Smith's speech on contested issues as stepping outside her lane and as evidence that she did not trust or respect agency staff or staff science. Through Panesko, they pressed Smith to stop voicing disfavored views and to end her associations with disfavored organizations. They compiled and circulated documents recasting her ordinary meetings and communications with advocacy organizations as "collusion," so that any future meeting would carry the risk of a further accusation.

496. The allegations and documents Defendants supplied led directly to the August 31, 2026, letter from the Governor's chief operations officer. That letter directed Smith to recuse herself from matters involving "personal or organizational relationships that can even create an appearance of a conflict of interest," warned her against "engagement in retaliatory conduct against anyone who participated in the investigation," and stated that failure to meet those expectations would result in her removal before the end of her term. On information and belief, no commissioner whose views aligned with Defendants' own views received any comparable letter, instruction, or warning.

497. No similarly situated commissioner was subjected to any of these measures.

498. Acting under color of state law, Defendants Susewind and Windrope took adverse action against Smith in retaliation for her exercise of her First Amendment rights of free speech



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

and association, including by abusing the authority and resources of the state to selectively retaliate against Smith by:

a. berating her and disparaging her to others, including WDFW employees and members of the public;

b. both directly and through Panesko, pressuring Smith to stop voicing her views and to end her associations with people and organizations who expressed viewpoints that they disfavored;

c. on information and belief, cooperating with state and national hunting rights groups to publicly malign, denigrate, threaten, and bully Smith;

d. exceeding the authority of their roles by diverting WDFW and Commission staff from other duties to comb through Ragen's, Rowland's, and/or Smith's emails and/or computers, without any equivalent review of similarly-situated commissioners;

e. directing WDFW and Commission staff to curate a collection of documents specifically designed to malign and discredit Smith and Rowland, without any similar effort against similarly situated commissioners;

f. drafting or directing the drafting of a memo to the attorney general's office fabricating allegations against Smith and containing false, misleading, defamatory, and inflammatory statements about her;

g. on information and belief, requesting that Panesko prepare, and collaborating with Panesko on the preparation of, a memo to Governor Ferguson's office containing facts and allegations about Smith that Defendants knew to be false, misleading, unsubstantiated, defamatory, and inflammatory;

h. directing Knoll, a lawyer working for Susewind in WDFW's enforcement division, to draft a memo to convey to Governor Ferguson forwarding facts and allegations that Defendants knew to be false, misleading, unsubstantiated, defamatory, and inflammatory;

i. using the Knoll Memo and the Panesko Memo, which they knew contained false, misleading, unsubstantiated, defamatory, and inflammatory statements, to persuade Governor Ferguson to open an investigation into Smith with the intent of seeing her sanctioned and removed as a commissioner;

j. compiling documents, summaries, and memoranda designed to target, disparage, and defame Smith;

k. using those materials to advocate to the Governor, the Attorney General, and others that adverse action be taken against Smith; and

l. submitting additional materials to the investigator hired by Governor Ferguson after the investigator completed the Final Report, on information and belief because they were unsatisfied with its conclusions regarding Smith.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

499. Defendants retained practical control over the investigation after it left their hands, and the state's adverse findings against Smith are built from materials Defendants selected. The five categories of inquiry cited in the investigation track the concerns Defendants supplied. Defendants were two of only eight witnesses interviewed. And on June 10, 2026, after the Final Report was issued, Defendant Windrope transmitted three further groups of documents directed at Smith's and Rowland's records productions. The Addendum's revised finding rests on those documents. The investigator cites them as sources 10, 11, and 12, each identified as provided by Windrope through Tami Lininger on June 10, 2026.

500. Defendants were also the only two witnesses Nziramasanga returned to after she had finished interviewing the commissioners. Nziramasanga re-interviewed Susewind and Windrope on February 20, 2026, two months after her last interview of Smith.

501. The documents Windrope sent on June 10, 2026, arrived in three groups. Group 1 was five records Smith produced and Rowland did not. Group 2 was fifty-six records Nziramasanga was told neither commissioner had produced. Group 3 was recovered text messages the investigator was told neither commissioner had produced. Windrope sent all three through Tami Lininger of WDFW, two months after the investigator had submitted her Final Report.

502. Defendants' conduct has chilled Smith's public and private speech and associations and crippled her ability to function effectively as a commissioner, especially after the public release of the Knoll Memo prepared at their direction, the Final Report evaluating their allegations, and the Plaistowe Letter responding to that report. Smith has changed who she associates with, what she says, whom she says it to, and where she says it, in order to avoid generating further material for findings against her. The state has told her in writing that the alternative is removal from her seat.

503. As the result of the adverse actions Defendants took against her and their foreseeable and intended consequences, Smith has also reduced the number of hours she works as a commissioner, halted most proactive work as the chair of the wildlife committee, curtailed



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

the questions she asks of leadership and staff, halted her attempts to bring broader knowledge and perspective to the Commission, avoided most participation in Commission debates on controversial subjects, self-censored her comments in public meetings, reduced her attendance at in-person Committee meetings, and limited her public criticism of Defendants and their management of WDFW.

504. Defendants' retaliatory actions against Smith have chilled the speech and associations of other commissioners, including by making other Commissioners reluctant to associate with Smith, or solicit her views.

505. Smith's protected activity was not confined to her Commission duties. Her advocacy for wildlife predates her appointment by decades, continued through her service in forums unconnected to the Commission, and will continue after her term ends. Defendants collected and used her private speech and her private associations as evidence against her. No duty of her office required Smith to hold the views Defendants targeted, to associate with the people and organizations Defendants targeted, or to express either.

506. Defendants also targeted Smith's speech as a member of a quasi-legislative body created by statute to set state wildlife policy following deliberation and debate.

507. Smith's protected activity was a substantial or motivating factor for Defendants''adverse actions against her, including their manufacture of false, misleading and/or defamatory allegations, improper use of WDFW resources to further those false, misleading and/or defamatory allegations, and efforts to persuade Governor Ferguson to open an investigation aimed at Smith's sanction and removal. This motive is evidenced by their written and oral statements, the direct connection between the nature and language of the allegations against Smith and her exercise of protected activity, the disparate treatment of current and former commissioners who engaged in conduct that was similar to, or more serious than, the behavior that purportedly formed the basis for the investigation into Smith, and the failure of that investigation to substantiate any of the allegations Defendants directed at Smith.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

508. But for Smith's participation in the protected activity alleged herein, Defendants would not have selectively targeted Smith using escalating retaliatory and discriminatory tactics, attempted to bully and intimidate her to chill her future speech and association, or fabricated allegations against her with the intent of having her investigated, sanctioned, publicly shamed, and removed as a commissioner.

509. Defendants' adverse actions as alleged herein have caused substantial harm to Smith and would chill a person of ordinary firmness from continuing to engage in protected First Amendment activity.

510. As a direct and proximate cause of Defendants' conduct, Smith has suffered and will continue to suffer injury, including chilling of her speech and association, reputational damage, emotional distress, impairment of health, and imminent irreparable harm from the selectively targeted "investigation" facilitated by Defendants, including interference with her ability to effectively carry out her responsibilities as a commissioner, and from each successive report, addendum, and public disclosure that investigation continues to generate.

511. Absent judicial intervention, Defendants will continue their ongoing campaign of viewpoint discrimination and retaliation against Smith and others who share her views, and the chilling effect of Defendants' conduct will impact not only Smith, but other wildlife commissioners, both in Washington and other states.

512. In doing the acts of which Smith complains, Defendants' conduct was intentional, reckless, or callously indifferent to Smith's federally protected right to be free from retaliation and discrimination for her engagement in activities protected under the First Amendment, and accordingly, Smith is entitled to punitive damages against Defendants Susewind and Windrope in their individual capacities. *See Smith v. Wade*, 461, U.S. 30, 56 (1983).

513. Smith seeks declaratory and prospective injunctive relief to halt ongoing constitutional violations committed by Defendants in their official capacities, as well as damages against Defendants in their individual capacities.

514. Smith seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

515. This Court has authority to remedy Defendants 'violations of the First Amendment of the Constitution, and without this Court's intervention, Smith cannot be made whole.

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983: First Amendment Viewpoint Discrimination and Retaliation**
*Plaintiff Claire Davis Against Defendants Susewind and Windrope, Individually and in Their Official Capacities*

516. Davis realleges and incorporates the preceding paragraphs as if fully set forth herein.

517. Under 42 U.S.C. § 1983, a plaintiff may seek relief against a person who, acting under color of state law, deprives the plaintiff of rights secured by the Constitution or laws of the United States.

518. The First Amendment protects freedom of speech, expressive association, assembly, and petition. U.S. CONST. AMEND. I.

519. Davis states claims for First Amendment retaliation and viewpoint discrimination by alleging that she engaged in protected speech, expressive association, and petitioning; Defendants took adverse governmental actions that would chill a person of ordinary firmness from continuing that activity; Defendants targeted Davis because of the viewpoints she expressed and advanced; Davis's protected activity and viewpoints were substantial or motivating factors in Defendants' actions; and Davis suffered concrete professional, reputational, emotional, and economic injuries as a result.

520. Davis is a Washington-licensed attorney, public-interest wildlife advocate, founder of WW1, its board president since its inception, and, at various times including the present, its executive director. She is also the managing partner of AEA, a public-interest law firm that brings litigation on behalf of wildlife and the environment.

521. Davis has engaged in protected speech and political expression by publicly criticizing Susewind, Windrope, and actions WDFW has taken at their direction, including WDFW's treatment of wildlife, subservience to hunting, fishing, and commercial interests,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

suppression or misrepresentation of science, failure to comply with environmental and procedural laws, treatment of employees, management of carnivores and hatcheries, and conduct concerning wolves, bears, cougars, the GMP, and other matters of public concern.

522. Davis has exercised her First Amendment right to petition the government for redress of grievances by communicating with commissioners and other public officials, participating in public proceedings, submitting and assisting with administrative rulemaking petitions, and representing public-interest clients in litigation concerning WDFW's conduct, environmental compliance, public participation, wildlife policy, and agency accountability.

523. Davis began challenging WDFW's conduct in 2017. Through Lane Powell PC and later through AEA, she has brought and participated in public-interest actions concerning WDFW's orders to kill state-endangered wolves; its treatment of fish, marine ecosystems, and hatchery production; violations of the Public Records Act; failures to comply with SEPA and the APA; carnivore-hunting rules; and adoption of the GMP.

524. Davis has also exercised her right to expressive association through her leadership of WW1; her association with Smith, WW1, WFC, and other wildlife-advocacy organizations; her work with the WA Wildlife Coalition; her relationships with scientists, agency employees, public officials, and other advocates; and her association with individuals and organizations that share or advance conservation-oriented viewpoints.

525. Davis's advocacy, litigation, communications, associations, and petitioning activity have opposed Defendants' preferred hunting, fishing, commercial, and other consumptive-use policies and have sought to require WDFW to comply with its statutory, environmental, public-records, and public-participation obligations.

526. Defendants opposed Davis's viewpoints and petitioning activity and harbored animus toward her because she repeatedly criticized WDFW leadership, challenged WDFW in court, advocated for opposing wildlife policies, communicated with commissioners, and helped lead WW1's efforts to reform wildlife governance.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

527. Defendants also opposed Davis because of her association with WW1, Smith, other commissioners, scientists, agency employees, public-interest organizations, and members of the public who shared or provided information concerning viewpoints opposed to Defendants' policy agenda.

528. Acting under color of state law, Defendants used WDFW resources, personnel, counsel, records, and official processes to retaliate against Davis for exercising her rights to speak, associate, and petition the government.

529. Defendants' adverse actions against Davis included commissioning, directing, facilitating, and disseminating memoranda and other materials that accused or implied that Davis had engaged in improper, unethical, or collusive conduct; portraying her communications and relationships with commissioners as wrongful; attempting to deter commissioners, agency personnel, advocates, and members of the public from communicating or associating with her; and using official processes and communications to stigmatize Davis and interfere with her advocacy and professional activities.

530. Defendants and their agents specifically portrayed Davis's communications with commissioners and advocacy on matters before the Commission as evidence of improper coordination, collusion, or conflicts of interest. They also treated Davis's representation of public-interest litigants and her communications concerning issues related to pending or potential litigation as evidence of wrongdoing, despite the absence of allegations that she sought or obtained confidential information, provided improper legal advice, or received a financial or other improper benefit.

531. Defendants' conduct included preparing, directing, or contributing to the AGO Outline, Panesko Memo, Knoll Documents, Knoll Memo, investigative submissions, and other communications that identified Davis and her relationships with commissioners, WW1, WFC, and other advocacy organizations as evidence of alleged misconduct.

532. Defendants also caused or facilitated the dissemination of allegations concerning Davis to hunting-rights activists and allied organizations. Those allegations were repeated and



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

amplified through public records, media reports, websites, social-media platforms, public testimony, emails, letters, and other communications.

533. Defendants' conduct was intended to punish Davis for her protected speech, expressive association, advocacy, litigation, and petitioning; to deter Davis from continuing those activities; and to deter commissioners, agency personnel, clients, advocates, and members of the public from communicating or associating with her.

534. Defendants' actions would chill a person of ordinary firmness from continuing to engage in protected speech, expressive association, advocacy, litigation, and petitioning. Defendants' actions also chilled Davis's actual exercise of those rights and interfered with her ability to function as a public advocate and attorney.

535. Defendants' conduct also constituted viewpoint discrimination. Defendants targeted Davis because of the conservation-oriented viewpoints she expressed and advanced through her speech, advocacy, litigation, association, and petitioning activity. At the same time, Defendants favored, encouraged, or tolerated comparable advocacy and associations by hunting, fishing, commercial, and other consumptive-use interests whose viewpoints aligned with Defendants' policy preferences.

536. Defendants' disparate treatment included permitting commissioners and WDFW personnel to maintain close relationships with hunting-rights organizations and other favored interest groups, including groups involved in litigation or policy disputes concerning WDFW, while treating Davis's communications and relationships with wildlife-advocacy organizations and public officials as evidence of misconduct, collusion, or an appearance of conflict.

537. Defendants and their agents, through the AGO Outline, Panesko Memo, Knoll Documents, Knoll Memo, interviews with Nziramasanga, and statements to commissioners, staff, and members of the public, portrayed Davis and persons associated with her as "animal rights" or "anti-hunting" activists and accused them of ignoring science, relying on emotion, pursuing improper agendas, and engaging in unethical or potentially unlawful conduct.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

538. Defendants knew or should have known that their allegations concerning Davis would become public through public-records requests, the investigation, the Final Report and Addendum, media coverage, public statements, and communications with the public.

539. Defendants knew or should have known that public disclosure and dissemination of those allegations would damage Davis's professional reputation, interfere with her law practice and public-interest advocacy, impair her relationships with clients and policymakers, and expose her to additional professional and personal harm.

540. Davis's protected speech, expressive association, advocacy, litigation, and petitioning activity were substantial or motivating factors in Defendants' adverse actions. The causal connection is shown by Defendants' statements and conduct; the direct focus of their allegations on Davis's viewpoints, relationships, advocacy, litigation, and petitioning activity; the timing and scope of the investigation; Defendants' use of state resources to investigate and stigmatize her communications and associations; the disparate treatment of favored interest groups; and Defendants' continued use of the resulting materials to discredit Davis and deter others from communicating or associating with her.

541. But for Davis's participation in protected speech, expressive association, advocacy, litigation, and petitioning, Defendants would not have selectively targeted her, used state resources and official processes to stigmatize her, or attempted to deter commissioners, agency personnel, clients, advocates, and members of the public from communicating or associating with her.

542. Defendants' conduct therefore constituted retaliation and viewpoint discrimination prohibited by the First Amendment, including retaliation for Davis's protected speech, expressive association, advocacy, litigation, and petitioning activity.

543. As a direct and proximate result of Defendants' conduct, Davis has suffered damage to her personal and professional reputation, impairment of her ability to function effectively as a public advocate, interference with her relationships with clients and



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

policymakers, and chilling of her speech, advocacy, petitioning, litigation-related activity, and association.

544. Defendants' allegations also generated professional and disciplinary consequences for Davis. Public calls were made for individuals to file grievances against her, and at least nine grievances were filed with the Washington State Bar Association's Office of Disciplinary Counsel. The Office of Disciplinary Counsel dismissed those grievances, but two dismissals have been appealed and referred to a Review Committee of the Disciplinary Board for further consideration.

545. The filing, investigation, and continuing review of those grievances have caused Davis professional harm, emotional distress, reputational injury, and additional interference with her ability to practice law and represent clients effectively.

546. Davis seeks recovery for lost or diminished legal, consulting, speaking, advocacy, and other professional opportunities; lost or diminished actual or prospective client relationships; impairment of her law practice and professional standing; and reasonable and necessary expenses incurred to respond to Defendants' conduct and its consequences, including expenses associated with responding to bar grievances, defending her reputation, and protecting her professional and personal safety.

547. Davis's damages are ongoing and will continue to accrue as Defendants' allegations remain available through public records and continue to be disseminated, repeated, or used to discourage others from communicating or associating with her.

548. Absent judicial intervention, Defendants will continue their campaign of viewpoint discrimination and retaliation against Davis and persons who associate with her, and the resulting chilling effect will continue to impair Davis's speech, advocacy, petitioning, professional practice, and public-interest work.

549. In taking the actions alleged herein, Defendants acted intentionally, recklessly, or with callous indifference to Davis's federally protected rights. Davis is therefore entitled to



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

punitive damages against Defendants Susewind and Windrope in their individual capacities. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

550. Davis seeks compensatory and nominal damages against Defendants in their individual capacities; punitive damages against Defendants in their individual capacities; and declaratory and narrowly tailored prospective injunctive relief against Defendants in their official capacities to remedy ongoing violations of Davis's First Amendment rights.

551. Davis also seeks reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law, together with pre- and post-judgment interest and such other relief as the Court deems just and proper.

552. Davis seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202.

## THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1983: First Amendment Viewpoint Discrimination and Retaliation

*Plaintiff Washington Wildlife First Against Defendants Susewind and Windrope, Individually and in Their Official Capacities*

553. WW1 realleges and incorporates the preceding paragraphs as if fully set forth herein.

554. Under 42 U.S.C. § 1983, a plaintiff may seek relief against a person who, acting under color of state law, deprives the plaintiff of rights secured by the Constitution or laws of the United States.

555. The First Amendment protects freedom of speech, expressive association, assembly, and petition. U.S. CONST. AMEND. I.

556. WW1 states claims for First Amendment retaliation and viewpoint discrimination by alleging that it engaged in protected speech, expressive association, and petitioning; Defendants took adverse governmental actions that would chill a person of ordinary firmness from continuing that activity; Defendants targeted WW1 because of the viewpoints it expressed and advanced; WW1's protected activity and viewpoints were substantial or motivating factors in Defendants' actions; and WW1 suffered concrete organizational, reputational, operational, and financial injuries as a result.



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

557. WW1 is a nonprofit organization whose mission is to transform Washington's approach to fish and wildlife policy into a more democratic paradigm that elevates science, recognizes the intrinsic value of individual animals, and prioritizes protecting, preserving, and perpetuating wild lives and ecosystems. WW1 also serves as an agency watchdog by monitoring and participating in Commission proceedings, attending meetings, providing testimony, submitting comments and administrative petitions, communicating with commissioners and other public officials, and pursuing public-interest litigation concerning WDFW.

558. WW1 and its representatives have engaged in protected speech and political expression by publicly criticizing Susewind, Windrope, and actions WDFW has taken at their direction, including WDFW's treatment of wildlife, reliance on hunting, fishing, and commercial interests, suppression or misrepresentation of science, failure to comply with environmental and procedural laws, treatment of employees, management of carnivores and hatcheries, and conduct concerning wolves, bears, cougars, the GMP, and other matters of public concern.

559. WW1 has exercised its First Amendment right to petition the government for redress of grievances by communicating with commissioners and other public officials, participating in public proceedings, submitting administrative rulemaking petitions, and pursuing public-interest litigation designed to enforce procedural and environmental laws, protect public participation in agency decision-making, and require consideration of environmental impacts.

560. In partnership with other wildlife-advocacy organizations, WW1 submitted petitions asking the Commission to undertake rulemaking concerning standards for lethal removal of state-endangered wolves and the regulation of cougar and bear hunting. The wolf petition led to rulemaking after Governor Inslee granted an appeal in January 2024. The Commission accepted the cougar and bear petition in December 2023 and adopted new rules resulting from that petition on July 19, 2024, and April 4, 2025.

561. Since its formation in 2021, WW1 has been a plaintiff or co-plaintiff in six legal actions against WDFW. Those actions challenged WDFW's compliance with SEPA and its statutory mandate in adopting the GMP; challenged the Commission's delegation of authority to



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

the director; challenged WDFW's hatchery policies and hatchery-construction decisions; and challenged WDFW's decision to kill endangered wolves from the Sherman wolf pack. As of the date of this filing, WW1 is preparing to appeal a superior court decision in one of these cases, while another case is pending in the Washington Court of Appeals.

562. WW1 has also exercised its First Amendment right to expressive association by affiliating with Davis as its President and Executive Director, working with organizations in the WA Wildlife Coalition, supporting efforts to reform state hatchery and fishery policy, consulting with scientists and advocates, and building relationships with policymakers, including Commission members.

563. Defendants opposed WW1's viewpoints and petitioning activity and harbored animus toward WW1 from its inception. Defendants and their agents expressed that animus through statements to staff and commissioners, communications with members of the public, treatment of WW1 and its representatives at public meetings, and disparate treatment of WW1 and organizations that shared its viewpoints.

564. Acting under color of state law, Defendants used WDFW resources, personnel, counsel, records, and official processes to retaliate against WW1 and its representatives for exercising their rights to speak, associate, and petition the government. Their actions included stigmatizing WW1 and its representatives; portraying association with WW1 as improper "collusion" or evidence of a conflict of interest; collaborating with or providing information to outside individuals and interest groups that attacked WW1, its representatives, and its donors; attempting to deter commissioners, WDFW personnel, and members of the public from communicating or associating with WW1; targeting commissioners because of their association with WW1; and preparing, directing, or contributing to documents and memoranda containing allegations against WW1 and its representatives.

565. Defendants' adverse actions against WW1 included using state resources and official processes to investigate and stigmatize association with WW1; characterizing WW1's advocacy and petitioning as improper or collusive; attempting to deter commissioners and



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

WDFW personnel from communicating with WW1; contributing to the dissemination of allegations concerning WW1 and its representatives; and using those allegations to impair WW1's access, credibility, fundraising, and ability to participate in public wildlife-governance processes.

566. Defendants also pursued a pretextual investigation into Smith that was based in significant part on her association with WW1 and its representatives. In connection with that investigation, Defendants and their agents portrayed WW1 and its representatives as unethical, extremist, or potentially engaged in unlawful conduct and accused Smith and other commissioners of "colluding" with WW1 to advance WW1's policy objectives.

567. Defendants' actions were intended to punish WW1 and its representatives for protected speech, expressive association, and petitioning; to deter WW1 from continuing those activities; and to deter public officials, agency personnel, advocates, donors, and members of the public from communicating or associating with WW1.

568. Defendants' actions would chill a person of ordinary firmness from continuing to engage in protected speech, expressive association, and petitioning. These actions did, in fact, chill commissioners, wildlife advocates, supporters, funders, and other members of the public from communicating or associating with WW1 because of the stigma, suspicion, investigation, and threatened adverse action Defendants attached to those relationships.

569. Defendants' conduct also constituted viewpoint discrimination. Defendants targeted WW1 because of the conservation-oriented viewpoints it expressed and advanced through its speech, association, administrative petitions, public-interest litigation, and communications with public officials. At the same time, Defendants favored, encouraged, or tolerated comparable advocacy and associations by hunting, fishing, commercial, and other consumptive-use interests whose viewpoints aligned with Defendants' policy preferences.

570. Defendants' disparate treatment included encouraging or permitting commissioners and WDFW personnel to maintain close relationships with hunting-rights organizations and other favored interest groups, including groups that had litigation or policy



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

disputes with WDFW, while treating communications and associations involving WW1 and its representatives as evidence of misconduct, collusion, or an appearance of conflict.

571. Defendants and their agents, through the AGO Outline, Panesko Memo, Knoll Documents, Knoll Memo, interviews with Nziramasanga, and statements to commissioners, staff, and members of the public, labeled WW1 and persons associated with it as “animal rights” and “anti-hunting” activists; accused them of ignoring science and relying on emotion; and portrayed them as extremist, unethical, incompetent, or unstable. Defendants made or caused these allegations to be made in order to discredit WW1 before the Commission, the Governor, agency personnel, and the public.

572. Defendants knew or should have known that their allegations concerning WW1 and its representatives would become public through public-records requests, the investigation, the Final Report and Addendum, media coverage, public statements, and communications with members of the public.

573. Defendants knew or should have known that public disclosure and dissemination of those allegations would create a hostile and potentially dangerous environment for WW1 and its representatives, given the history of threats, harassment, misogynistic abuse, and calls for violence directed at WW1, its representatives, and other wildlife advocates by members of the hunting-rights community.

574. WW1’s protected speech, expressive association, and petitioning activity were substantial or motivating factors in Defendants’ adverse actions. The causal connection is shown by Defendants’ statements and conduct; the direct focus of their allegations on WW1’s viewpoints, relationships, and petitioning activity; the timing and scope of the investigation; the use of state resources to investigate communications with WW1; the disparate treatment of favored interest groups; and Defendants’ continued use of the resulting materials to stigmatize WW1 and deter association with it.

575. But for WW1’s participation in protected speech, expressive association, and petitioning, Defendants would not have selectively targeted WW1 and its representatives, used



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

state resources and official processes to investigate and stigmatize association with WW1, or attempted to deter public officials and private citizens from communicating or associating with WW1.

576. Defendants' conduct therefore constituted retaliation and viewpoint discrimination prohibited by the First Amendment, including retaliation for WW1's protected speech, expressive association, and petitioning activity.

577. As a direct and proximate result of Defendants' conduct, WW1 has suffered reputational harm, loss of credibility, alienation of supporters, impairment of its relationships with policymakers, interference with its ability to operate as a government watchdog and wildlife-advocacy organization, diversion of organizational resources, a decline in donations and other financial support, and impairment of its advocacy, educational, coalition, and public-engagement activities.

578. Defendants' conduct has impaired WW1's ability to obtain the access, cooperation, trust, and association necessary to provide information to decisionmakers, coordinate advocacy efforts, educate the public, and advance its organizational mission.

579. WW1 has been required to divert staff, leadership, volunteer, and contractor time from its ordinary advocacy, education, coalition-building, and watchdog activities to monitor, respond to, and mitigate the consequences of Defendants' conduct.

580. Absent judicial intervention, Defendants will continue their campaign of viewpoint discrimination and retaliation against WW1 and persons who associate with it, and the resulting chilling effect will continue to impair WW1, its representatives, and other wildlife advocates and organizations.

581. In taking the actions alleged herein, Defendants acted intentionally, recklessly, or with callous indifference to WW1's federally protected rights. WW1 is therefore entitled to punitive damages against Defendants Susewind and Windrope in their individual capacities. *See Smith v. Wade,* 461 U.S. 30, 56 (1983).



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

582. WW1 seeks compensatory and nominal damages against Defendants in their individual capacities; punitive damages against Defendants in their individual capacities; and declaratory and narrowly tailored prospective injunctive relief against Defendants in their official capacities to remedy ongoing violations of WW1's First Amendment rights.

583. WW1 also seeks reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law, together with pre- and post-judgment interest and such other relief as the Court deems just and proper.

584. WW1 seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor on every claim for relief set forth above, and award them relief, including but not limited to, the following:

1. Declaring that Defendants Kelly Susewind and Amy Windrope, acting under color of state law, violated the First Amendment rights of Plaintiff Lorna Smith by retaliating and discriminating against her based on viewpoint and association, including through the improper use of WDFW resources to manufacture allegations against her to prompt the Governor to launch an investigation against her that could lead to her removal as a Commissioner;

2. Declaring that Defendants Kelly Susewind and Amy Windrope violated the First Amendment rights of Plaintiff Claire Loebs Davis by retaliating against and chilling her protected speech, advocacy, and petitioning activity, including by making false, misleading, and defamatory statements about her and manufacturing allegations against commissioners suspected of associating with her;

3. Declaring that Defendants Kelly Susewind and Amy Windrope violated the First Amendment rights of Plaintiff Washington Wildlife First by retaliating against and chilling WW1's protected speech, advocacy, and petitioning activity; stigmatizing its representatives and those who associate with it; and manufacturing allegations against commissioners suspected of associating with the organization, its representatives, and its "affiliates";

4. Preliminarily and permanently enjoining Defendants Kelly Susewind and Amy Windrope in their official capacity, and their officers, agents, employees, attorneys, and all persons acting in concert with them, from continuing, directing, using, or deploying WDFW resources, personnel, counsel, or official processes to further any retaliatory investigation,



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

discipline/removal pressure, or stigmatization campaign because of Plaintiffs' protected speech, association, or petitioning, including any pressure put on commissioners or members of the public to cease constitutionally protected communications with Davis and/or WW1;

5. Preliminarily and permanently enjoining Defendants Kelly Susewind and Amy Windrope in their official capacities, from further disseminating, promoting, or publishing the Knoll Memo and/or any derivative investigative report, including the Final Investigation Report submitted April 6, 2026 and the Addendum issued July 10, 2026, to the extent such dissemination is being used as part of an ongoing retaliatory campaign that chills Plaintiffs' First Amendment rights, pending an expedited hearing and further order of the Court; or, in the alternative, ordering narrowly tailored corrective measures including (i) a meaningful opportunity for Plaintiffs' to respond and (ii) contemporaneous inclusion and distribution of Plaintiffs' responses with any public release of potentially false, defamatory, and stigmatizing allegations;

6. Declaring that communications and meetings between commissioners and Plaintiffs Davis and Washington Wildlife First are protected by the First Amendment, and that such communications may not lawfully be made the basis of findings of misconduct, of removal proceedings, or of protocols restricting commissioners' contact with advocacy organizations on the basis of the viewpoints those organizations express;

7. Awarding compensatory damages to Plaintiff Lorna Smith, against Defendants Kelly Susewind and Amy Windrope in their individual capacities, in an amount according to proof, including for emotional distress, reputational harm, impairment of Smith's ability to perform official duties free from unconstitutional retaliatory pressure, and all other damages proximately caused by Defendants' unlawful conduct;

8. Awarding compensatory damages to Plaintiff Claire Loebs Davis, against Defendants Kelly Susewind and Amy Windrope in their individual capacities, in an amount according to proof, including for reputational harm, loss of business and professional opportunities, emotional distress, and all other damages proximately caused by Defendants' unlawful conduct;

9. Awarding compensatory damages to Plaintiff Washington Wildlife First, against Defendants Kelly Susewind and Amy Windrope in their individual capacities, in an amount according to proof, including for reputational damage, loss of grants or fundraising dollars, diversion of organizational resources, impairment of effectiveness, and all other damages proximately caused by Defendants' unlawful conduct;

10. Awarding punitive damages against Defendants Kelly Susewind and Amy Windrope in their individual capacities, in an amount sufficient to punish and deter, to the extent



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

Plaintiffs prove Defendants acted with reckless or callous indifference to Plaintiffs' federally protected rights;

11. Awarding Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable authority;

12. Awarding pre-judgment and post-judgment interest as allowed by law; and

13. Granting such other and further relief as the Court may deem just and proper.

Dated: November 13, 2026

Respectfully submitted,

*/s/ Jessica L. Blome*
Jessica L. Blome (CA Bar No. 314898)
*Admitted pro hac vice*
**GREENFIRE LAW, PC**
2748 Adeline Street Ste. A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*/s/ Toby Thaler*
Toby Thaler (WA Bar No. 8318)
**LAW OFFICE OF TOBY THALER**
P.O. Box 1188
Seattle, WA 98111-1188
(206) 697-4043
toby@thaler.org

*Attorneys for Plaintiff Lorna Smith*

*/s/ Ann E. Prezyna*
Ann E. Prezyna (WA Bar No. 17572)
**ANIMAL & EARTH ADVOCATES PLLC**
2031 Fairview Ave. E Apt. A
Seattle, WA 98102-3571
(206) 910-0753
ann@animalearthlaw.com

*Attorney for Washington Wildlife First*

*/s/ Claire Loebs Davis*
Claire Loebs Davis (WA Bar No. 39812)
20520 105th Ave., SW
Vashon, WA 98070
(206) 601-8476
claire@animalearthadvocates.com

*Pro Se*



ANIMAL & EARTH ADVOCATES, PLLC
2031 FAIRVIEW AVE. E APT. A
SEATTLE, WA 98102-3571
TEL: (206) 910-0753 FAX: 206.456.5191

# Attachment 1 -Sexist, Obscene, Misogynistic Comments

First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

The list below reflects a small sample of the thousands of sexist, obscene, misogynistic, homophobic, racist and dehumanizing comments directed toward Commissioners Lorna Smith and Melanie Rowland, Washington Wildlife First ("WW1") President Claire Loebs Davis, and/or a female WW1 donor, found in emails, social media posts, blogs, and websites that discuss the allegations Washington Fish and Wildlife Director Kelly Susewind and Deputy Director Amy Windrope made against Smith, Rowland, Davis, and WW1. Content is copied directly from emails and web and social media pages last visited or reviewed by WW1 staff between September 10-24, 2026. All comments listed below were posted or emailed sometime after February 13, 2026, when the memo authored by WDFW employee Thomas Knoll Jr. was publicly released. Nearly all comments listed below were posted or emailed between July 31, 2026, the date of the public release of the Final Report and Addendum, and September 24, 2026, the date of this filing.

**Language, punctuation, syntax, and spelling are copied directly from the original; some passages are excerpted from longer comments.**

- Get those animal rights fuckin cunts out of our game department
- It's all a bunch of dumb motherfuckers that suck somebody's cock together where they need to go and the best thing for them is to be beheaded or castrated
- Sideshow will probably reward these crooked commissioners. And how do to old white women get to control Hunter and fishing laws??? Bet they have never fished or hunted in their lives
- To win a case over wwf, wfc and see that cunt smith be gone, ill gladly pony up.
- That's why DEI hire women , and so called men ,should not be running Wa game dept . They are against hunters.

# Attachment 1 -Sexist, Obscene, Misogynistic Comments

First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- What are women doing in control of a male dominated sport
- It's kind of telling and disgusting at the same time that this trend seems to be Nationwide of these women in power in places where they really don't belong but they're everywhere they have flooded our country and they're destroying it and we know this needs to stop
- None of them can tell you what a woman is. need to get rid of these DEI and woke government employees.
- Ha! Most anti hunters don't neven know what gender they are!
- Like having Muslims in office.
- Fn liberal, femanized, dems. No thought, no reason, no logic, just emotion.
- These two bitches are insane.
- Bunch of f^*king cunts trying to ban all fishing, hunting and trapping. I say bring back flogging.




- That worthless twat is just mad that the knoll report wasnt in her favor.
- keep women the fuck out of hunting and fishing.
- Hang the b******

**Attachment 1 -Sexist, Obscene, Misogynistic Comments**
First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- White women you're just like Muslims you go against everything that's America. Fuck you all wanted you liberal that boneless.…stay out of the outdoors there's no restroom and place where you could wash that dirty cunt of yours bears wouldn't even eat after they smelt that shit.

- What does that dirty Vag... know about hunting and its preservation??? She looks shady as 💩

- The Karen's infiltrate every system of government.

- more libtard BS Kalifornication at it core.




- The two mouth breeders in this picture one has a wiener and one don't but still aren't the biggest feminist. Demasculated neutered b******

- Those of the board have the faces only a hard dick could love

- This is what happens when DEI is used in the hiring process. DEI has been a disaster where ever it has been used. Why would it be any different here.

- Bitches!

- Well just look at those two dipshits they probability are the neighborhood HOA as well😂 🤣

- another clueless libtard that has no idea just money and emotions but no brains

- Look at the hunters those look like 2 respectable dudes. Look at the anti hunters they look weak sick and mentally retarded

**Attachment 1 -Sexist, Obscene, Misogynistic Comments**
First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- Toss them in prison!! BEOTCHES!!
- Run these douche bags out of town.
- They just need to fire that stupid b**** undercutting everything the Public would like
- Stop Electing women they are harmful to any sensible anything
- These are the faces of evil! Just look at them! I see nothing but evil coming from these sorry excuses for human beings.
.
- FUUUUCCKK, THATS ONE UGLY MOTHER FUCKER ! ! YA DUMB CUNT !
- Your ignorance and stupidity is destroying the eco. Your fucking feelings mean nothing and the cunts in the commision should have their brain scrambling lobotomy scheduled immediately.
- The Washington state commissioners are fags that are destroying the eco with their biased non-scientific bullshit and greed for money and power. Honestly they are as useful as a bleeding hemroid.…Typical of society today, the fucking homely and lonely women are destroying the planet. This group of greedy cunts gotta go
- Sideshow will probably reward these crooked commissioners. And how do to old white women get to control Hunter and fishing laws??? Bet they have never fished or hunted in their lives!
- Ain't no way some old hags like that need to be making decisions about hunting and fishing
- Liberal whores.
- Why would there be women on the wildlife commission?
- I've only known a handful of women that have a clue about hunting and wildlife management and most don't want to. From my observation, women are too " kind hearted" to understand the logistics of managing wildlife.
- call the karen cops and send them to the karen correction center
- She's a Can't Understand Normal Thinker
- CNTS

**Attachment 1 -Sexist, Obscene, Misogynistic Comments**
First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- Self preservation. She's afraid she'll be mistaken for a feral hog. Seems possible....

- These bitches need criminal charges against them to take away from us, hard-working individuals who enjoy the outdoors and enjoy to harvest off the land that we have given the right to. We pay the right to these bitches. They need to sit behind bars I'm talking to the metal ones fucking bullshit. I'm tired of this shit in Washington.

- They just need to fire that stupid b**** undercutting everything the Public would like

- yee haa .I just hope we get some judges with out blue hair and pride month tendancies AKA KARENS!!!




- Two stupid women infiltrating a organization with hopes of destroying the very things that they are supposed to advocate for...typical communists.

- liberal activist women "appointed" to positions such as these is the single biggest threat to conservation and stewardship. These are wretched people.

- Hey, why don't you fucking weak white people just stay in your cars and go to your office none of your hunt not one of you. Women are Annie Oakley, and not any of you men are Jack O'Connor. You have never done anything. You cannot study the outdoors by being indoors keep women the fuck out of hunting and fishing.

- Right off the bat, that woman has to go, there's your problem. Definitely a cat hoarder

- Just look at her and the half man sitting next to her. Says everything

**Attachment 1 -Sexist, Obscene, Misogynistic Comments**
First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope* US.
District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- Fucking karens
- Those of the board have the faces only a hard dick could love
- Americans have become such pushovers. Look at the Islam invasion and how we seem to be just bending over to their demands
- Oh look The two mouth breeders in this picture one has a wiener and one don't but still aren't the biggest feminist. Demasculated neutered b******
- F the anti hunting, NGO, femanotzi's. Damn, government is working against America in all directions.
- How much were these crooked ass old lady commissioners paid by the libtard anti hunting and fishing groups?
- I was thinking "what a homely old .... hag"!!
- let's see how it goes when all the harbored illegals don't have a vote in our elections…if we can get ma honest election and we show up in numbers, we can flip this state and get rid of the left wing bullshit!
- She needs to stay in her lane.
- Beetch
- bet she is a miserable karen spreading her misery apon all. Bet the thing is a cat lady. Damn the white liberal women, the most dangerous thing in america today, worse than the bite of a bob cat. LOL.
- amen. Hogs wouldn't eat her.
- that's what I thought , WOW isn't she a nasty looking pig
- the reason she wants to stop hunting...she might be mistaken for a walrus....and i dont hunt just respect the rights of those who do...
- look of a liberal nasty hog
- Fuck nazi communist democrat thief traitor cunt whore
- not holy is she butt ugly She is out of touch reality and dumb as a fucking rock.

# Attachment 1 -Sexist, Obscene, Misogynistic Comments

First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope* US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- Put that pig in prison
- Shut the old hag up !!!!!
- When you were born that ugly , you just hate life , and everyone in it.
- What a Cunt
- Well that is a face to stop any kind of erection
- Another crazy white liberal. She’s probably ok with three kids getting strangled
- Ain't she about the prettiest thing you've ever seen? 🤮Every trash can has its lid.
- This underhanded conspiracy has also been adopted by the governor of Colorado and his husband Marlon Reis, a non-elected animal rights supporter. Both Governor Polis and Marlon Reis are systematically dismantling the outdoor sportsmans rights while expanding the gay community, gay rights and supporting illegal immigration. Vote Republican
- Figures. Takes a filthy rich cunt to be involved in something that has no business in.
- What a sower old C-U-N-T this female is🙄🤦🤬🤬
- They all look the same…. Ugly fat lonely skank women, who need a lifetime of Duracell
- She would have made a perfect poster child for birth control. I bet if you took her brain out and put it in a hummingbird it would fly backwards and suck a mule's ass for a morning glory.
- Fugly bitch that!! While you're looking for the criminal activity, you should get yourselves some Search Warrants to get a peek at the Commissioner's BANK ACCOUNT INFORMATION and their VOTING RECORDS after they have had Secret meetings with this interfering Cunt with unlimited money!
- That ignorant cunt needs to be thrown in jail
- That's one ugly dude. No wonder it's an anti hunter, cause there isn't any one ever hunting that sasquatch.

# Attachment 2 – Violent, Threatening Comments

First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

The list below reflects a small sample of the thousands of violent and threatening comments directed toward Commissioners Lorna Smith and Melanie Rowland, Washington Wildlife First ("WW1") President Claire Loebs Davis, and/or a female WW1 donor, found in emails, social media posts, blogs, and websites that discuss the allegations Washington Fish and Wildlife Director Kelly Susewind and Deputy Director Amy Windrope made against Smith, Rowland, Davis, and WW1. Content is copied directly from emails and web and social media pages last visited or reviewed by WW1 staff between September 10-24, 2026. All comments listed below were posted or emailed sometime after February 13, 2026, when the memo authored by WDFW employee Thomas Knoll Jr. was publicly released. Nearly all comments listed below were posted or emailed between July 31, 2026, the date of the public release of the Final Report and Addendum, and September 24, 2026, the date of this filing.

**Language, punctuation, syntax, and spelling are copied directly from the original; some passages are excerpted from longer comments.**

- I pray all of you have a miserable death. I have to kill a dozen bears every year because there are so many now a days. They are killing my livestock on my personal property. … I will continue to pray for yourself, your family's and friends miserable deaths.… How stupid can you be? Although I pray for your miserable deaths, I also pray GOD has a special place for you so I won't have to deal with your ignorance in the after life, oh wait you won't be seeing GOD because your playing god and he doesn't tolerate people who act as if they are him.
- Run her out of the state.
- she is definitely a tyrant! Where dose she live. Someone knows. I know where several prominent democRats live, on the east side. One lives in Madison Park. Someone knows where she lives. Dox that bitch
- that lawyer could use a good fucking

**Attachment 2 – Violent, Threatening Comments**
First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- Sickem! Go after them like a dog with a bone and they're all wearing bone underwear.
- Maybe we're hunting the wrong species
- Thin the herd of the bureaucracy
- Agreed, no tag necessary, and no limit.



- I think we need a hunting stamp for lawyers because that heard needs to be thinned out especially liberal ones🤔😅
- this is why we have the second amendment.
- Sound slike a different season needs opened.
- BEAR BAIT.
- She needs to be sent out to pet a pack of wild wolves
- MAYBE ITS TIME WE HUNT THESE IDIOTS TO EXTINCTION

**Attachment 2 – Violent, Threatening Comments**
First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- Take her to the woods and fuck her.
- They don't hunt back if you destroy them first.
- it is time to hunt a different species.
- They have addresses
- When is it commissioner season again? I got 4 tags
- Shoot, shovel, and shut up.
- Names and Addresses...! 💩 💩 💩
- Time to pay them a late night visit.
- Smoke a pack a day
- Bang
- I guess we got to change our target species, to protect our rights and keep bs legislation and regulation out of the way.
- 🖕 🖕 those po💩
- Fired, then tar & feathered
- A good old rebellion is in order. Lock and load Brothers and Sisters.
- I am so so grateful for the second amendment that allows us to stop tyrannical governments from taking over. US
- Environmental Nazis are infiltrating all fish and game operations like sheep in wolves clothing. They are here to take away rights and privileges. Time to fight back every way possible.
- maybe it's time for "comminsors Season"
- Time to hunt the antis and stop this God given right to eat
- Maybe it's time for open season on the commission members.

**Attachment 2 – Violent, Threatening Comments**
First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- Who gives a shit at this point? If you don't have names and known addresses of the fucking people on both sides, nobody fucking cares. If we can't do anything about it, a k a a rope and a tree, then there's no fucking point in knowing
- About the wolves in Wa---- SSS, Repeat.... they want to play fuck-fuck,,, ok... open season....that's what happens when a loser governor picks his own cocksuckers ......
- THEY NEED TO BE DRAGGED OUT AND FIRED!! BY THE CITIZENS THEY ARE SUPOSE TO BE WORKING FOR!! THEY WORK FOR US!! 30 GUYS DRAG EM OUT AND GET THEM TARRED AND FEATHERED!!
- Hang em for it, punishment needs to equal the cost
- These pieces of shit need to be fed to the wildlife
- I bet if tags were issued for these traitors they'd become very compliant and want a nice barred room.
- Buricrats acting as self serving tyrents using their positions to violate public trust in favor of biased agendas actions Should be viewed as TREASON and punished like anyone else commiting TREASON against the State and COUNTRY. Bring back MANDITORY LYNCHING of public servents abusing their power of position!
- Lethal injection!!
- PUBLICLY HANG THE BITCH!
- Let's lock these bureaucratic pricks in cages with the overpopulated predators that they so want to "protect"...
- Take them out tie them in the woods and let the wolves and the bears eat them P.O.S. MFS
- Fuck that thats fucking treason if you ask me soak the ropes.
- Get a rope!!
- Hang them.
- ACTS OF WAR AGAINST THE PEOPLE SHOULD BE AUTOMATIC DEATH.
- Hang them for treason for breaking their oath ! Plain and simple facts . Who knows how deep that corruption will be.

# Attachment 2 – Violent, Threatening Comments

First Amended Complaint

*Washington Wildlife First et. al v Kelly Susewind and Amy Windrope*
US. District Court for the Western District of Washington
Case No. 3:26-cv-05333-TMC

- Hang them or spay and neuter them ￼
- ACTS OF WAR AGAINST THE PEOPLE SHOULD BE AUTOMATIC DEATH
- Take them to the gallows. Time to start treating traitors how traitors should be treated
- These pieces of shit need to be fed to the wildlife
- String them up It's unanimous




- Time to hunt the antis and stop this God given right to eat
- Kill those fucking CUNTS
- prosecute or just execute.
- 30 GUYS DRAG EM OUT AND GET THEM TARRED AND FEATHERED!! THEY KIND OF COME RIGHT OUT AND SAY WE ARE TAKING BRIBES FROM THE WORTHLESS ANIMAL GROUPS!! MOST LIKELY PAID OFF WITH MONEY FROM BILL UN-AMERICAN GATES, SO HE CAN GET LAB GROWN MEAT IN A STORE NEAR YOU

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing to all parties in the case who are registered users of the CM/ECF system.

/s/ Ann E. Prezyna
Ann E. Prezyna